UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ADRIAN M. ATUTIS,

                                        Plaintiff,

v.                                                          9:21-cv-00715
                                                            (DNH/TWD)

GEORGE KNAPP, et al.,

                                        Defendants.
_____

APPEARANCES:                                  OF COUNSEL:

ADRIAN M. ATUTIS
*Plaintiff, pro se*
20-A-1797
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

BROOME COUNTY ATTORNEY'S OFFICE          JENNIFER L. CHURCH, ESQ.
*Counsel for Defendants*
Broome County Office
60 Hawley St.
P.O. Box 1766
Binghamton, NY 13902

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

### I.    INTRODUCTION

        This matter has been referred for a Report and Recommendation by the Honorable David

N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Adrian M. Atutis ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 1983 alleging

wrongdoings while he was confined at the Broome County Correctional Facility ("Facility") as a

pretrial detainee.  (Dkt. No. 1.)  Following initial review of the amended complaint under 28

U.S.C. §§ 1915(e) & 1915A, only Plaintiff's Fourteenth Amendment excessive force claim

against George Knapp, Renee Stock, Nicholas Bixby, Sean Pomeroy, and Richard Hrebin

(collectively, "Defendants") remains.  (Dkt. Nos. 7, 9.)  Defendants now move for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 32.)  Plaintiff

opposes the motion and Defendants have replied.  (Dkt. Nos. 34, 35.)  For the reasons set forth

below, the Court recommends that Defendants' motion be denied.

## II.    BACKGROUND

On October 18, 2020, Plaintiff was involved in an incident with Defendants, which

admittedly involved the use of force.  (Dkt. No. 7 at 4; Dkt. No. 32-1 at ¶¶ 22-25.)  The facts and

circumstances of that use of force, however, are highly disputed.

In the verified amended complaint, Plaintiff states Defendants "beat him in a cell

extraction for no good reason."  (Dkt. No. 7 at 4.)  At approximately 12:24 a.m., Plaintiff was

quietly doing legal work in his cell in the G-Pod unit when Officer Troutman[1] told him to "go to

bed".  (Dkt. No. 34-1 at 8.)  After Plaintiff explained that he was "doing his legal work",

Troutman brought an "empty" 24-hour keep lock form and told Plaintiff to sign it.  *Id.* at 9.

Plaintiff admits that he refused to sign the form and crumpled the form into a ball, and flushed it

down the toilet.  *Id.*

Shortly after, Defendants arrived at Plaintiff's cell and told him to "get on the bed" and

"turn around."  *Id.*  Plaintiff complied.  *Id.*  Defendants then pushed Plaintiff face down into the

mattress, "piled on top of [him] and started punching [him on his] body, head, back, arms, legs,

---

[1]  All claims against Officer Troutman were dismissed on initial review of the original complaint.
(Dkt. No. 5.)

and feet." *Id*. Plaintiff was punched and kicked for approximately two to three minutes. *Id*. After he was "beaten and bruised and handcuffed," Plaintiff was then "dragged" out of his cell and taken down the corridor to the "D-Block", and beaten again. *Id.* at 10. As a result, Plaintiff suffered from bruising all over of his body, a fat lip, lacerations to his ankles and wrists, and he lost a toenail the next day. *Id*. On October 22, 2020, Plaintiff filed a grievance complaint for the "unwarranted beating." (Dkt. No. 7 at 11.)

Defendants, Officer Troutman, and other employees at the Facility present a different version of events. (Dkt. Nos. 33-3 through 33-10.) To that end, Defendants maintain that at approximately 12:18 a.m., Plaintiff disrupted quiet hours by making comments while standing in the doorway of his cell of the G-Pod unit at the Facility. (Dkt. No. 32-1 at ¶ 12.) After hearing Plaintiff's comments, Officer Troutman checked on Plaintiff to see if he was okay. *Id*. at ¶ 15. In response, Plaintiff became belligerent and made several verbal threats directed at Officer Troutman. *Id.* Officer Troutman told Plaintiff he would be receiving a 24-hour keep lock for the verbal threats. *Id*. at ¶ 17. When Officer Troutman approached Plaintiff's cell with a keep lock notice, he explained to Plaintiff that he must sign the notice or he would be transferred to the D-Pod unit, also known as the "special housing unit." *Id*. at ¶ 18. After Plaintiff was asked a third time to sign the notice, Plaintiff grabbed the form in an "aggressive manner" and "began pacing in his cell out of anger." *Id*. Plaintiff then crumbled the notice and flushed it down the toilet while stating "fuck off", which prompted Officer Troutman to call Central Control. *Id*.

At approximately 12:24 a.m., Defendants arrived to transfer Plaintiff to the D-Pod unit. *Id*. at ¶ 22. Plaintiff refused several direct orders to kneel on his bunk. *Id*. Defendants proceeded to enter Plaintiff's cell. *Id*. Upon entering Plaintiff's cell, Defendants attempted to handcuff Plaintiff, but he resisted and curled up in the fetal position. *Id*. at ¶ 23. Defendants

used "soft hands" to attempt to gain control of Plaintiff. *Id.* at ¶ 24. "When Plaintiff's resistance became more violent Defendant Pomeroy applied a hands-only bent arm technique, as well as a hands-only use of force known as the Hypoglossal pressure point technique, to attempt [to] gain control of the Plaintiff to handcuff him which was unsuccessful." *Id.* at ¶ 25.

Plaintiff refused to comply with their orders and proceeded to grab Defendants' hands, wrists, pepper spray, and batons. *Id.* at ¶ 26. In response, Defendants moved Plaintiff to the floor in an attempt to gain control, and Plaintiff violently kicked the entire time. *Id.* at ¶ 27. Plaintiff was given several orders to stop resisting and comply with orders, and he continued to refuse them all. *Id.* Defendant Hrebin then applied the "Hypoglossal pressure point technique" with "hands only" once more to place handcuffs on Plaintiff. (Dkt. No. 32-1 at ¶ 28.) Defendants gained control of Plaintiff, handcuffed him, and escorted him to the D-Pod unit without further incident. *Id.* at ¶ 29. An investigation into this incident was conducted after Plaintiff submitted a grievance complaint. *Id.* at ¶ 32. Plaintiff's allegations of assault were unfounded. *Id.*

## III.    STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

On summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996),

## IV.   DISCUSSION

### A.   Excessive Force

The Court recommends denying summary judgment to Defendants. "Excessive force claims frequently involve factual disputes that make them difficult to resolve pursuant to summary judgment." *Velleca v. Pangburn*, No. 9:20-CV-0887 (BKS/DJS), 2022 WL 2392543, at *2 (N.D.N.Y. June 2, 2022) (citation omitted), *report-recommendation adopted*, 2022 WL 2390243 (N.D.N.Y. July 1, 2022). This case is no different.

#### 1.   Legal Standard

"[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989). The Supreme Court has held that "pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). "An officer's actions can amount to punishment if they are taken with 'an expressed intent to punish.'" *Frost v. New York City Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)). Alternatively, in the absence of an expressed intent to punish, "a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398.

"[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Id.* at 397. A pretrial detainee "must show only that the force purposely or

knowingly used against him was objectively unreasonable." *Id*. at 396-97.  The "objective

reasonableness" standard "turns on the facts and circumstances of each particular case."  *Frost*,

980 F.3d at 252 (citing *Kingsley*, 576 U.S. at 397).  Courts consider several factors to determine

whether a defendant applied force reasonably including:

> the reasonableness or unreasonableness of the force used; the
> relationship between the need for the use of force and the amount
> of force used; the extent of the plaintiff's injury; any effort made
> by the officer to temper or to limit the amount of force; the severity
> of the security problem at issue; the threat reasonably perceived by
> the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397.  The determination regarding objective reasonableness is "made from

the perspective of a reasonable officer on the scene, including what the officer knew at the time,

not with 20/20 vision of hindsight."  *Id*.  The factfinder must also "take account of the legitimate

interests in managing a jail, acknowledging as part of the objective reasonableness analysis that

deference to policies and practices needed to maintain order and institutional security is

appropriate."  *Frost*, 980 F.3d at 252.

## 2.    Analysis

Here, Defendants argue Plaintiff's excessive force claim fails as a matter of law because

the record evidence demonstrates the use of force was "objectively reasonably" and "rationally

related to a legitimate governmental purpose to gain control" of Plaintiff.  *Id*. at 7-8.  However,

"resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party

against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight

Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004), the Court finds material issues of fact regarding the

amount and necessity of force preclude summary judgment.

As detailed above, the submissions on the instant motion make clear that a use of force

took place on October 18, 2020.  According to Plaintiff that force was unprovoked and

unnecessary.  Defendants maintain Plaintiff repeatedly refused to comply with direct orders and violently resisted Defendants by kicking them and attempted to remove a can of pepper spray and a baton affixed to Defendant Hrebin's duty belt.  According to Defendants, the extent of the force to gain control of Plaintiff consisted only of "soft hands" and a Hypoglossal pressure point technique.  Plaintiff expressly denies resisting orders and testified he did not kick Defendants or try to grab their batons or pepper spray.  (Dkt. No. 34-2 at 18, 20.)  Plaintiff maintains Defendants punched and kicked him for several minutes, handcuffed him, dragged him to another cell, and beat him again.  Deciding which version of events to believe requires a credibility determination best left to a jury. *Jennings v. Decker*, No. 5:17-CV-0054 (LEK/TWD), 2021 WL 3471557, at *8 (N.D.N.Y. Aug. 6, 2021); *see also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

In their reply brief, Defendants point out that Plaintiff admitted he knew what "quiet hours" meant, admitted he was asked more than once to take the keep lock form from Officer Troutman, and further admitted that he took the form, crumpled it up, and flushed it down the toilet, all of which was a disruption during quiet hours and a threat to the safety and security of the Facility.  (Dkt. No. 35 at 5.)  Thus, according to Defendants, a "reasonable" amount of force was necessary in order to handcuff Plaintiff, extract him from his cell, and transfer him to a new cell. *Id*. at 6.[2]  However, a reasonable jury could credit Plaintiff's version of events, *i.e.*,

---

[2]  Defendants further contend they acted reasonably because Plaintiff's actions "greatly interfered with the safety and security of the Facility," when he verbally threatened Officer Troutman and "actively resisted" Defendants' demands, which involved kicking the officers and his attempts to free himself from their control and to remove Defendant Hrebin's pepper spray and baton off his duty belt.  (Dkt. No. 35 at 6-7.)  However, as noted, Plaintiff expressly denies the foregoing.

Defendants punched, kicked, and restrained him with handcuffs, dragged him down the corridor

without his shoes on, and beat him again when they reached the other cell, all while Plaintiff was

not resisting and was being compliant, and find Defendants' force was unreasonable even

assuming the initial cell extraction was justified. Accordingly, a reasonable jury could find

Defendants used excessive force against Plaintiff including unnecessary and gratuitous punching,

kicking, and dragging.

Defendants also contend nothing in the record suggests Plaintiff sustained any injuries

from the incident providing further support that the use of force—consisting of "soft hands" and

applying a Hypoglossal pressure point technique—was objectively reasonable. (Dkt. No. 32-13

at 10; 35 at 6.) But contrary to Defendants' assertion, Plaintiff's submissions arguably show

Defendants kicked, punched, and dragged him while handcuffed, and beat him while restrained,

causing lacerations to his wrists and ankles, a fat lip, bruising all over his body, and trauma to his

toenail resulting in "extreme pain for weeks after the incident." (Dkt. No. 7 at 5; Dkt. No. 34-1

at 10, ¶ 10; Dkt. No. 34-1 at 31.) "A plaintiff need not demonstrate serious injury to prevail in an

excessive force claim; bruising and other nonpermanent injuries are sufficient." *Sforza v. City of

New York*, No. 07-CIV-6122, 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) (citing

*Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004); *Robison v. Via*, 821 F.2d 913,

924 (2d Cir. 1987) ("If the force used was unreasonable and excessive, the plaintiff may recover

even if the injuries inflicted were not permanent or severe.")); *see, e.g.*, *Jennings*, 2021 WL

3471557, at *9 (rejecting argument that summary judgment was appropriate on excessive force

claim where the plaintiff's "medical records do not show proof of a complaint or treatment for

injury"); *Dallio v. Sanatamore*, No. 9:06-CV-1154 (GTS/DRH), 2010 WL 125774, at *9

(N.D.N.Y. Jan. 7, 2010) (denying summary judgment due to hesitancy to resolve credibility

issues and weighing evidence on summary judgment where the plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, despite evidence showing both minor injuries the plaintiff suffered and defendants' contrary evidence); *Cicio v. Lamora*, 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *7-8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on excessive force claim despite "seemingly overwhelming" contradictory evidence, including plaintiff's very minor injury); *see also Jacoby v. Phelix*, No. 9:07-CV-872 (DNH/ATB), 2010 WL 1839299, at *8-9 (N.D.N.Y. Mar. 31, 2010) (summary judgment denied on excessive force claim where issues of fact remained both as to the nature of the interaction between defendant and plaintiff and its severity where plaintiff alleged defendant kicked and stomped on his feet causing his big toenail to fall off and defendant denied assaulting plaintiff).

Based on the foregoing, Defendants have not met their burden of showing that no genuine issue of material fact exists. Therefore, the Court recommends denying Defendants' motion for summary on the Fourteenth Amendment excessive force claim.

### B. Personal Involvement

In their reply brief, Defendants contend summary judgment is warranted because Plaintiff is unable to establish the personal involvement of Defendants. (Dkt. No. 35 at 8.) To that end, Defendants point out Plaintiff admits he could not identify or describe any Defendant (except for the sergeant because he was ordering the other officers), and "nothing from the record suggests that Plaintiff could point to a specific punch or kick thrown by any Defendant." (Dkt. No. 35 at 8; Dkt. No. 34-1 at 6, ¶ 33.) Instead, Plaintiff claims he was "beaten by a gang of officers all the while he was being compliant[.]" (Dkt. No. 34-1 at 5.) Similarly, during his deposition, Plaintiff could not attribute any specific conduct to a particular Defendant. (*See* Dkt. No. 34-1 at 20-24.)

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

A personal involvement inquiry on summary judgment "examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct." *Brandon v. Schroyer*, No. 9:13-CV-0939 (TJM/DEP), 2016 WL 1638242, at *14 (N.D.N.Y. Feb. 26, 2016) (quotation marks omitted), *report-recommendation adopted*, 2016 WL 1639904 (N.D.N.Y. Apr. 25, 2016), *rev'd on other grounds sub nom. Brandon v. Kinter*, 938 F.3d 21 (2d Cir. 2019).  A plaintiff's verified complaint and deposition testimony constitutes such evidence and "[a]ny discrepancies or inconsistencies in [the] plaintiff's testimony are for a jury to assess." *Latouche v. Tompkins*, No. 9:09-CV-308 (NAM/RFT), 2011 WL 1103045, at *5 (N.D.N.Y. Mar. 23, 2011).

A corrections officer is "personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y.2003), *aff'd sub nom. Jeffreys v. City of N.Y.*, 426 F.3d 549 (2d Cir. 2005); *accord Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010) (citing

*Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)).  Contrary to Defendants'

assertion, "a plaintiff need not establish who, among a group of officers, directly participated in

the attack and who failed to intervene."  *Jeffreys*, 275 F. Supp. 2d at 474.

Based upon the record and Plaintiff's sworn testimony, there are triable issues of fact

regarding Defendants' personal involvement.  (Dkt. No. 7 at 4; Dkt. No. 32-1 at ¶¶ 22-30.)  *Cf.*

*Scarbrough v. Thompson*, No. 10-CV-901 (TJM/CFH), 2012 WL 7761439, at *10 (N.D.N.Y.

Dec. 12, 2012) (summary judgment granted where inmate failed to allege that supervisor was

present for the extraction and directly failed to intervene to protect inmate from excessive force).

Accordingly, the Court recommends denying Defendants' motion for summary judgment on this

ground.

### C.    Qualified Immunity

Defendants further assert they are shielded from liability based on qualified immunity.

(Dkt. No. 32-13 at 10-11.)  "It is well established that qualified immunity may operate as a

defense to excessive force claims."  *Butchino v. City of Plattsburg*, No. 8:20-CV-796

(MAD/CFH), 2022 WL 137721, at *5 (N.D.N.Y. Jan. 14, 2022) (quoting *Betts v. Rodriquez*, No.

15-CV-3836, 2017 WL 2124443, at *4 (S.D.N.Y. May 15, 2017)).

"Under the doctrine of qualified immunity, 'government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010)

(quoting *Kelsey v. Cty. of Schoharie*, 567 F.3d 54, 60-61 (2d Cir. 2009)).  The Court is mindful

that qualified immunity is "'an entitlement not to stand trial or face the other burdens of

litigation,'" and that this privilege is "'effectively lost if a case is erroneously permitted to go to

trial.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The disputed amount and necessity of force in this case makes summary judgement on qualified immunity inappropriate. *See Frost*, 980 F.3d at 255 (because a dispute of facts exists, summary judgement on the defendants' qualified immunity defense is unwarranted); *Kerman v. City of New York*, 261 F.3d 229, 240 (2d. Cir. 2001) (holding "summary judgement on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness"); *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain . . . .").

Construing the facts in Plaintiff's favor, Defendants punched, kicked, restrained Plaintiff with handcuffs, dragged him down the corridor without his shoes on, and beat him again when they reached the other cell, all while Plaintiff claims he was not resisting and was being compliant. The Second Circuit caselaw clearly establishes that once restrained by officers, repeated punches may constitute excessive force. *Butchino*, 2022 WL 137721 at *6 (quoting *Garner v. Robinson*, No. 16-CIV-1548, 2018 WL 722858, *6 (S.D.N.Y. Feb. 6, 2018)); *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) (holding that it is "clearly established by our Circuit caselaw that it is impermissible to use significant force against a restrained arrestee who is not actively resisting"). Even if Plaintiff did initially resist, it is equally well established that "gratuitous force after resistance has stopped and compliance has been secured is unreasonable." *Lee v. City of Troy*, 520 F. Supp. 3d 191, 207 (N.D.N.Y. 2021) (citing *Lennox*, 968 F.3d at 157).

Accordingly, due to the factual dispute over the level of force used by Defendants and Plaintiff's level of resistance, as well as the timing of the alleged excessive force, the Court

recommends denying Defendants' motion for summary judgment on the grounds of qualified immunity.

###### D.    State Law Claims

Defendants also seek summary judgment and dismissal of any state law claims properly pled by Plaintiff because of his failure to comply with General Municipal Law § 50-e-(1), § 50-j. (Dkt. No. 32-13 at 5; Dkt. No. 35 at 4-5.)  As discussed herein, only Plaintiff's Fourteenth Amendment excessive force claim survived initial review.  (Dkt. No. 9.)  Therefore, the Court does not address this argument because no state law claims remain.

**WHEREFORE**, after carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 32) be **DENIED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[3]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

---

[3]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72, 6(a).

**IT IS SO ORDERED.**

Dated: November 23, 2022
       Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge

2022 WL 2392543
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Paul VELLECA, Plaintiff,

v.

Robert PANGBURN and Fred Ford, Defendants.

9:20-CV-0887 (BKS/DJS)
|
Signed June 2, 2022

**Attorneys and Law Firms**

PAUL VELLECA, 20-B-0586, Plaintiff, pro se, Greene Correctional Facility, P.O. Box 975, Coxsackie, New York 12051.

FRANK W. MILLER, ESQ., THOMAS J. MURPHY, ESQ., THE LAW FIRM OF FRANK W. MILLER, PLLC, Attorney for Defendants, 6575 Kirkville Road, East Syracuse, New York 13057.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 alleging that his constitutional rights were violated while he was incarcerated at the Delaware County Correctional Facility. Dkt. No. 1, Compl. Following initial review of the Complaint under 28 U.S.C. §§ 1915(e) & 1915A, three claims remain: 1) an Eighth Amendment excessive force claim against Defendants Pangburn and Ford; 2) a First Amendment retaliation claim against those Defendants; and 3) a section 1983 conspiracy claim. Dkt. No. 4 at p. 18. Defendants have now moved for summary judgment. Dkt. No. 27. Plaintiff opposes the Motion, Dkt. Nos. 34 & 39, and Defendants have replied. Dkt. Nos. 35 & 40. For the reasons set forth below, the Court recommends that Defendants' Motion be denied.

## I. BACKGROUND

The events at issue took place while Plaintiff was housed at the Delaware County Correctional Facility. Compl. at pp. 4-5. On May 6, 2020, Plaintiff was involved in an incident with Defendants Pangburn and Ford that admittedly involved the use of force. See Dkt. No. 27-3, Use of Force Report. The facts and circumstances of that use of force, however, are highly disputed.

Plaintiff states that the force was an unprovoked assault. Compl. at pp. 5-7. Plaintiff alleges that Defendants entered his cell and stated that they wanted to speak with him about grievances he had filed. Dkt. No. 39, Pl.'s Decl. at ¶ 3. Plaintiff states that he told Defendants he did not wish to speak with them about his grievances and "simply asked them to leave." *Id.* at ¶ 4. According to Plaintiff, Defendants grabbed him from his bunk and pulled him to the floor. *Id.* at ¶ 6. He alleges that one Defendant used his knee to pin Plaintiff to the ground, that his head was slammed against the wall, and that chemical agents were used. Compl. at p. 7. Plaintiff expressly denies that he charged at Defendant Ford and maintains that he complied with staff direction at all times. Pl.'s Decl. at ¶¶ 5 & 7.

Defendants present a different version of events. Neither Defendant has offered an affidavit in support of their Motion. In support of the Motion, they rely on statements [1] submitted in relation to the Use of Force report produced regarding this incident. According to those statements, Defendants went to Plaintiff's cell "to discuss his grievances." Dkt. No. 27-3, Use of Force Report at p. 6; *see also id.* at p. 8 (Defendants went "to speak to [Plaintiff] about his grievances."). According to Defendant Ford, Plaintiff became agitated and "moved quickly at me off the bed with his fist clenched while pulling it back as if to strike." Use of Force Report at p. 8. Defendant Pangburn recites a similar version of events in which Plaintiff "rose from his bunk quickly towards CO Ford with a clenched fist." *Id.* at p. 6. Defendants maintain that Plaintiff was then taken to the ground and handcuffed before being removed from his cell. *Id.* Defendants concede that a chemical agent was used during this encounter. *Id.* Defendants agree that a "Code Red" was called by Defendant Pangburn during the incident. Dkt. No. 27-8, Defs.' Rule 56.1 St. at ¶ 7.

[1]     The statement of Defendant Ford appears to be sworn to under penalty of perjury, Dkt No. 27-3 at p. 8, but the same is not true of Defendant Pangburn's statement. *Id.* at p. 6.

## II. STANDARD OF REVIEW

**\*2** Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett, 477* U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(C); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). In considering a summary judgment motion, the Court's role "is carefully limited to discerning whether there are any genuine issues of material fact to be tried." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), accord, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

### A. Plaintiff's Excessive Force Claim

The Court recommends that summary judgment be denied as to Plaintiff's excessive force claim. "Excessive force claims frequently involve factual disputes that make them difficult to resolve pursuant to summary judgment." *Savage v. Acquino*, 2018 WL 1478254, at \*7 (W.D.N.Y. Mar. 23, 2018). This case is no different.

"The Eighth Amendment prohibition on cruel and unusual punishments precludes the unnecessary and wanton infliction of pain and protects inmates against the use of excessive force." *Jones v. Rock*, 2013 WL 4804500, at \*17 (N.D.N.Y. Sept. 6, 2013) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). [2] Eighth Amendment excessive force claims have both objective and subjective elements. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Hudson v. McMillian*, 503 U.S. at 8). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright v. Goord*, 554 F.3d at 268).

2      Defendants argue that this claim is governed under a Fourteenth Amendment due process standard, Dkt. No. 27-9, Defs.' Mem. of Law at pp. 2-3. While that standard would apply if Plaintiff was a pretrial detainee, his actual status at the time of this incident is not clear from the record. The only reference to it is Defendants' statement that Plaintiff was "a post arrest and post disposition prisoner." *Id.* at p. 4. Plaintiff pled an Eighth Amendment violation, Compl. at p. 11, and the District Court found an Eighth Amendment claim survived initial review, Dkt. No. 4 at p. 18, and so that is the claim considered here.

**\*3** The record before the Court is insufficient to recommend dismissing Plaintiff's excessive force case on the present Motion. It is not a close case. The submissions on the Motion make clear that a use of force took place inside Plaintiff's cell. According to Plaintiff that force was unprovoked and

unnecessary. *See generally* Pl.'s Decl. at ¶¶ 3-7. Defendants maintain that Plaintiff aggressively moved toward Defendant Ford with a clenched fist. Use of Force Report at pp. 6 & 8. Plaintiff expressly denies that allegation. In opposing the Motion, Plaintiff states that "[a]t no time did Plaintiff approach Defendant Ford with a clenched fist or in a threatening manner." Pl.'s Decl. at ¶ 5. He maintains that he was compliant at all times. *Id.* at ¶ 7. Plaintiff contends that despite this compliance he was dragged from his bed, had his head slammed against a wall, and was sprayed with a chemical agent. *Id.* at ¶¶ 5-9.

> If plaintiff's testimony is credited, a reasonable factfinder could find the defendants' actions wanton and malicious. As plaintiff described, the need for force in response to compliant and non-threatening behavior could be deemed malicious. Plaintiff's testimony could establish that the use of force was an unnecessary tactic implemented not to restore or maintain order, but to maliciously assault an inmate for no apparent reason, which could constitute a per se constitutional violation.

*Brown v. Dubois*, 2017 WL 2983305, at *9 (N.D.N.Y. June 16, 2017), *report and recommendation adopted*, 2017 WL 2983011 (N.D.N.Y. July 12, 2017).

As a result, this case "presents quintessential fact questions that cannot be resolved on summary judgment." *McGinnis v. Crissell*, 2018 WL 4635707, at *4 (N.D.N.Y. Apr. 18, 2018), *report and recommendation adopted*, 2018 WL 3970668 (N.D.N.Y. Aug. 20, 2018). [3] For these reasons, Defendants' Motion for Summary Judgment should be denied as to the excessive force claim. [4]

[3]     The Court notes, in addition, that the same questions of fact would preclude summary judgment even if the claim were considered under the Fourteenth Amendment due process theory briefed by Defendants.

[4]     Those same factual questions also preclude granting summary judgment based on qualified immunity since the right to be free from excessive force is clearly established. *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness."); *Kavanaugh v. Vill. of Green Island*, 2018 WL 1033288, at *6 (N.D.N.Y. Feb. 22, 2018); *Swift v. Mauro*, 2008 WL 207793, at *7 (N.D.N.Y. Jan. 24, 2008).

**B. Plaintiff's Retaliation Claim**

Plaintiff asserts a First Amendment retaliation claim alleging that the assault at issue took place, at least in part, to retaliate against Plaintiff for the exercise of his constitutional rights. Compl. at pp. 5-7. Defendants seek summary judgment on this claim on the ground that it is "legally deficient" because Plaintiff has offered no evidence to support his allegations. Defs'. Mem. of Law at p. 5.

"To prevail on a First Amendment retaliation claim, an inmate must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action.' " *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)). The plaintiff must establish that "the protected conduct was a substantial or motivating factor" behind the retaliatory action. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). The Second Circuit has warned that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)). This is true because given the nature of a retaliation claim they are "easily fabricated" and as a result "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d at 491.

**\*4** The first element of Plaintiff's retaliation claim is the presence of protected activity. *Holland v. Goord*, 758 F.3d at 225. An inmate's filing of grievances is clearly activity protected by the First Amendment. *Davis v. Goord*, 320 F.3d

346, 352 (2d Cir. 2003) (citing cases). There is no dispute that the interaction between Plaintiff and Defendants on May 6th began when Defendants came to Plaintiff's cell to discuss grievances he had filed. Compl. at p. 5; Defs.' Rule 56.1 St. at ¶ 2.

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes v. Walker*, 239 F.3d at 493. Plaintiff has also plausibly alleged that he suffered such action. He claims he was assaulted by Defendants as a result of his grievances. Compl. at pp. 5-7. Plaintiff's "claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing cases).

Defendants argue, in rather conclusory fashion, that Plaintiff's claim is itself conclusory. Defs.' Mem. of Law at p. 5. They rely on the lack of "independent proof" to support Plaintiff's claims. *Id.* On summary judgment the record must be viewed in the light most favorable to Plaintiff. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). As noted, the record before the Court is that Defendants admittedly went to Plaintiff's cell to discuss prior grievances filed by Plaintiff. Defs.' Rule 56.1 St. at ¶ 2. Viewed in the light most favorable to Plaintiff, he refused to discuss the grievances with Defendants, and Defendants, including Pangburn, who is alleged to have discussed becoming involved in a use of force with Plaintiff just the night before, proceeded to assault Plaintiff. Pl.'s Decl. at ¶¶ 3-7 & 10. That evidence is sufficient for purposes of summary judgment to at least raise a question of fact as to the causal connection element. *See Espinal v. Goord*, 558 F.3d at 129 ("we find that the passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers, ... is sufficient to support an inference of a causal connection."). In sum, "[t]he questions of fact that preclude summary judgment on Plaintiff's excessive force claim, ... lead to a similar conclusion here." *Vasquez v. Russell*, 2018 WL 5728041, at *6 (N.D.N.Y. Aug. 10, 2018), *report and recommendation adopted*, 2018 WL 4521203 (N.D.N.Y. Sept. 21, 2018); *see also Barnes v. Fischer*, 2018 WL 5660414, at *18 (N.D.N.Y. Mar. 16, 2018), *report and recommendation adopted*, 2018 WL 4660380 (N.D.N.Y. Sept. 28, 2018) (similar).

Accordingly, the Court recommends that Defendants' Motion be denied. [5]

**5** Defendants also seek qualified immunity with respect to this claim on the ground that the right is not clearly established. Defs.' Mem. of Law at p. 9. However, "[i]t was clearly established in 2006 that officers could not assault an inmate by slamming his head into the wall in retaliation for the filing of grievances." *Quezada v. Ercole*, 2011 WL 3251811, at *6 (S.D.N.Y. July 29, 2011); *see also Edwards v. McGrain*, 2012 WL 6701826, at *8 (W.D.N.Y. Dec. 26, 2012). Given the factual questions presented, qualified immunity is not appropriate.

### C. Plaintiff's Conspiracy Claim

**\*5** Finally, the Court previously recognized that the Complaint also asserts a section 1983 conspiracy claim. Dkt. No. 4 at pp. 16-17. Defendants also seek dismissal of this claim on the ground that there is simply no evidence to support it. Defs.' Mem. of Law at pp. 6-7.

"To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights ... secured by the Constitution or the federal courts. Conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983." *O'Neil v. Bebee*, 2010 WL 502948, at *9 (N.D.N.Y. Feb. 10, 2010) (internal citations and quotation marks omitted). Here, however, Plaintiff specifically alleges that Defendants conspired against him the day prior to the use of force. He alleges that Defendant Pangburn told another officer the night before this incident that he planned to call a "code red" regarding Plaintiff the next day. Pl.'s Decl. at ¶ 10. A "code red" was called by Pangburn during the use of force the next day. Defs.' Rule 56.1 St. at ¶ 7. In light of these allegations,

> If the plaintiff's account is believed by a jury, then the defendants were not coordinating to implement official policy, but rather acting in concert to exact retaliation that was personal, rather than official, in nature. The defendants also argue that the section

1983 conspiracy claim is not supported by evidence, but rests instead on purely conclusory allegations. The jury could conclude that the plaintiff's account of his [assault] provides sufficient circumstantial evidence of coordination to prove a meeting of the minds regarding the retaliatory [assault] of the plaintiff. The section 1983 conspiracy claim presents questions of fact that must go to a jury.

*Walsh v. City of New York*, 2016 WL 3648370, at *3 (S.D.N.Y. June 30, 2016) (internal quotation and citation omitted).

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 27) be **DENIED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days [6] within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[6]     If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2022 WL 2392543

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2390243
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Paul VELLECA, Plaintiff,

v.

Robert PANGBURN, et al., Defendants.

9:20-cv-887 (BKS/DJS)
|
Signed July 1, 2022

**Attorneys and Law Firms**

Plaintiff pro se: Paul Velleca, 20-B-0586, Greene Correctional Facility, P.O. Box 975, Coxsackie, NY 12051.

For Defendants: Frank W. Miller, Thomas J. Murphy, The Law Firm of Frank W. Miller, 6575 Kirkville Road, East Syracuse, NY 13057.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

 **\*1** Plaintiff Paul Velleca, a New York State inmate proceeding pro se, commenced this civil rights action under 42 U.S.C. § 1983, raising claims arising out of his incarceration at the Delaware County Jail. (Dkt. No. 1). On October 22, 2021, Defendants filed a motion for summary judgment under Fed. R. Civ. P. 56. (Dkt. No. 27). The motion was fully briefed, with a response filed by Plaintiff and a reply filed by Defendants. (Dkt. Nos. 34, 40). This matter was referred to United States Magistrate Judge

Daniel J. Stewart who, on June 2, 2022, issued a Report-Recommendation recommending that Defendants' motion for summary judgment be denied. (Dkt. No. 42). Magistrate Judge Stewart advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. (*Id.* at 12–13). No objections to the Report-Recommendation have been filed.

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Court adopts the Report-Recommendation in its entirety.

For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 42) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 27) is **DENIED;** and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 2390243

**End of Document**      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3471557
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Tony JENNINGS, Plaintiff,

v.

Jeremy DECKER, et al., Defendants.

5:17-CV-0054 (LEK/TWD)
|
Signed 08/06/2021

**Attorneys and Law Firms**

Kevin M. Cannizzaro, Kevin M. Cannizzaro-Attorney at Law, Albany, NY, for Plaintiff.

Tony Jennings, Moravia, NY, Pro Se.

Patrick R. Blood, City of Syracuse Law Department, Christina F. DeJoseph, Sarah Mae Knickerbocker, City of Syracuse Corporation Counsel, Syracuse, NY, for Defendants Jeremy Decker, Darren Ettinger, City of Syracuse.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, Senior United States District Judge

**I. INTRODUCTION**

**\*1** On January 19, 2017, Tony Jennings commenced this 42 U.S.C. § 1983 action against the City of Syracuse [1] and two officers employed by the Syracuse Police Department: Officer Jeremy Decker and Officer Darren Ettinger. [2] Dkt. No. 1 ("Complaint"); see also Dkt. No. 1-1 ("Preliminary Statement of Facts"). Plaintiff's claims arise out of circumstances surrounding his January 5, 2015 arrest in Syracuse, New York. See Compl. Now before the Court is Defendants' second motion for summary judgment, filed on July 27, 2020 along with a memorandum and statement of material facts ("SMF"). Dkt. Nos. 127 ("Motion"), 127-19 ("Defendants' SMF"), 127-20 ("Defendants' Memorandum"). Plaintiff opposes the Motion and submits his cross-motion for summary judgment. Dkt. Nos. 138 ("Cross-Motion"), 138-16 ("Plaintiff's Response to SMF"), 138-17 ("Plaintiff's SMF"), 138-18 ("Plaintiff's Memorandum"). Defendants, in turn, oppose Plaintiffs Cross-Motion. Dkt. No. 146 ("Defendant's Reply"). For the reasons

set forth below, Defendants' Motion is granted in part and denied in part, and Plaintiff's Cross-Motion is denied.

[1]   Plaintiff's initial pleading named the Syracuse Police Department as a defendant, not the City of Syracuse. Dkt. No. 1 at 1. However, in a report-recommendation issued May 2017, the Honorable David E. Peebles, U.S. Magistrate Judge, determined that "[t]he Syracuse Police Department is an agency of the City of Syracuse and not an independent entity subject to suit." Dkt. No. 7 ("Report-Recommendation") at 6. Judge Peebles recommended that the Syracuse Police Department be dismissed as a defendant and replaced with the City of Syracuse, id. at 8, a suggestion later adopted and implemented by the Court, Dkt. No. 15 ("June Order") at 2.

[2]   Officer Robert Ocker was also named as a defendant in the original complaint. Dkt. No. 1 at 1. Ocker was dismissed as a defendant pursuant to the Court's grant of partial summary judgment issued January 17, 2019. Dkt No. 62.

**II. BACKGROUND**

**A. Factual Background**

The record and materials submitted in connection with the Motion and Cross-Motion make clear that the Plaintiff and Defendants allege significantly different narratives surrounding Plaintiff's arrest. Their respective versions of events are set forth below.

*1. Defendants' Version of Events*

On January 5, 2016, officers Decker and Ettinger were patrolling together in the Pioneer Homes housing complex in Syracuse, New York. Defendants' SMF at 1; Dkt 127-11 ("Decker Deposition") at 23–24; Dkt. No. 127-12 ("Ettinger Deposition") at 74. Both officers were members of the Crime Reduction Team ("CRT"), a "proactive" police unit focused on reducing crime and gun violence in high crime areas. Decker Dep. at 12, 15.

During their patrol, Defendants approached the 100 block of Radisson Court where they encountered a parked vehicle occupied by two individuals, Plaintiff and his friend Willie Jones. Defs.' SMF at 1–2. Defendants immediately noticed

the individuals look at them, then turn and "make furtive movements toward their laps, looking down as if they were attempting to hide" items. Defs.' SMF at 2; Ettinger Dep. at 86. The officers parked and exited their patrol vehicle. Id. Decker approached the driver's side of Plaintiff's car while Ettinger approached the passenger side and began talking to Mr. Jones who was seated in the front passenger seat. Defs.' SMF at 2; Ettinger Dep. at 93–95; Dkt. No. 127-5 ("Decker Suppression Hearing Testimony") at 7, 10, 25, 35.

**\*2** Decker observed a black digital scale with white residue in the front console area of Plaintiff's vehicle. Defs.' SMF at 3; Decker Sup'n Hr'g Test. at 7, 10–11. Decker recovered the scale and asked Plaintiff and Jones if they had drugs, which they denied. Decker Dep. at 53; Decker Sup'n Hr'g Test. at 12. Ettinger asked Jones to step out of the car and placed him in handcuffs. Ettinger Dep. at 95. Decker then asked Plaintiff to step out of the car and Plaintiff complied. Defs.' SMF at 5; Decker Dep. at 57.

Decker ordered Plaintiff to turn and put his hands on the vehicle and proceeded to search Plaintiff for contraband. Decker Dep. at 59. Plaintiff turned, "violently pulled away and fled on foot." Dkt. No. 127-4 ("Ettinger Suppression Hearing Testimony") at 14; Defs.' SMF at 6. Decker "tackled Plaintiff from behind and the two landed on the ground." Defs.' SMF at 7. Decker ordered Plaintiff to put his hands behind his back, but Plaintiff continued to struggle, keeping his hands under his body to push off the ground and get away or, it appeared, to grab a weapon. Decker Sup'n Hr'g Test. at 13; Defs.' SMF at 8.

Ettinger left Jones by the passenger side of Plaintiff's car and ran to Decker and Plaintiff on the ground. Ettinger Dep. at 118. Ettinger tried to aid Decker by pulling Plaintiff's hands behind his back but was unable to do so. Id.; Defs.' SMF at 8. Ettinger then struck Plaintiff once on the right side of the head, after which they were able to secure Plaintiff's arms behind his back and place him in handcuffs. Ettinger Dep. at 118; Defs.' SMF at 8.

Once Plaintiff had been handcuffed, Decker resumed his search of Plaintiff's person and car and Ettinger resumed speaking with Jones. Ettinger Supp'n Hr'g Test. at 15. During the search, Decker found crack cocaine wrapped in plastic, two cell phones, and a few hundred dollars in cash. Decker Supp'n hr'g Test. at 13–14; Defs.' SMF at 10.

Decker and Ettinger took Plaintiff to the Onondaga Justice Center, where he was charged with two counts of criminal possession of a controlled substance. Defs.' SMF at 11. Plaintiff declined medical attention on the scene and did not claim to be injured during booking, nor did he ever seek treatment for any alleged injury sustained. Id. at 10–12.

### 2. Plaintiff's Version of Events

On January 5, 2016 around 6:30 P.M. Plaintiff and Willie Jones were sitting in Plaintiff's car in the parking lot of Radisson Court, part of the Pioneer Homes housing complex in Syracuse, NY. Pl.'s SMF at 5; Dkt. No. 127-13, ("Jennings Deposition") at 2. The pair had stopped to return Jones to his girlfriend's home in Pioneer Homes after attempting to fix Jones' car, which had broken down elsewhere. Jennings Dep. at 25. Jones stepped out of Plaintiff's vehicle and began removing his tools from inside the car. Pl.'s SMF at 5; Jennings Dep. at 28.

At around this time, Ettinger and Decker were patrolling in the Pioneer Homes area and pulled into Radisson Court. Pl.'s SMF at 5. The two officers were part of the CRT, a unit in the Syracuse Police Department that regularly patrols high crime areas, is more proactive and aggressive than other units, makes more arrests, and regularly arrests for minor offenses. Id. at 2. The Syracuse Housing Authority had designated the members of the Syracuse Police Department as agents for enforcing trespassing laws on Housing Authority property. Id. at 3–4. Ettinger believed this designation allowed him to stop any individual on Pioneer Homes property to determine if they had lawful business there. Id. at 4.

**\*3** As Decker and Ettinger scanned the parking lot, they noticed Plaintiff and Jones sitting in Plaintiff's vehicle. Id. at 6. Decker and Ettinger could only see the pair's shoulders and upper torsos, but believed they were making furtive movements. Id. Decker and Ettinger stopped their cruiser behind Plaintiff's black Acura, both exited the cruiser and approached the passenger side of Plaintiff's vehicle. Jennings Dep. at 30; Pl.'s SMF at 7. Ettinger proceeded to question Jones, place him in handcuffs, and search him. Jennings Dep. at 31–32; Dkt. No. 127-14 ("Jones Deposition") at 26.

Plaintiff opened his car door, intending to step out and "assess the situation." Pl.'s SMF at 7; Jennings Dep. at 33. Decker ran around the car to block Plaintiff's exit and began to question

Plaintiff, asking if he had drugs or guns. Jennings Dep. at 34; Pl.'s SMF at 7.

Decker ordered Plaintiff to step out of the vehicle and place his hands on the hood of the car. Jennings Dep. at 40. Decker began to search Plaintiff. Id. at 43. At no point did Plaintiff run or try to escape. Pl.'s SMF at 8. During the search, Plaintiff "turned around to protest Decker's placement of his hands inside [Plaintiff's] pants." Pl.'s SMF at 8; Jennings Dep. at 51. Decker grabbed Plaintiff by the coat and pants and "violently slammed him to the ground and onto the hard pavement." Pl.'s SMF at 8; Jennings Dep. at 51. Plaintiff immediately attempted to put his arms behind his back and did not resist or try to strike or harm Decker in any way. Pl.'s SMF at 8; Jennings Dep. at 46, 51. Nevertheless, Decker landed on top of Plaintiff and proceeded to strike him. Pl.'s SMF at 8; Jones Dep. at 37–38. Ettinger ran from the passenger side of Plaintiff's car and struck Plaintiff in the face with a closed fist as Plaintiff lay face down on the ground with his arms behind his back. Jennings Dep. at 56; Jones Dep. at 40–41. Neither officer instructed Plaintiff to stop resisting or put his hands behind his back. Jennings Dep. at 56; Pl.'s SMF at 9.

After Ettinger struck Plaintiff, Decker and Ettinger placed him in handcuffs. Pl.'s SMF at 9. Plaintiff was transported to Onondaga County Justice Center and booked. Id. Plaintiff was bleeding from his nose immediately after the incident. Jones Dep. at 44. Plaintiff reported pain around his right eye to the Justice Center medical department and suffered pain in his knee and ribs as a result of the incident. Dkt. No. 127-17 ("50-h Hearing Testimony") at 13–14; Pl.'s SMF at 9; Jennings Dep. at 147. Plaintiff was not offered, and did not refuse, any medical treatment at the scene. Pl.'s SMF at 9.

### B. Procedural History

The procedural history of this case up to the filing of the Defendants' first motion for summary judgment is fully set forth in this Court's Memorandum-Decision and Order, Dkt. No. 62, familiarity with which is assumed. On January 17, 2019, Defendants' first motion for summary judgment was granted in part and denied in part, with Plaintiff's claims for Fourteenth Amendment racial profiling against Decker and Ettinger, Plaintiff's claim based on Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) against the City of Syracuse, and Plaintiff's Fourth Amendment excessive force claim against Decker and Ettinger surviving. Id.

On March 26, 2019, Plaintiff was appointed pro-bono counsel in preparation for trial. Dkt. No. 71. On May 20, 2019, the Court granted Plaintiff's request to reopen discovery. Dkt. Nos. 75, 80.

On February 6, 2020, Defendants requested, and were granted, permission to file a dispositive motion. Dkt. Nos. 121, 123. On July 27, 2020, Defendants filed the instant motion for summary judgment, which has since been fully briefed. Defendants argue that (1) Plaintiff's racial profiling claim should be dismissed because there is no evidence on the record to establish discriminatory intent, Plaintiff has failed to show a group of similarly situated individuals, and the doctrine set forth in Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) bars the claim; (2) Plaintiff's Monell claim should be dismissed because the underlying racial profiling claim has been dismissed; and (3) Plaintiff's excessive force claim must be dismissed because the level of force used was reasonable as a matter of law, Plaintiff suffered no physical injury, and Decker and Ettinger are entitled to qualified immunity.

**\*4** On October 30, 2020, Plaintiff submitted his opposition to Defendant's Motion as well as his own cross-motion for summary judgment. Dkt. No. 138. Plaintiff argues he is entitled to summary judgment on his excessive force claim because the force used by Defendants was unreasonable as a matter of law.

### III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."). The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate

the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322, 106 S.Ct. 2548.

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. Fourteenth Amendment Racial Profiling Claim against Decker and Ettinger

The Equal Protection Clause of the Fourteenth Amendment mandates that no state shall deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1. "To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race." Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000) (citing Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)).

There are several avenues a plaintiff may take to plead intentional racial discrimination in violation of the Equal Protection Clause. A plaintiff may allege that a law or policy expressly classifies persons on the basis of race, a facially neutral law or policy is applied in an intentionally discriminatory manner, or a facially neutral statute or policy was motivated by discriminatory animus and has an adverse, discriminatory effect. See Brown, 221 F.3d at 337; see also Hayden, 180 F.3d at 43; Miller v. Terrillion, 391 F. Supp. 3d 217, 224–25 (E.D.N.Y. 2019). A plaintiff may also allege that government actors engaged in selective enforcement or selective prosecution based on the impermissible consideration of race. Miller, 391 F.Supp.3d at 225 (treating equal protection claim for racial profiling as selective prosecution based on race); Anderson v. City of New York, 817 F. Supp. 2d 77, 93–94 (E.D.N.Y. 2011) ("[T]he crux of plaintiff's allegations [regarding being arrested due to race] is a claim of selective enforcement/prosecution and denial of equal protection under the Fourteenth Amendment."); Faccio v. Eggleston, No. 10-CV-783, 2011 WL 3666588 at *8 (N.D.N.Y Aug. 22, 2011) ("Plaintiffs' allegations of racial profiling will be construed as a claim ... of selective prosecution in violation of the Equal Protection Clause.").

**\*5** The parties dispute whether Plaintiff's racial profiling claim is properly categorized as selective enforcement and prosecution or as an application of a facially neutral law in an intentionally discriminatory manner. Defs.' Mem. at 4; Pl.'s Mem. at 12–13. A selective enforcement or prosecution claim requires the plaintiff to show a better treated, similarly situated group, whereas a plaintiff alleging racist application of a neutral law does not. Coward v. Town & Vill. of Harrison, 665 F. Supp. 2d 281, 303 (S.D.N.Y. 2009) (citations omitted) (quoting Pyke v. Cuomo, 258 F.3d 107, 109–110 (2d Cir. 2001)) (holding that a plaintiff who "alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner ... is not obligated to show a better treated, similarly situated group of individuals ... [but] a plaintiff alleging a claim of selective prosecution ... must").

However, the Court need not resolve this dispute. Both avenues require a showing of discriminatory intent. Compare Anderson v. City of N.Y., 817 F. Supp. 2d 77, 93 (E.D.N.Y. 2011) (dismissing claim of selective prosecution and enforcement on summary judgment because plaintiff was "unable to offer any evidence that defendants acted with purposeful discrimination based on his race") with Pyke, 258 F.3d at 110 ("Plaintiffs will, of course, be required to substantiate their claim that [the discriminatory application of the neutral policy] ... was motivated by racial discrimination"); see also Brown, 221 F.3d at 337 ("To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor *intentionally discriminated* against him on the basis of his race.") (emphasis added). Even drawing all inferences in Plaintiff's favor, the record does not provide evidence from which a reasonable jury could find that Decker and Ettinger acted with discriminatory intent. Thus, Plaintiff's claim of racial profiling must be dismissed regardless of which theory his claim pursues.

2021 WL 3471557

To establish discriminatory intent, a plaintiff must show that a discriminatory purpose was a motivating factor in the challenged action. In other words, a plaintiff must provide evidence that the particular course of action at issue was chosen "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Miller, 391 F. Supp. 3d at 225, (quoting Floyd v. City of N.Y., 959 F. Supp. 2d 540, 571 (S.D.N.Y. 2013)); see also Hayden, 180 F.3d at 51 ("Discriminatory purpose 'implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.' ") (quoting Personnel Administrator v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)). This evidence may be direct or circumstantial, since "discriminatory intent is rarely susceptible to direct proof." Miller, 391 F. Supp. 3d at 225 (quoting Floyd, 959 F. Supp. 2d at 571).

Plaintiff does not offer any direct evidence of Defendants' discriminatory intent, but does offer theories based on circumstantial evidence, none of which are availing.

First, Plaintiff asserts there were no reports of crimes or suspicious activity in the Pioneer Homes area where Plaintiff was parked on the night of the arrest and the vehicle itself was "innocuous." Pl.'s Mem. at 14–15. Plaintiff seemingly argues that a reasonable jury could use this absence of apparent motivation to infer that Defendants' decision to approach Plaintiff's vehicle was motivated by racism. Id. Even if an absence of evidence as to motivation could reasonably give rise to such an inference, this is not an accurate representation of the record which establishes that Plaintiff and Jones made furtive movements after Defendants spotted them in Plaintiff's car. [3] Dkt. Nos. 127-12 ("Ettinger Dep.") at 85; 127-11("Decker Dep.") at 33; Pl.'s SMF at 6. Thus, Plaintiff is incorrect in arguing Defendants had no reason to approach the vehicle, or that there is an absence of evidence as to apparent motivation.

[3]     Plaintiff, arguably, has asserted that he did not make furtive movements. Jennings Dep., at 37; Pl.'s Resp. to SMF at 3–4. At the summary judgment state, the Court would normally make all rational inferences in Plaintiff's favor and accept this assertion as true. However, the Court is unable to do so because of the doctrine set forth in Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Heck prohibits a party from recovering damages under § 1983 for "harm caused

by actions whose unlawfulness would render a conviction or sentence invalid." Id. In Plaintiff's New York state criminal proceedings, the criminal court found that Plaintiff did indeed engage in furtive movements and, significantly, relied on that finding to deny Plaintiff's motion to suppress evidence obtained during the traffic stop at issue, evidence upon which his criminal convictions for possession of a controlled substance were based. Dkt. 127-6 ("Suppression Hearing Order"), at 8. If Plaintiff claims that Defendants' actions were unlawful because Plaintiff did not engage in those furtive movements, the success of that claim would thus necessarily render Plaintiff's criminal conviction invalid and would be barred by Heck. 512 U.S. at 487, 114 S.Ct. 2364 (a claim may proceed only if, "even if successful, [it] will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff."). Thus, Plaintiff may not now assert that he did not engage in furtive movements. This may be why Plaintiff acknowledges such furtive movements in his Memorandum. Pl.'s Mem. at 15. Additionally, whether Plaintiff made furtive movements was an issue that was litigated and decided against him in his criminal trial, therefore it is not an issue of triable fact here. See Hardy v. Plante, No. 6-CV-687, 2009 WL 249787, at *4–5 (N.D.N.Y. 2009) ("While a court on a summary judgment motion must credit all rational factual inferences in favor of the party opposing summary judgment, Hardy's conviction for resisting arrest prevents him from asserting factual allegations or legal arguments that have been litigated and decided against him in his criminal trial."); Diggs v. New York Police Dep't, No. 04-CV-1846, 2005 WL 3533158 (E.D.N.Y. 2005) (holding that plaintiff's possession of a weapon was litigated and decided against him in his criminal trial and thus was not a triable issue of fact on summary judgment for § 1983 suit).

*6 Second, Plaintiff points out that Defendants were members of the Syracuse Police Department's CRT, "a highly aggressive unit known for proactively making arresting [sic] individuals for minor crimes while patrolling a predominately minority area of the city" designated as being high crime. Pl.'s Mem. at 14–15. However, Defendants' mere membership in a proactive, aggressive policing unit does not reasonably lead to an inference that Defendants' actions the night of

2021 WL 3471557

the arrest were motivated by race. The fact that Defendants were patrolling a high crime, predominantly minority area likewise does not reasonably give rise to an inference of discriminatory intent. Beyond the fact that it is common for police to assign resources to high crime areas, Floyd, 959 F. Supp. 2d at 562 ("I recognize that the police will deploy their limited resources to high crime areas."), it is undisputed that Defendants were not responsible for deciding which areas of the city they patrolled, Decker Dep. at 27. Thus, Defendants' presence in a specific area is not evidence of intent in their encounter with Plaintiff.

Third, Plaintiff argues there are significant issues of fact regarding whether the CRT enforced the facially neutral New York State trespassing law in a racist fashion, because the Housing Authority had requested the CRT patrol predominantly African American areas of the city. See Pl.'s Mem. at 15. However, such an allegation does not bear on the motives or intent of Defendants themselves during their interaction with Plaintiff, because it is not alleged that the Defendants were in any way responsible for the policy or enforcement decisions of the CRT or the Housing Authority.

Plaintiff does claim Defendants mistreated him and used excessive force against him. While "mistreatment by defendants is not irrelevant in assessing the strength of plaintiff's circumstantial evidence of race-based animus, it is certainly not sufficient to establish it." Lizardo v. Denny's, Inc., 270 F.3d 94, 102 (2d Cir. 2001).

Drawing all reasonable inferences in favor of Plaintiff, the record demonstrates only that two white police officers, members of a proactive crime unit assigned to patrol a high crime area, approached Plaintiff and Jones—two black males —after seeing furtive movements, and engaged in excessive force during their encounter. These allegations, taken individually or together, are insufficient for Plaintiff's claim to survive summary judgment. The only facts supporting an inference of racial motivation is the racial discrepancy between Plaintiff and Defendants, and Plaintiff's asserted belief that the encounter was racially motivated. From this record, no reasonable jury could find the existence of discriminatory intent on part of Defendants. See Miller, 391 F. Supp. 3d at 225 ("The mere fact that Defendant is white and Plaintiff is black does not mean that Defendant's arrest of Plaintiff was motivated by Plaintiff's race."); Coggins v. County of Nassau, 254 F. Supp. 3d 500, 511–15 (E.D.N.Y. 2017) (granting summary judgment and dismissing § 1981 discrimination claim because "the only evidence of racial

animus [was] plaintiff's belief that [his] arrest was racially motivated").

**B. Monell Claim against the City of Syracuse**

A Monell claim for municipal liability cannot survive absent an underlying constitutional violation. See Pinter v. City of New York, 448 F. App'x 99, 106 (2d Cir. 2011) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)) (dismissing Monell claim because "if [the officer] inflicted no constitutional injury on respondent, it is inconceivable that [the city] could be liable to respondent."). Plaintiff's Monell claim is premised entirely upon his Fourteenth Amendment racial profiling claim. Dkt. No. 111 ("[The] Court finds [P]laintiff's Monell claims and related discovery are limited to a claim of improper policy, custom or practice regarding racial profiling"). As that Fourteenth Amendment claim is dismissed, Plaintiff's Monell claim is likewise dismissed.

**C. Fourth Amendment Excessive Force Claim against Decker and Ettinger**

 **\*7** The Court reaches a different result regarding the Fourth Amendment Excessive Force claim against Decker and Ettinger.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. This has been interpreted to "protect persons from the use of excessive force by state police officers incident to an arrest." Messina v. Mazzeo, 854 F. Supp. 116, 128 n.6 (E.D.N.Y. 1994) (citing Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Fourth Amendment claims of excessive force are governed by an objective reasonableness standard, such that no claim will lie when "the force used by the officers was objectively reasonable under the circumstances." Id. (citing Roundtree v. City of New York, 778 F. Supp. 614 (E.D.N.Y. 1991)). The objective reasonableness inquiry weighs the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In determining objective reasonableness, courts examine the totality of the circumstances, including "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [wa]s actively resisting arrest or attempting to evade

arrest by flight." Id., 490 U.S. at 395 n.10, 109 S.Ct. 1865; see also Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Brown v. City of New York, 798 F.3d 94, 107 (2d Cir. 2015) (internal quotation marks omitted) (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865).

Plaintiff alleges that Defendants Decker and Ettinger used excessive force against him during his arrest by slamming him to the ground without provocation and striking him while he was facedown, already subdued, and defenseless. Plaintiff seeks summary judgment on the grounds that Defendants' use of force was objectively unreasonable as a matter of law. Pl.'s Mem. 2–5. Defendants, in turn, seek summary judgment on Plaintiff's excessive force claim on the grounds that Defendants' use of force was objectively reasonable as a matter of law and Plaintiff did not suffer sufficient physical injury. Defendants also argue that Plaintiff's testimony and deposition have been so inconsistent and contradictory they should be disregarded under Jeffreys, and that Plaintiff's criminal conviction prevents him from factually disputing his conduct during the altercation with Defendants. Defs.' Mem. at 8–14, 16.

### 1. There are Material Issues of Fact Regarding Whether Defendants' Use of Force was Reasonable

Both parties claim they are entitled to summary judgment, even construing events in the light most favorable to the other party. However, there are significant and material differences between the parties' respective versions of events, the resolution of which could lead a reasonable jury to find in favor of either party.

According to Plaintiff, while being searched, Plaintiff verbally objected and attempted to turn after Decker placed a hand between his buttocks. Jennings Dep. at 53–55. Plaintiff never tried to run or escape. Id. at 44; Jones Dep. at 46, 55. Decker then lifted Plaintiff and slammed him to the pavement. Jennings Dep. at 51, 55; Jones Dep. at 37. Plaintiff immediately submitted, attempting to place his arms behind his back to be handcuffed. Jennings Dep. at 51, 55; Jones Dep. at 55. Decker proceeded to strike Plaintiff while he was face down on the ground and "rough[ ] [him] up." Pl.'s SMF at 8; Jones Dep. at 37; Jennings Dep. at 55. At this point, Ettinger ran from the passenger side of the car and struck Plaintiff in the face while he was still face down with his hands behind

his back and with Decker still on top of him. Id. at 56; Jones Dep. at 40–41.

**\*8** Defendants paint a far different portrait. In their narrative, Plaintiff aggressively spun while being searched, broke Decker's hold on him, and started running. Decker Dep. at 60–61; Ettinger Dep. at 102–103, Defs.' Mem. at 12. Decker pursued and tackled Plaintiff to the ground. Decker Dep. at 61; Ettinger Dep. at 107. Decker did not strike Plaintiff while on the ground. Decker Dep. at 102, 117–118. Plaintiff resisted, refused to comply, and attempted to get up off the ground. Ettinger Dep. at 109–110. Plaintiff kept his hands out of sight underneath his body and appeared as if he were either trying to get off the ground or access a weapon. Decker Dep. at 66; Ettinger Dep. at 109. Ettinger struck Plaintiff in the head, and Plaintiff finally allowed his hands to be placed behind his back. Ettinger Dep. at 112–113.

The parties thus dispute whether Plaintiff ran from police, whether Decker merely tackled Plaintiff while running or lifted him and slammed him to the pavement, whether Decker struck Plaintiff after taking him to the ground, whether Plaintiff actively resisted arrest, where Plaintiff's hands were located during the altercation, and whether Plaintiff was compliant when Ettinger struck him. These factual disputes are material. They weigh directly on the objective reasonableness of Defendants' actions, namely the "nature and quality of [Defendants'] intrusion" and "whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 395 n.10, 396, 109 S.Ct. 1865.

Deciding which version of events to believe requires a credibility determination best left to a jury. A reasonable jury could credit Plaintiff's version of events and find that Defendants' use of force was objectively unreasonable. Thus, Defendants are not entitled to summary judgment on Plaintiff's excessive force claim. See Breen v. Garrison, 169 F.3d 152, 153 (2d Cir. 1999) (denying summary judgment where parties' factual assertions differed regarding the arrest and the nature of force used); Farrow v. City of Syracuse, No. 12-CV-1401, 2014 WL 1311903 (N.D.N.Y. Mar. 31, 2014) (Kahn, J.) ("Where a plaintiff alleges that he was largely defenseless during the arrest, courts have found such allegations to be plainly sufficient to withstand a motion for summary judgment") (internal quotation marks omitted); Ostroski v. Town of Southold, 443 F. Supp. 2d 325, 342–43 (E.D.N.Y. 2006) (allegations that plaintiff did not resist and

officers used force after plaintiff had been subdued precluded summary judgment) (collecting cases).

Conversely, a reasonable jury could credit Defendants' version of events, and find that their use of force *was* objectively reasonable. Thus, Plaintiff is also not entitled to summary judgment. See Stratakos v. Nassau Cty., No. 15-CV-7244, 2019 WL 6699817, at *16 (E.D.N.Y. Dec. 9, 2019) (denying plaintiff's request for summary judgment on excessive force claim where parties offered disparate accounts of force used by officers and whether plaintiff resisted arrest).

### 2. Plaintiff has Shown Sufficient Physical Injury to Survive Summary Judgment

Defendants argue they are entitled to summary judgment because "Plaintiff has not attributed any specific physical injury to the alleged use of force" and has only made "conclusory assertions[s] of injury." Defs.' Mem. at 10. They further assert that Plaintiff's medical records "are devoid of any proof that he complained of any injuries, or [sic] treated for any injuries allegedly sustained" from Ettinger's strike. Defs.' Reply at 10. Finally, Defendant claims that the record evidence completely belies Plaintiff's claim of injury. Defs. Mem at 11.

To survive summary judgment for excessive force, a plaintiff must show physical injury. Castro v. Cty. of Nassau, 739 F. Supp. 2d 153, 177 n.16 (E.D.N.Y. 2010) ("[I]t is clear that some type of injury is required to prevail on a § 1983 excessive force claim"). A conclusory, vague claim of injury that does not identify any specific or identifiable harm is insufficient. Acosta v. City of New York, No. 11-CIV-856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (granting summary judgment where "plaintiff does not allege 'any specific or identifiable physical or mental harm beyond [ ] conclusory assertion[s]' ") (quoting Wims v. N.Y.C. Police Dep't, No. 10-CIV-6128, 2011 WL 2946369, at *5 (S.D.N.Y. July 20, 2011)).

**\*9** Here, Plaintiff does point to several specific injuries to support his claim of excessive force. He claims that the altercation caused pain and "[s]welling around [his] right eye," aggravated an existing injury to his ribs, and inflicted long-term pain and discomfort in his knee. Compl. at 4; Pl.'s SMF at 9; 50-h Hr'g Test. at 13–14, 49–50. Allegations that set forth similar specific injuries have been found sufficient to

survive summary judgment. See e.g., Castro, 739 F. Supp. 2d at 177 n.16 (denying summary judgment on excessive force claim where plaintiff "submitted sworn testimony that the handcuffs were too tight ... and that he sustained an injury" in the form of redness and soreness.); Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (bruised shin and swollen knee); Allen v. City of N.Y., 480 F. Supp. 2d 689, 698 (S.D.N.Y. 2006) (swelling, bruising, and redness on head); Brewer v. Jones, No. 02-CV-3570, 2003 WL 22126718 at *2 (S.D.N.Y. Sept. 12, 2003) (reddened forehead and jaw pain); Nunez v. Goord, 172 F. Supp. 2d 417, 433 (S.D.N.Y. 2001) (bruise to left brow); Smith v. Marcellus, 917 F. Supp. 168, 171–72 (W.D.N.Y. 1995) (abrasion under left eye, laceration near right ear, four superficial scratches on upper calf behind knee, and slightly swollen right wrist).

The cases cited by Defendants are inapposite and differ factually from the present case. They deal with plaintiffs who made only a vague assertion of injury or did not claim any injury at all. In Acosta, for example, the plaintiff merely alleged that he had "suffered emotional and physical damages" as a result of being handcuffed. 2012 WL 1506954, at *11. In Livingston v. Henderson, the plaintiff gave sworn testimony explicitly stating he had not been injured by the defendants. 2019 WL 1427689 at *11–12 (N.D.N.Y. 2019). In Brown v. City of New York, the plaintiff likewise conceded they had suffered no physical injury. 2015 WL 427942, at *5 (E.D.N.Y. Feb. 2, 2015).

Next, Defendants claim they are entitled to summary judgment because Plaintiff's medical records are devoid of proof that Plaintiff complained of injury or was treated for injury. Defs.' Reply at 10. However, a failure to seek medical attention is not fatal to a claim for excessive force. See Robison v. Via, 821 F.2d 913, 923–24 (2d Cir. 1987) ("While [the plaintiff] did not seek medical treatment for her injuries ... this failure is not fatal to her claim. If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe.") (citing Norris v. District of Columbia, 737 F.3d 1148, 1150–52 (D.C. Cir. 1984)); see also Sidney v. Wilson, No. 03-CV-0830, 2007 WL 4208626, at *7 (S.D.N.Y. Nov. 21, 2007) (While medical records "suggest [plaintiff] did not sustain profound injuries, the Second Circuit has cautioned against giving the conclusions in such health records conclusive weight on a motion for summary judgment where there is other evidence in the record detailing plaintiff's injuries.") (collecting cases). Thus, Defendants are not entitled to summary judgment on

the grounds that Plaintiff's medical records do not show proof of a complaint or treatment for injury.

Finally, Defendants refer to the pictures taken of Plaintiff after the altercation and Plaintiff's discussion during the intake process and claim that Plaintiff's assertion of injury is "completely belied" by the evidence presented. Defs.' Rep. at 11; Defs.' Mem. at 10. The pictures taken by Officer Ocker do not appear to show visible injury to Plaintiff's face. Dkt. 127-18 ("Arrest Pictures"). Further, it is admitted Plaintiff did not report any injuries when questioned by justice center staff. Plaintiff's SMF at 18–19. However, this evidence is not as conclusive as Defendants argue. A reasonable fact finder could find that Plaintiff did not reveal his injuries to the police or medical staff even though they did indeed exist, and that the pictures taken by police do not show the full extent of potential injuries to Plaintiff's face, ribs, and knee. Put simply, while this evidence certainly supports Defendants' narrative, the weight of such evidence is more appropriately evaluated by the trier of fact and does not conclusively establish that Plaintiff did not suffer injury as a matter of law. See Zalewski v. City of New York, No. 13-CV-7015, 2018 WL 5113137, at *5 (E.D.N.Y. Oct. 19, 2018) (refusing to grant summary judgment where records contradicted Plaintiff's claim of injury because "[t]he credibility of [a plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.") (quoting Scott v. Coughlin, 344 F.3d 282, 289–90 (2d Cir. 2003)); see also Centeno v. City of New York, No. 16-CV-2393, 2019 WL 1382093, at *7 (S.D.N.Y. Mar. 27, 2019) (holding that, at summary judgment stage, jury should determine "how much weight" to give evidence contradicting excessive force narrative).

**\*10** For the reasons set forth above, Plaintiff has set forth sufficient evidence of injury to survive summary judgment.

### 3. The Court will not Invoke the Jeffreys Exception and Resolve Credibility Issues against the Defendant on Summary Judgment

Defendants argue this is one of the "rare circumstances" where credibility issues may be resolved on summary judgment under Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005). "To qualify for the Jeffreys exception, a defendant must satisfy each of the following three requirements: (1) 'the plaintiff must rely "almost exclusively on his own testimony," '(2) the plaintiff's "testimony must be 'contradictory or incomplete," 'and (3) the plaintiff's

testimony must be contradicted by evidence produced by the defense.' " Quick v. Quinn, No. 12-CV-1529, 2014 WL 4627104, at *4 (N.D.N.Y. 2014) (quoting Benitez v. Ham, No. 04-CV-1159, 2009 WL 3486379, at *20–21 (N.D.N.Y. Oct. 21, 2009)).

In Jeffreys, the plaintiff claimed he was assaulted by police officers and thrown out of a third-floor window. 426 F.3d at 552. However, he could not identify any of the officers involved, say how many there were, or describe them. Id. He also testified later that he was not thrown, but had jumped out of the window. Id. at 555 n.2. The district court held the plaintiff's account was incomplete, and "so replete with inconsistencies and improbabilities" that no juror would suspend disbelief to credit the allegations. Id. at 555.

In Quick, cited by Defendants, a prison inmate alleged he was assaulted by four prison guards. 2014 WL 4627106, at *1. His allegation that a specific defendant was present at the assault was supported only by the inmate's verified complaint. Id. at *5. This allegation was contradicted when the inmate admitted he did not have enough information to state whether the defendant was even at work that day. Id. The court determined under Jeffreys that no factfinder could conclude the defendant was present at the attack. Id.

In a case often cited to support application of Jeffreys, Aziz Zarif Shabazz v. Pico, then-District Judge Sotomayor granted summary judgment in a case involving allegations of excessive force. 994 F. Supp. 460, 470–71 (S.D.N.Y. 1998). In deciding to resolve credibility issues against the plaintiff, the Aziz court relied on the absence of any supporting evidence in the record, and the fact the plaintiff had repeatedly submitted affidavits that significantly contradicted his prior sworn testimony concerning what injuries he suffered, and even where the alleged assault occurred. Id.

Unlike in Jeffreys and the cases noted above, Plaintiff's narrative is not founded entirely or almost exclusively on his own testimony, but is largely supported by an eyewitness, Willie Jones. See Jones Dep.

As to the second prong of Jeffreys, the Court finds that Plaintiff's allegations are not incomplete. Plaintiff has consistently identified the officers involved in the use of force, where it occurred, the nature of the force used, and his own actions during the altercation. See Grubbs v. Serrell, No. 14-CV-467, 2016 U.S. Dist. LEXIS 110783, at *35 (N.D.N.Y. Aug. 18, 2016) (finding plaintiff's testimony was

2021 WL 3471557

not incomplete where he consistently identified the officers involved as well as the nature of the altercation); Torres v. Caron, No. 08-CV-0416, 2009 U.S. Dist. LEXIS 121277, at *36, 2009 WL 5216956 (N.D.N.Y. Dec. 8, 2009) ("[U]nlike in Jeffreys, Plaintiff has specifically identified the officers whom he alleges assaulted him. Thus, this factor suggests that the Jeffreys exception should not apply."). Contentions that are, again, supported by Jones' recitation of events.

 *11  The Court also finds that Plaintiff's testimony is not sufficiently contradictory to warrant the Jeffreys exception. Defendants argue that Plaintiff's account of the force used against him—namely that he did not run and was "slammed" to the ground—is "clearly" contradicted by Mr. Jones' deposition testimony. Defs.' Mem. at 12. While Jones at one point does refer to a past statement he made that Plaintiff ran, Jones Dep. at 45, Jones also stated multiple times that Plaintiff "didn't try to run" and that Decker "threw [Plaintiff] on the ground" while searching him. Jones Dep. at 28, 37. Thus the contradiction is not as clear as Defendants claim. Even were the contradiction clear, it would not satisfy the second Jeffreys prong, which requires a plaintiff's testimony be contradicted by the plaintiff himself, such as in Jeffreys, Aziz, and Quick, where the plaintiffs' assertions were contradicted by their own, later testimony. See Jeffreys, 426 F.3d at 555 n.2; Aziz, 994 F. Supp. at 470–71; Quick, 2014 WL 4627106, at *5. Defendants also contend Plaintiff's claim that he didn't run is contradicted by his failure to object when the booking deputy stated that Plaintiff "had like, a little chase." Defs.' Mem at 12; Defs.' SMF at 11. Failing to speak up and deny a booking deputy's assertion while being booked into jail does not directly or necessarily contradict Plaintiff's assertion that he didn't run, and is a far cry from the direct testimonial contradictions present in cases where Jeffreys has been applied. See Jeffreys, 426 F.3d at 555 n.2; Aziz, 994 F. Supp. at 470–71; Quick, 2014 WL 4627106, at *5.

Next, Defendants argue that the Court should disregard Plaintiff's contention that he did not run from Decker, and indeed disregard all Plaintiff's contentions regarding Defendants' use of force, because Plaintiff has made other unrelated statements that turned out to be false. Defs.' Mem at 12. Defendants point to six of Plaintiff's assertions: (1) Plaintiff's initial statement to Decker that he didn't have drugs; (2) Plaintiff's denial that there was a scale in the car, which Mr. Jones has admitted he placed there right before stepping out, Jones Dep. at 24; (3) Plaintiff's assertion that Decker rushed Jones; (4) Plaintiff's claim that he advised "booking deputies" that his eye was bothering him, (5) Plaintiffs statement at his

criminal trial that a security officer tried to break his arm, and (6) Plaintiff's claim that he thought the substance in his pocket was "Molly" rather than cocaine. Defs.' Mem at 12–13.

In no case cited by Defendants, or found by this Court, has a court applied Jeffreys against a Plaintiff on a claim of excessive force due to inconsistencies in statements wholly unrelated to that use of force. Indeed, in Jeffreys, Quick, and Aziz, the contradictions noted by the court dealt directly with the force used by police or whether a specific defendant was even present when force was used. See Jeffreys, 426 F.3d at 555 n.2; Aziz, 994 F. Supp. at 470; Quick, 2014 WL 4627106, at *5.

Even were such an application permissible, the inconsistencies noted by Defendants do not render Plaintiff's narrative so "contradictory and improbable" that the very rare exception in Jeffreys is warranted. These inconsistencies may undermine Plaintiff's credibility, but that is most appropriately decided by a jury. See Ali v. Connick, 136 F. Supp. 3d 270, 281 (E.D.N.Y. 2015) (finding that Plaintiff's failure to remember certain aspects of his encounter with police "may undermine the credibility of his claims ... [b]ut that is for a jury to decide."). Plaintiff's narrative of events is not so contradictory or inconsistent as to render it so facially implausible that no reasonable person could believe Plaintiff's testimony. See id. (refusing to apply Jeffreys where "[p]laintiff has clearly identified ... the officer who allegedly assaulted him, and his testimony regarding the details of the alleged assault, while at times unclear, is not so contradictory or inconsistent as to render it facially implausible.").

Because Defendants' argument fails on the first and second prongs, the Court will not apply the Jeffreys exception.

### 4. Plaintiff's Criminal Conviction Does Not Bar Plaintiff from Disputing his Conduct During the Altercation

Defendants further claim that there is no triable issue of material fact regarding Plaintiff's conduct during his altercation with Defendants, and the Court does not need to make all rational inferences in favor of Plaintiff regarding his conduct, because this is an issue that has "been litigated and decided against him in his criminal trial." [4] Defs.' Mem. at 16. Defendants rely on Hardy v. Plante, No. 6-CV-687, 2009 WL 249787 (N.D.N.Y. 2009) and Diggs v. New York Police Dep't, No. 4-CV-1846, 2005 WL 3533158 (E.D.N.Y. 2005) to support this assertion.

4          Defendants make this argument in Section VI
           of their Memorandum which deals with qualified
           immunity. However, were the Court to accept the
           argument, the consequences would reach beyond
           qualified immunity to the heart of Plaintiff's
           excessive force claim. Thus, the Court addresses it
           here.

**\*12** Defendants' argument is misplaced. In both cases
Defendants cite, the contested behavior (1) was expressly
disputed and litigated in the previous criminal trial, (2) had
been decided against the plaintiff, and (3) formed the basis
for the plaintiff's criminal conviction. In Hardy for instance,
the plaintiff had previously been convicted of resisting arrest
during his interaction with the police-defendants and was thus
precluded from claiming in his civil case that he did not
resist arrest. 2009 WL 249787 at \*5. Likewise, in Diggs, the
plaintiff had previously been convicted of criminal possession
of a weapon and attempted murder of a police officer, and
was thus prohibited from contending in his civil trial that he
did not fire a weapon with intent to kill the defendant-police
officer. 2005 WL 3533158 at \*4.

Here, Plaintiff was convicted only of two counts of possession
of a controlled substance. Dkt 127-8 ("Trial Transcript") at
358. He was not convicted of resisting arrest, assault on
a police officer or any similar charge regarding his physical
comportment during his altercation with the police. The facts
Plaintiff contests—whether he was resisting arrest, whether
he ran and the nature of force used by the officers—were not
at issue in his charges of possession of a controlled substance
and have not been litigated and decided against him. [5] Thus,
he is not estopped from arguing those factual elements and the
Court must indeed make all reasonable inferences in favor of
Plaintiff regarding his behavior during the altercation for the
purposes of Defendants' motion for summary judgment.

5          At sentencing, the state court judge did state that
           Plaintiff "fought with police." Dkt. No. 127-9
           ("Sentence") at 5. However, there is a presumption
           against using statements and findings at sentencing
           as a basis for collateral estoppel in later civil trials.
           Sec. Exch. Comm'n v. Monarch Funding Corp.,
           192 F.3d 295, 306 (2d Cir. 1999) (holding
           that "precluding relitigation on the basis of [sentencing]
           findings should be presumed improper" and only
           be allowed where moving party has shown it to be
           "clearly fair and efficient to do so."). Defendants

have made no showing sufficient to overcome this
presumption, and it would likely be unfair to use
such statements here, where the conduct underlying
the sentencing remarks was not fully and fairly
litigated. See id.

### D. Decker and Ettinger Are Not Entitled to Qualified Immunity

"When facing a defense of qualified immunity at the summary
judgment stage, 'a court should ask whether, viewing the
evidence in the light most favorable to the non-moving party,
the conduct that may be proved at trial is conduct that, at the
time it occurred, violated a clearly established constitutional
or statutory right.' " Ruhlmann v. Ulster County Dep't of Soc.
Servs., 234 F. Supp. 2d 140, 174 (N.D.N.Y. 2002) (quoting
Mozzochi v. Borden, 959 F.2d 1174, 1178 (2d Cir. 1992)). "To
be clearly established, a right must be sufficiently clear that
every reasonable official would have understood that what he
is doing violates that right." Reichle v. Howards, 566 U.S.
658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012). The right
must be established "in light of the specific context of the
case, not as a broad general proposition." Saucier v. Katz, 533
U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This
does not require that the very action at issue be previously
held unlawful, but merely that "in the light of pre-existing
law the unlawfulness [is] apparent." Anderson v. Creighton,
483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
"[W]here plaintiff has a clearly established constitutional or
statutory right, the only remaining inquiry is whether the
defendant's conduct is objectively reasonable." Ruhlmann,
234 F. Supp. 2d at 174 (citing Anderson, 483 U.S. at 639,
107 S.Ct. 3034). Regarding claims of excessive force, the two
prongs of the qualified immunity inquiry somewhat merge
in that "the qualified immunity inquiry turns on whether the
defendants' actions were objectively reasonable under clearly
established law; and the clearly established law of excessive
force itself hinges on the reasonableness of the force used."
Matthews v. City of N.Y., 889 F. Supp. 2d 418, 443–44
(E.D.N.Y. 2012) (citing Stephenson v. Doe, 332 F.3d 68, 77
(2d Cir. 2003)).

**\*13** Defendants claim it is undisputed, due to Plaintiff's
underlying criminal conviction, that Plaintiff resisted arrest,
attempted to flee, and had his hands underneath his body after
being taken to the ground, and therefore Defendants acted
in an objectively reasonable fashion. Defs.' Mem. at 16–17.
However, as the Court explains above, see supra, Section
IV(C)(4), Plaintiff's criminal conviction does not estop him
from contesting his conduct during the altercation with police.

Making all rational inferences in favor of Plaintiff, the record does not demonstrate that the force used was objectively reasonable.

The facts surrounding Defendants use of force, read in the light most favorable to Plaintiff, are set forth above. See supra. Section IV(C)(1). Existing case law clearly establishes that lifting and slamming a suspect to the ground after they verbally object and offer minimal physical resistance, then striking that individual on the ground despite being unarmed, subdued and compliant, and not posing a threat to officers, is not objectively reasonable and is thus a violation of that person's constitutional right to be free from excessive force. See Marcano v. City of Schenectady, 38 F. Supp. 3d 238, 263 (N.D.N.Y. 2014) (denying qualified immunity where plaintiff "offered no physical threat to the officers or resistance to being arrested, but he was tackled and physically restrained ... [and officers] struck him several times."); Matthews, 889 F.Supp.2d at 443 (denying qualified immunity where police officers placed "excessively tight handcuffs" on a plaintiff who did not resist arrest). [6] A reasonable jury could credit Plaintiff's telling of events and find that both Decker and Ettinger acted objectively unreasonably in their use of force —Decker for slamming Plaintiff to the ground and striking him, and Ettinger for striking Plaintiff in the face while face down on the ground with his hands behind his back.

[6]    For more examples see Crawford v. City of New London, No. 11-CV-1371, 2014 WL 186417, at *7 (D. Conn. Jan. 16, 2014) (denying qualified immunity where officers allegedly pushed plaintiff to the ground and "repeatedly pushed his head against the floor and kneeled on his back"); Methvin v. Cossette, No. 11-CV-959, 2013 WL 5740076, at *7 (D. Conn. Oct. 22, 2013) (denying qualified immunity where officers struck plaintiff while "lying face down on the ground"); Lemmo v. McKoy, No. 8-CV-4264, 2011 WL 843974, at *6 (E.D.N.Y. Mar. 8, 2011) ("[G]ratuitous uses of force that are not required to subdue an individual likely fail the Graham objective unreasonableness test."); Williams v. City of New York, No. 6-CV-6601, 2009 WL 3254465, at *1, *7-*8 (E.D.N.Y. Oct. 9, 2009) (alleged force used was unreasonable where officers "rushed and tackled" plaintiff, slamming him to the ground and landing on him, even though he did not struggle or resist); Pierre-Antoine v. City of New York, No. 4-CV-6987, 2006 WL 1292076, at *6 (S.D.N.Y.

May 9, 2006) (denying qualified immunity despite "modest and largely passive" resistance to arrest where police officers struck a plaintiff "pinned facedown on the ground" who did not "attempt at any point to strike the officers back."); Nogue v. City of New York, No. 98-CV-3058, 1999 WL 669231, at *9 (E.D.N.Y. Aug. 27, 1999) (denying qualified immunity where officers "kicked and punched" armed robbery suspect while he was on ground and not resisting).

Thus, due to the factual disputes present on the record concerning the level of force used by Defendants, Plaintiff's level of resistance, and whether Plaintiff presented an objectively reasonable threat to the officers, the Court will not grant Defendants qualified immunity. See Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007) ("If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable [sufficient to warrant qualified immunity] is an issue of law to be determined by the court. [I]f there is such a dispute, however, the factual questions must be resolved by the factfinder.") (internal citations and quotation marks omitted); Thomas v. Roach, 165 F.3d 137, 144 (2d Cir. 1999) ("Because the district court could not determine whether the officers reasonably believed that their force was not excessive when several material facts were still in dispute, summary judgment on the basis of qualified immunity was precluded.").

## V. CONCLUSION

 **\*14**  Accordingly, it is hereby:

**ORDERED**, that that Defendants' Motion (Dkt. No. 127) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that Plaintiff's Fourteenth Amendment racial profiling claim against Decker and Ettinger and Plaintiff's Monell claim against the City of Syracuse be dismissed from this action; and it is further

**ORDERED**, that Plaintiff's Fourth Amendment excessive force claim against Decker and Ettinger survive Defendants' Motion; and it is further

**ORDERED**, that the City of Syracuse be **DISMISSED** as a defendant in this action; and it is further

**ORDERED**, that Plaintiff's Cross-Motion (Dkt. No. 138) be **DENIED**, and it is further

**Jennings v. Decker, Slip Copy (2021)**

2021 WL 3471557

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3471557

---

**End of Document**                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 35 of 140

Russo v. County of Warren, Not Reported in Fed. Supp. (2015)

2015 WL 7738043

2015 WL 7738043
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nicole RUSSO, Plaintiff,

v.

COUNTY OF WARREN, Richard T. Graham,
Bryan Rainville, Thomas Haskell, Roy Mihill,
and Sergeant Christopher Webster, Defendants.
County of Warren, Richard T. Graham, Bryan
Rainville, Thomas Haskell, Roy Mihill, and Sergeant
Christopher Webster, Third-party Plaintiffs,
United States of America and Department of Health
and Human Services, Third-party Defendants.

1:12-CV-1616 (FJS/CFH)
|
Signed 12/01/2015

**Attorneys and Law Firms**

D'Orazio Peterson, LLP, 125 High Rock Avenue, Giovanna
A. D'orazio, Esq., of Counsel, Saratoga Springs, New York
12866, for Plaintiff.

LEmire, Johnson & Higgins, LLC, 2534 Route 9, P.O. Box
2485, Gregg T. Johnson, Esq., April J. Laws, Esq., of Counsel,
Malta, New York 12020, for Defendants and Third-Party
Plaintiffs.

Office of the United States Attorney, James T. Foley
Courthouse, 445 Broadway, Room 218, Karen F. Lesperance,
AUSA of Counsel, Albany, New York 12207, for Third-Party
Defendants.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior Judge

**\*1 I. INTRODUCTION**

Plaintiff Nicole Russo brings this case against Defendant
County of Warren and Defendants Richard T. Graham,
Bryan Rainville, Thomas Haskell, Roy Mihill, and Sergeant
Christopher Webster ("CO Defendants"), all of whom
were employed as corrections officers at Warren County
Correctional Facility ("the Facility") at the times in question.
Plaintiff alleges eight causes of action in her second amended

complaint. *See generally* Dkt. No. 19, Second Amended
Complaint. Four of these are federal claims under 42 U.S.C.
§ 1983, to wit (1) against the CO Defendants for use of
excessive force in violation of the Eighth Amendment, (2)
against the CO Defendants for denial of medical treatment
in violation of the Eighth Amendment, (3) against the
CO Defendants for conditions of confinement violating the
Eighth Amendment, and (4) against Defendant County of
Warren for an unconstitutional custom or practice which
caused a violation of her constitutional rights. Plaintiff also
asserts four pendent state-law claims, to wit (1) assault
and battery against the CO Defendants, (2) intentional
infliction of emotional distress against all Defendants, (3)
vicarious liability against Defendant County of Warren, and
(4) negligence against Defendant County of Warren.

Defendants, in turn, filed a third-party complaint against
the United States and the U.S. Department of Health and
Human Services for indemnification or, in the alternative,
contribution.

**II. BACKGROUND**

In June of 2011, Plaintiff was incarcerated at the Facility
for approximately five days. Plaintiff's eight causes of action
against Defendants arise from events which took place during
this interval.

**A. Events giving rise to Plaintiff's claims**
On the first day of Plaintiff's incarceration, she was processed
without incident and assigned a cell. *See* Dkt. No. 68-25,
Defs.' Statement of Material Facts, at ¶¶ 6-7. It is undisputed
that Plaintiff failed to disclose that she had recently undergone
an abortion and had been experiencing vaginal bleeding. *See
id.* at ¶¶ 8-11. During processing, Plaintiff turned over her
prescription medication, which was "sent to medical." *See*
Dkt. No. 68-3, Defs.' Ex. "B", at 6. She was issued bedding
and other basic items and then proceeded to her cell, where
she slept for much of the next twenty-four hours. *See* Dkt. No.
68-25, Defs.' Statement of Material Facts, at ¶ 31.

*1. Transfer between cells*
The parties are less in agreement as to the events of the second
day. Plaintiff awoke on Friday afternoon to find that she
was bleeding from her vagina and that the blood had soaked
into her jumpsuit. *See* Dkt. No. 68-25, Defs.' Statement of
Material Facts, at ¶ 32. Plaintiff testified at her deposition

Russo v. County of Warren, Not Reported in Fed. Supp. (2015)
2015 WL 7738043

that she called out to Defendant CO Graham that she was in need of medical attention. *See* Dkt. No. 71-1, Plaintiff's 50-h Deposition, at 61:12-22. She further testified that he provided her with a medical request form but that he refused to provide her a pen with which to fill it out. *See id.* at 64:10-14. Lacking a pen with which to complete the form, Plaintiff testified that she shouted, "What am I supposed to f'ing do, write this in f'ing blood?" *See id.* at 64:15-22. According to Defendants, Plaintiff was aggressive, disruptive, and belligerent from the time she woke up. In response to this exchange with Defendant CO Graham, it was determined that Plaintiff be transferred to housing unit "Linear A." *See* Dkt. No. 68-19, Affidavit of Defendant Richard Graham, at ¶ 7.

**\*2** During the transfer, Defendants maintain that they followed proper procedure, took precautions for Plaintiff's safety, and used no greater force than necessary. *See, e.g.*, Dkt. No. 68-18, Aff. of Def. Sgt. Webster, at ¶¶ 4-5; Dkt. No. 68-25, Defs.' Statement of Material Facts, at ¶¶ 53-68. Plaintiff, on the other hand, alleges that, as a result of the Defendant COs' behavior, she suffered a chipped tooth, a laceration on the side of her torso, and lacerations and bruising on her wrists. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 40:17-41:7, 53:10-23. Plaintiff testified that, during the transfer, she did not resist and that she told Defendant COs many times that she was not resisting. *See, e.g.*, *id.* at 3:13-14.

The Facility's security cameras recorded most of Plaintiff's transfer to Linear A. Defendants present this footage to the Court in three segments. *See* Dkt. No. 69, Defs.' Ex. "A". Notably, the video includes footage only of Defendants guiding Plaintiff into and through the Facility's corridors. It does not show anything that took place within either cell. However, Plaintiff alleges that the bulk of her injuries, namely, the chipped tooth, the laceration on her side, and part of the damage to her wrists, took place inside the Linear A cell at the end of the transfer. *See* Dkt. No. 19, Second Am. Compl., at ¶¶ 37-38.

In the first video segment, a CO approaches Plaintiff's cell, slides a sheet of paper under the door, and returns to his post. *See* Dkt. No. 69, Defs.' Ex. "A", at 15:14:00-15:14:42 (A Pod view). A few minutes later, all the prisoners in the common areas near Plaintiff's cell return to their own cells. *See id.* at 15:20:00-15:20:35. Four male COs then approach Plaintiff's cell and enter it. *See id.* at 15:21:30-15:22:04. Approximately fourteen seconds later, Plaintiff is first seen exiting her cell with Defendant COs guiding her from behind. *See id.* at 15:22:18. She descends the stairs and crosses the common

area on the floor below, and at this time the fifth Defendant CO joins them. *See id.* at 15:22:24-15:22:50. At this point there is one CO touching Plaintiff's arm. *See id.* According to Plaintiff, at this time Defendant COs began twisting her handcuffs because they perceived her to be resisting when she stumbled over her jumpsuit at the bottom of the stairs. *See* Dkt. No. 71-2, Pl.'s Ex. "A", at 4:19-5:17.

In the second segment, Defendant COs guide Plaintiff through the Facility's corridors. At one point, Plaintiff drops to her knees for approximately thirteen seconds. *See* Dkt. No. 69, Defs.' Ex. "A", at 15:23:34-15:23:48 (Main and Off Hall view). Plaintiff testified that she was forced to the floor in pain because one of Defendant COs applied a great force upon her handcuffs. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 18:16-19:11. Indeed, Plaintiff maintains that she was in severe and increasing pain for the duration of the transfer due to Defendant COs' application of force in twisting her handcuffs. *See id.* at 10:3-12. She further testified that she laid on the floor sobbing before Defendant COs pulled her up to her feet and resumed the transfer. *See id.* at 19:5-11. The video does not show Plaintiff lying on the floor, however due to the lack of sound on the video, it is impossible to confirm or deny whether Plaintiff is sobbing, crying out in pain, or telling Defendant COs that she is not resisting.

The third and final video segment, showing the corridor outside Plaintiff's Linear A cell, is most telling. At time 15:24:53, Defendant COs guide Plaintiff through a metal door into what appears to be her new cell. *See* Dkt. No. 69, Defs.' Ex. "A", at 15:24:53 (Linear Hallway view). Twenty seconds later, one of Defendant COs is seen removing a mattress from the cell. *See id.* at 15:25:13. Immediately thereafter, the same CO is seen hurrying back into the cell. *See id.* at 15:25:20-15:25:22. Defendant COs emerge from the cell all together at 15:27:25, two minutes and thirty-three seconds after Plaintiff and Defendant COs entered the cell. As mentioned, Plaintiff alleges that the majority of the events giving rise to her excessive force claims took place during this interval. Yet there is no video footage capturing what happened.

**\*3** With respect to Plaintiff's original cell, placing Plaintiff in handcuffs and removing her from the cell took approximately fourteen seconds. *See* Dkt. No. 69, Defs.' Ex. "A", at 15:22:04-15:22:18 (A Pod view). During this time, according to Plaintiff, the following events took place out of the cameras' view. Defendant COs lifted her to her feet by pulling up on her handcuffs, causing her pain and contributing to her wrist

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 37 of 140

Russo v. County of Warren, Not Reported in Fed. Supp. (2015)

2015 WL 7738043

injuries. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 1:2-5, 4:12-18. At this point, Plaintiff testified, she began telling Defendant COs that she was not resisting and that they need not use so much force with her. *See id.* at 5:15-17 ("I have to have said it at least 20 or 30 times that I was not resisting."). She did, however, also testify that she was squirming in an attempt to lessen the pressure on her wrists. *See id.* at 4:13-15.

With respect to the destination cell at Linear A, Plaintiff alleges that, after being pushed to the floor, her face was smashed into the floor such that she suffered a chipped tooth. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 40:20-23. She further testified that one of Defendant COs kicked her in the side, resulting in a laceration. *See id.* at 41:2-7. Finally, Plaintiff testified that, while she was being held face-to-the-floor in the Linear A cell, Defendant Sgt. Webster stepped on her back and pulled her arms up by the handcuffs, causing further damage to her wrists. *See* Dkt. No. 71-3, Pl.'s Dep., at 76. In support of these allegations, Plaintiff has produced photographs of her wrists and of her torso which show bruising, scabs, and scarring. *See* Dkt. No. 68-13, Defs.' Ex. "O."

The Facility's Inspection and Supervision policy in place during the time at issue required a female CO to be present at any time when force was used against a female inmate. *See* Dkt. No. 68-15, Defs.' Ex. "N", at 17. The CO Defendants, apparently excluding Sgt. Webster, testified that they were not aware of this policy. *See* Dkt. No. 71-7, Thomas Haskell Dep., at 19:5-17; Dkt. No. 71-9, Brian Rainville Dep., at 22:10-13; Dkt. No. 71-6, Richard Graham Dep., at 13:20-24; Dkt. No. 71-8, Roy Mihill Dep., at 14:25-15:3. It is undisputed that no female officer was present during Plaintiff's transfer. *See generally* Dkt. No. 69, Defs.' Ex. "A." It does not appear from the security video that any blood is plainly visible on Plaintiff's jumpsuit.

### 2. Life in Linear A

Upon arriving at her new cell, Plaintiff's bedding was taken away from her. It was returned at 12:38 a.m. the following day, depriving her of bedding for a total of approximately nine hours. *See* Dkt. No. 68-3, Defs.' Ex. "B", at 15. Plaintiff testified that she had to sleep on a concrete slab and that she was "freezing." *See* Dkt. No. 71-4, Pl.'s Dep., at 53:3-11, 64:14. Defendant CO Haskell testified that it was the Facility's practice to take away an inmate's bedding when the inmate was being disruptive or when the inmate was misusing the mattress. *See* Dkt. No. 71-7, Haskell Dep., at 21:25-26:5.

Plaintiff testified that, beginning with her initial request for medical attention on Friday afternoon, she was repeatedly denied medical attention until Sunday afternoon. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 58:8-16. When she did see the medical staff, Plaintiff told the attending nurse that her level of pain was "nothing serious." *See* Dkt. No. 71-18, Pl.'s Response to Statement of Material Facts, at ¶ 127. The medical chart says that Plaintiff was complaining of heavy bleeding and pain at this time. *See* Dkt. No. 68-7, Defs.' Ex. "F", at 7. Moreover, it is undisputed that Plaintiff was not given her prescription medication at any time. *See* Dkt. No. 71-18, Pl.'s Response to Statement of Material Facts, at ¶¶ 157, 159.

Plaintiff further testified that, beginning Friday afternoon and for approximately the next 48 hours, she was repeatedly denied a change of clothing, a shower, and sanitary napkins. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 58:8-16. According to Plaintiff, she asked for these things from every staff member with whom she spoke, including both COs and nurses. *See id.* During this time, Plaintiff alleges, she was forced to subsist in her blood-stained jumpsuit with no means of cleaning herself up. *See id.* at 56:11-14.

### 3. Aftermath

**\*4** Plaintiff testified that she was diagnosed with Post Traumatic Stress Disorder in connection with the events outlined above. *See* Dkt. No. 71-3, Pl.'s Dep. at 43:3-17. When Plaintiff visited a doctor three to four days after her release from the Facility, she was advised that her vaginal bleeding was normal. *See* Dkt. No. 68-25, Defs.' Statement of Material Facts, at ¶ 142; Dkt. No. 71-2, Pl.'s 50-h Dep., at 70:16-20 (bleeding was "something normal. It was nothing serious.").

### B. Third-party complaint

Defendants filed a third-party complaint pursuant to, among other provisions, the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, against the United States and the U.S. Department of Health and Human Services, seeking indemnity or contribution in connection with the conduct of the Facility's medical staff. *See generally* Dkt. No. 47, Third-Party Complaint. In particular, Third-Party Plaintiffs allege that any liability they face in connection with Plaintiff's claims are "solely due to the conduct" of medical staff at the Facility, who were employees of the federally-funded Hudson Headwaters Health Network ("Hudson Headwaters"). *See* Dkt. No. 47, Third-Party Complaint, at ¶ 34. In other words, because Defendants "contend that they are not in any way legally responsible" in this case, they seek indemnification

Case 9:21-cv-00715-DNH-TWD   Document 36   Filed 11/23/22   Page 38 of 140

Russo v. County of Warren, Not Reported in Fed. Supp. (2015)

2015 WL 7738043

to the extent that Plaintiff's damages were attributable to the medical staff's failure to provide medical care. *See id.* at ¶ 37.

Third-Party Plaintiffs advance two other claims. First, they bring a claim for breach of contract, alleging that Hudson Headwaters breached its contract with Defendant County by failing to provide adequate medical treatment to Plaintiff. *See* Dkt. No. 47, Third-Party Compl., at ¶ 43. Second, Third-Party Plaintiffs bring a claim for negligence, alleging that Hudson Headwaters breached its duty of care to provide Plaintiff with reasonable medical care. *See id.* at 51.

### III. DISCUSSION

**A. Summary judgment standard of review**
Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (citation omitted). In addition, "[the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(a), (c), (e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (citations omitted).

**\*5** As for the materiality requirement, a dispute of fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson,* 477 U.S. at 248.

"Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted).

**B. Plaintiff's federal claims** [1]

[1]  As an initial matter, the Court notes that Plaintiff was not obligated to exhaust her administrative remedies under 42 U.S.C. § 1997e(a) before filing suit because she was no longer a prisoner when she commenced this action. *See Greig v. Goord,* 169 F.3d 165, 167 (2d Cir. 1999) (holding that "litigants ... who file prison condition actions after release from confinement ... need not satisfy the exhaustion requirements ....").

### *1. Eighth Amendment excessive force claims*
The Eighth Amendment prohibits punishments involving the "'unnecessary and wanton infliction of pain'" that are incompatible with "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble,* 429 U.S. 97, 102, 104 (1976) (quotations and other citations omitted). Analysis of cruel and unusual punishment claims requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *See Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8, 112 S. Ct. 995, 117 L. Ed. 2d 152 (1992)) (other citation omitted).

After *Hudson,* the "'core judicial inquiry'" is focused not upon the extent of the injury sustained but instead whether the nature of the force applied was nontrivial. *Green v. McLaughlin,* 480 F. App'x 44, 48 (2d Cir. 2012) (quoting *Hudson v. McMillan,* 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)) ("For excessive force claims, the core judicial inquiry is ... whether force was applied ... maliciously or sadistically to cause harm."). Accordingly, the absence of serious injury, although relevant, does not necessarily negate a finding of wantonness because

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. ... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 39 of 140

Russo v. County of Warren, Not Reported in Fed. Supp. (2015)

2015 WL 7738043

diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9 (internal citation omitted).

Put another way, the extent of an inmate's injury is but one of the factors a court should consider in determining whether a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force is proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *See Whitley v. Albers,* 475 U.S. 312, 321 (1986).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "'contemporary standards of decency.'" *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S. Ct. 995). With respect to an allegation of overly-tight handcuffs, "'a [c]ourt is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists.*'" *Finley v. Perry,* No. 9:06-CV-1524, 2010 WL 6427496, *7 (N.D.N.Y. July 13, 2010), *rept. & rec. adopted,* 2011 WL 1302248 (N.D.N.Y. Mar. 31, 2011) (quotation omitted).

 *6  In this case, Defendants' first argument, namely, that Plaintiff's injuries were insufficient to rise to the level of a constitutional violation, is without support in the law. Although the *Hudson* Court noted that "[t]he Eighth Amendment ... necessarily excludes ... *de minimis* uses of physical force," it held that a use of force resulting in bruises, swelling, and loosened teeth could rise to the level of a constitutional violation. 503 U.S. at 9-10. By way of comparison, in this case, Plaintiff has produced evidence of bruises and lacerations to her wrists and the side of her torso, as well as a chipped tooth. This is sufficient to raise a genuine issue of material fact. *See Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury"); *Cicio v. Lamora,* No. 9:08-CV-431, 2010 WL 1063875, *2, *7 (N.D.N.Y. Feb. 24, 2010), *rept. & rec. adopted,* 2010 WL 1063864 (N.D.N.Y. Mar. 22,

2010) (denying summary judgment where photographs of the plaintiff's injuries showed only minor bruising).

With respect to the other factors of the subjective element, namely, the need for force, whether the force was proportionate to the need, the threat that the officials reasonably perceived, and what, if anything, the officials did to limit their use of force, the circumstances set the stage for allowing a jury to determine whether Defendant COs' use of force was malicious and sadistic. In particular, the fact that five male COs transported Plaintiff, a female, goes to the factor of what threat the officials perceived. In addition, the fact that there appears to be no dispute that Plaintiff was not resisting during the transfer goes to the factors of what need there was for force and whether such force was proportional to the need. Viewed together, these facts present genuine disputes of material fact as to whether Defendant COs' use of force against Plaintiff was malicious and sadistic.

Additionally, Defendants' related arguments that the Court should disregard Plaintiff's testimony because of the security video footage and because she lacks credibility fall short in two respects. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007) (finding that summary judgment was appropriate where police video contradicted plaintiff's account of high-speed chase); *McKinney v. Dzurenda,* 555 F. App'x 110, 111-12 (2d Cir. 2014) (holding that the district court properly disregarded plaintiff prisoner's account of events where video clearly showed correction officers using force only after plaintiff "assumed a boxing stance and made clear his willingness to fight"). In this case, the allegations giving rise to the substance of Plaintiff's excessive force claims transpired out of the cameras' view and thus are not "blatantly contradicted" by the security video footage. *See Scott,* 550 U.S. at 380.

Moreover, although a plaintiff's story "need not be literally impossible for a court to reject it" at summary judgment, *Moore v. Casselberry,* 584 F. Supp. 2d 580, 585, 588 (W.D.N.Y. 2008) (citations omitted), before a court may properly do so, the law of this Circuit requires the moving party to show that there is *no evidence* in the record upon which a reasonable jury could find in the plaintiff's favor. *See Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005). In this case nearly all the contradictions Defendants raise

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 40 of 140

Russo v. County of Warren, Not Reported in Fed. Supp. (2015)

2015 WL 7738043

with respect to the video go largely to collateral matters—for example, that Plaintiff testified to her transfer lasting five-to-ten minutes when the video shows it lasting three. Such contradictions do not render Plaintiff's testimony objectively unbelievable.

*7 For these reasons, the Court denies Defendants' motion with respect to Plaintiff's Eighth Amendment excessive force claims.

### 2. Eighth Amendment deliberate medical indifference claims

The Eight Amendment's prohibition against cruel and unusual punishment applies to prison officials providing medical care to inmates. *See Estelle v. Gamble,* 429 U.S. 97, 103 (1976); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) (citation omitted). In order to survive summary judgment on a claim for denial of medical treatment, a plaintiff must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle,* 429 U.S. at 106. This analysis embodies both an objective and subjective prong. *See Lasher v. City of Schenectady,* No. 02-CV-1395, 2004 WL 1732006, *4 (N.D.N.Y. Aug. 3, 2004) (citing *Hathaway,* 37 F.3d at 66). The injury must be "sufficiently serious" in objective terms, and the charged official must act with a sufficiently culpable state of mind. *See id.* (citation omitted).

Deliberate indifference is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state "'equivalent to subjective recklessness.'" *Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir. 2014) (quotation omitted). To demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835 (1994); *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir. 1996) (quoting [*Farmer,* 511 U.S.] at ___, 114 S. Ct. at 1978) (other citation omitted). In other words, "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hathaway,* 37 F.3d at 66 (quoting [*Farmer,* 511 U.S.] at ___, 114 S. Ct. at 1979).

In this case, Plaintiff alleges that, beginning on Friday afternoon, she repeatedly told every Facility staff member she encountered that she needed medical attention and requested

to be seen. However, she testified that all of these requests were ignored until Sunday afternoon, the second full day after she discovered she was bleeding. Moreover, Plaintiff testified that Defendant CO Graham offered her a form with which to request medical attention but that he refused to provide her a pen with which to complete the form.

These facts, viewed in isolation, reasonably could be interpreted as suggesting that Defendant COs, and Defendant CO Graham in particular, acted with deliberate indifference to Plaintiff's medical issue. However, viewing the record as a whole, it is clear that Defendants could not have been aware of circumstances from which they could have inferred that a serious risk of harm existed. Plaintiff failed to notify Facility staff that she had recently undergone an abortion. Further, there is no evidence in the record tending to show that Defendants were aware of blood on Plaintiff's clothing. For example, the Facility's security video footage, taken after Plaintiff awoke to find that she was bleeding, shows no discernible trace of blood on Plaintiff's clothing. In other words, even assuming that Plaintiff had a serious medical condition, no reasonable factfinder could conclude based on this record that Defendant COs were "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed with respect to Plaintiff's health, *Hathaway,* 37 F.3d at 66, or that Defendant COs were more than merely negligent, *see Farmer,* 511 U.S. at 835. For these reasons, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment deliberate medical indifference claims.

*8 ### 3. Eighth Amendment conditions of confinement claims

To state an Eighth Amendment claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was "sufficiently serious that [s]he was denied the minimal civilized measure of life's necessities," and (2) subjectively, the defendant official acted with "a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety." ...

*Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation omitted). The subjective element of these claims is the same as for Plaintiff's medical needs claims. *See id.*

With respect to the objective element, the inmate must show that the conditions, either alone or in combination, posed an unreasonable risk of serious damage to her health. *See Rhodes v. Chapman,* 452 U.S. 337, 346-47 (1981); *Phelps v.*

Case 9:21-cv-00715-DNH-TWD   Document 36   Filed 11/23/22   Page 41 of 140

Russo v. County of Warren, Not Reported in Fed. Supp. (2015)

2015 WL 7738043

*Kapnolas,* 308 F.3d 180, 185-86 (2d Cir. 2002) (*per curiam*). Thus, prison officials violate the Eighth Amendment when they deprive an inmate of "basic human needs" such as food, clothing, medical care, and safe and sanitary living conditions. *See Phelps,* 308 F.3d at 185 (quotation omitted). "[T]here is no 'static test' to determine whether a deprivation is sufficiently serious; '[t]he conditions themselves must be evaluated in light of contemporary standards of decency.'" *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir. 2012) (quotation omitted).

Failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation. *See Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir. 2003) (citations omitted). Notwithstanding, the courts of this Circuit have set a high bar for surviving summary judgment on such a claim. *See, e.g., McNatt v. Unit Manager Parker,* No. 3:99CV1397, 2000 WL 307000, *4 (D. Conn. Jan. 18, 2000) (finding no Eighth Amendment violation when inmates endured "stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions") (cited in *Gill v. Hoadley,* 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003)). In this case, Plaintiff went without toilet paper for approximately 48 hours, was denied a change of clothes for two days, was denied the use of sanitary napkins, and had no access to a shower or a towel. These circumstances, viewed together, do not objectively rise to the level of an unreasonable risk of serious damage to Plaintiff's health. For this reason, the Court grants Defendants' motion with respect to Plaintiff's Eighth Amendment conditions of confinement claims.

### 4. Municipal liability based on unconstitutional customs or policies [2]

[2]  In this case, since there is no constitutional violation with respect to Defendants depriving Plaintiff of a mattress for approximately nine hours, the Court does not reach the question of whether any policy with respect to removing inmates' mattresses caused a constitutional violation. Accordingly, the Court addresses this question only with respect to Defendant County of Warren's Inspection and Supervision Policy.

**\*9** In order to impose Section 1983 liability against a municipal defendant, a plaintiff must set forth facts that demonstrate the alleged constitutional violation resulted from

an official policy, custom, or practice. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694-95 (1978). A plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989). The existence of a policy or custom can be inferred from "circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir. 1991) (citation omitted). To establish deliberate indifference within the context of failure to train municipal employees, a plaintiff must show that

> (i) a policymaker knows "to a moral certainty" that [municipal] employees will confront a particular situation; (ii) the situation either presents the employee with "a difficult choice of the sort that training or supervision will make less difficult" or "there is a history of employees mishandling the situation;" and (3) "the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights." ...

*Wray v. City of New York,* 490 F.3d 189, 195-96 (2d Cir. 2007) (internal quotation omitted).

Defendant County of Warren's Inspection and Supervision Policy requires "[a]n officer of the same sex [to] be present when physical force is to be used, except in emergency situations." *See* Dkt. No. 68-15, Defs.' Ex. N, at 17. All but one of Defendant COs testified that they were not aware of this requirement. However there is no genuine issue of material fact as to deliberate indifference. In this case, there is no evidence in the record tending to suggest that there is a history of Facility COs using excessive force in cross-gender situations. Additionally, there is no evidence in the record from which a reasonable jury could conclude that training COs with respect to having a female CO present during the use of force against a female inmate would reduce the difficulty of choosing how much force to use. *See Wray,* 490 F.3d at 195-96. For these reasons, the Court grants Defendants' motion with respect to Plaintiff's municipal liability claims.

### C. Plaintiff's state-law claims

As a preliminary matter, although New York Correction Law Section 24 bars inmates from suing New York Department of Corrections and Community Supervision ("DOCCS") employees in their individual capacities in state court for torts

2015 WL 7738043

arising from acts done in the scope of employment, *see* N.Y. Corr. Law § 24, this provision does not apply here. In this case, Defendant COs were employees of Defendant County of Warren at the time in question. Because its plain language makes clear that it grants immunity only to employees of "the department," referring to DOCCS, *see* N.Y. Corr. Law § 2, New York Correction Law Section 24 does not immunize the CO Defendants from defending Plaintiff's state-law claims.

### *1. Assault and battery claims*

"'[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state-law assault and battery claims are] substantially identical.'" *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (quotation omitted). For this reason, genuine issues of material fact with respect to an excessive force claim translate to assault and battery claims arising from the same facts, rendering summary judgment inappropriate. *See Hattar v. Carelli*, No. 09 CV 4642, 2012 WL 246668, *4 (S.D.N.Y. Jan. 11, 2012) (citations omitted). In this case, because genuine issues of material fact exist with respect to Plaintiff's excessive force claims, the Court denies Defendants' motion with respect to Plaintiff's assault and battery claims.

### *2. Intentional infliction of emotional distress ("IIED") claims*

 **\*10**  "In New York, 'intentional infliction of emotional distress is a theory of recovery that is to be invoked only as a last resort,' when traditional tort remedies are unavailable." *Naccarato v. Scarselli*, 124 F. Supp. 2d 36, 44 (N.D.N.Y. 2000) (citing *EEOC v. Die Fliedermaus, L.L.C.*, 77 F. Supp. 2d 460, 472 (S.D.N.Y. 1999) (quoting *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 256 A.D.2d 269, 682 N.Y.S.2d 167, 169 (1st Dep't 1998))). Accordingly, "'[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability.'" *Id.* (quoting *Hansel v. Sheridan*, 991 F. Supp. 69, 75 (N.D.N.Y. 1998)). In this case, Plaintiff's IIED claims concern the same conduct as her excessive force claims and her assault and battery claims. For this reason, Plaintiff may not properly bring her IIED claims in addition to her excessive force and assault and battery claims. Accordingly, the Court grants Defendants' motion with respect to Plaintiff's claims for intentional infliction of emotional distress.

### *3. Defendant County's vicarious liability*

An employer may be liable for the tortious acts of its employees when those acts occur within the scope of the employment. *See Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979) (citations omitted). When a court denies summary judgment with respect to assault and battery claims against law enforcement officers, the court must also deny summary judgment with respect to related *respondeat superior* claims. *See Pravda v. City of Albany*, 956 F. Supp. 174, 183 (N.D.N.Y. 1997).

As noted, there exist genuine issues of material fact with respect to Plaintiff's assault and battery claims. In addition, there is no dispute that Defendant COs were employees of Defendant County of Warren or that they were acting within the scope of their employment. For these reasons, the Court denies Defendants' motion with respect to Plaintiff's *respondeat superior* claim against Defendant County of Warren.

### *4. Defendant County of Warren's negligence*

Government entities may be sued in negligence for breaching their duty to protect the health and safety of inmates in their custody. *See Sanchez v. State of New York*, 99 N.Y.2d 247, 252 (2002) (citations and footnote omitted). As with any negligence claim, this duty is limited to reasonably foreseeable risks of harm. *See id.* Under New York law, the elements of a negligence claim are (1) a duty owed to the plaintiff by the defendant, (2) a breach of that duty, and (3) injury substantially caused by that breach. *See Robinson v. U.S. Bureau of Prisons*, 244 F. Supp. 2d 57, 64-65 (2d Cir. 2003) (citation omitted).

"When a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Naccarato*, 124 F. Supp. 2d at 45 (citations omitted). Accordingly, Plaintiff may not properly bring a negligence claim with respect to the same facts from which her excessive force and assault and battery claims arise. With respect to the remainder of Plaintiff's negligence claim, namely, the deprivation of hygienic items and medical care, there is no evidence in the record upon which a reasonable jury could conclude that such deprivation substantially caused any injury. Accordingly, the Court grants Defendants' motion with respect to Plaintiff's negligence claim in its entirety.

### D. Qualified Immunity [3]

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 43 of 140

Russo v. County of Warren, Not Reported in Fed. Supp. (2015)

2015 WL 7738043

3       Since the Court grants Defendants' motion for
        summary judgment with respect to Plaintiff's
        constitutional claims, the Court need
        only address whether Defendant COs are entitled to
        qualified immunity with respect to Plaintiff's Eight
        Amendment excessive force claims.

The doctrine of qualified immunity "'protects federal and state officials from ... unnecessary and burdensome discovery or trial proceedings.'" *Raspardo v. Carlone*, 770 F.3d 97, 111 (2d Cir. 2014) (quotation omitted). Law enforcement officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights; or (2) it was objectively reasonable for them to believe that their acts did not violate those rights. *See id.* at 113 (quotation and other citation omitted). Although this inquiry requires a focus on the particular facts of the case, the Second Circuit has held that a defendant is entitled to summary judgment on qualified immunity grounds only when

   **\*11**  "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ], could conclude that it was objectively unreasonable for the defendant[s]" to believe that [they were] acting in a fashion that did not clearly violate an established federally protected right. ...

*Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987) (internal quotation omitted).

"Because analysis of the defense of qualified immunity is not 'merely duplicative' of a court's determination of an excessive force claim, early and particularized resolution of the former is required." *Swift v. Mauro*, No. 5:04-CV-0899, 2008 WL 207793, \*4 (N.D.N.Y. Jan. 24, 2008) (quotation omitted). Indeed, denying a motion for summary judgment with respect to an excessive force claim does not translate into a *per se* denial of the qualified immunity defense. *See Henry v. Dinelle*, 929 F. Supp. 2d 107, 128 (N.D.N.Y. 2013). However courts have denied such motions on facts similar to those at issue in this case. *See Cicio*, 2010 WL 1063875, at \*7.

In this case, there is no question that the constitutional claims concern clearly established rights. Moreover, no reasonable corrections officer would question that it is a constitutional violation to shove an inmate face-first into the floor, kick her in the side, and pull back on her wrists by the handcuffs, breaking the skin—especially when she is not resisting. For these reasons, the Court denies Defendants' motion with

respect to qualified immunity as it relates to Plaintiff's excessive force claims.

**E. Third-party complaint**

A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. *See Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996) (quotation omitted). The court may look beyond the pleadings to other evidence in the record to determine the question of subject matter jurisdiction. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 n.6 (2d Cir. 2001).

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (citations omitted). Accordingly, the Government may only be sued with its consent. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quotation omitted). The terms of such waiver "'define [the] court's jurisdiction to entertain the suit.'" *Id.* (quotation omitted) The Government's waiver of sovereign immunity must be unequivocally expressed and strictly construed. *See United States v. King*, 395 U.S. 1, 4 (1969) (citation omitted); *United States v. Sherwood*, 312 U.S. 584, 590 (1941).

The FTCA's waiver of sovereign immunity does not extend to alleged constitutional violations. *See Paulino-Duarte v. United States*, No. 02 Civ. 9499, 2003 WL 22533401, \*3 (S.D.N.Y. Nov. 7, 2003). In this case, the Government enjoys sovereign immunity, and accordingly the Court lacks subject matter jurisdiction to the extent that the third-party claims are based upon alleged constitutional violations. Moreover, to the extent that the third-party claims sound in breach of contract, these claims are dismissed as moot because Plaintiff's medical care is no longer at issue in this case. For these reasons, the Court dismisses the third-party complaint in its entirety.

**IV. CONCLUSION**

Having reviewed the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

 **\*12**  **ORDERS** that Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiff's Eighth Amendment medical indifference claims, Eighth Amendment conditions of confinement claims; municipal liability claims;

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 44 of 140

Russo v. County of Warren, Not Reported in Fed. Supp. (2015)
2015 WL 7738043

intentional infliction of emotional distress claims; and negligence claims; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **DENIED** with respect to all other claims [4]; and the Court further

[4]    As a result of this Memorandum-Decision and Order, the following claims remain for trial: (1) Plaintiff's Eighth Amendment excessive force claims against Defendant COs; (2) Plaintiff's state-law assault and battery claims against Defendant COs; and (3) Plaintiff's *respondeat superior* claim against Defendant County of Warren as it relates

to Plaintiff's assault and battery claims against Defendant COs.

**ORDERS** that Third-Party Defendants' motion to dismiss the third-party complaint is **GRANTED**; and the Court further

**ORDERS** that trial counsel shall participate in a telephone conference on **December 15, 2015**, at **10:00 a.m.** to schedule a trial in this matter. The Court will provide counsel with the dial-in instructions prior to the conference.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2015 WL 7738043

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 45 of 140
Sforza v. City of New York, Not Reported in F.Supp.2d (2009)
2009 WL 857496

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Zimpfer v. Hilbert College,   W.D.N.Y.,   December 2, 2021

2009 WL 857496
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Chris SFORZA, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 07 Civ. 6122(DLC).
|
March 31, 2009.

West KeySummary

**1**    **Federal Civil Procedure** 🔑 Civil Rights
Cases in General

Genuine issues of material fact as to the amount of force used precluded summary judgment in an arrestee's § 1983 claim for municipal liability based on the use of excessive force during an arrest. The arrestee, a transgender woman, alleged that she was arrested after being attacked by a restaurant employee with a pipe in the restroom. The arrestee claimed that she was handcuffed too tightly, creating ongoing numbness in her hands, and that the police deliberately slammed her head twice into the roof of a police vehicle, causing bruises that remained for two months. The city was not entitled to summary judgment based on medical records that reflected injury only to the arrestee's arm, because bruising and other non-permanent injuries can be sufficient to prevail in an excessive force claim. 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Rose M. Weber, Rose M. Weber Law Office, New York, NY, for Plaintiff.

Susan P. Scharfstein, New York City Law Department, New York, NY, for Defendants City of New York and individual City Defendants.

*OPINION AND ORDER*

DENISE COTE, District Judge.

 **\*1**   This lawsuit concerns allegations of civil rights violations stemming from plaintiff's arrest at a McDonald's restaurant and her treatment by the New York City Police following the arrest. Defendants the City of New York (the "City"), Officers Joseph Bonner, Dennis Morgano, Bryan Hanson, and Jordan Bistany, and Sergeants Liz Salinas, Michael McGovern, Christopher Newsom, Ralph Perfetto, John Adriano, and Luigi Pagano (collectively, the "City Defendants") have moved to dismiss plaintiff Chris Sforza's Third Amended Complaint under Rules 8(a), 12(b)(1), 12(b)(6), and 56, Fed.R.Civ.P. The motion is granted with the exception of the motion to dismiss the excessive force claim brought against the City.

BACKGROUND

Before addressing the parties' legal arguments, the plaintiff's allegations will be summarized and the relevant procedural history of this litigation will be set forth in some detail. The procedural history underlies the defendants' motion to dismiss all claims against the individual City Defendants.

1. July 11, 2006 Arrest

Plaintiff, a transgender female, alleges that she was attacked by a McDonald's employee wielding a metal pipe on July 11, 2006, while injecting herself with insulin in a bathroom at a Manhattan branch of the restaurant to treat her diabetes. Police officers soon arrived on the scene and allegedly arrested plaintiff without probable cause, telling the McDonald's employee that "I got you covered" and allowing him to hide the pipe in a back room at the restaurant. While taking Sforza into custody, the officers allegedly slammed her head onto the roof of a patrol car and handcuffed her too tightly, causing injuries that persist to the present day. [1]

1     At a December 17, 2007 initial conference, plaintiff's counsel explained that the plaintiff

suffered no permanent physical injuries but remained traumatized by these events.

Sforza also claims that the officers refused to take her to the hospital for treatment, bringing her first to Manhattan South Precinct instead. She was later transported to the hospital and then returned to the precinct. There, plaintiff alleges, she was strip-searched in full view of male police officers and held in police custody for 24 hours. Sforza was subsequently prosecuted on two counts of assault in the third degree, one count of attempted assault in the third degree, and one count of harassment in the second degree. The charges were dismissed on October 26, 2006.

Sforza alleges that no probable cause for the prosecution existed and that defendants withheld exculpatory evidence and falsified evidence before the District Attorney. She also alleges that, following her release from custody, officers at the precinct refused to allow her to file charges against the McDonald's employee who she maintains assaulted her, despite repeated requests.

2. Delays in Initiating the Lawsuit

Sforza filed a complaint against the City, McDonald's Corporation, and unidentified employees of the New York City Police Department and McDonald's on June 29, 2007, bringing claims under 42 U.S.C. §§ 1983 (" § 1983") and 1985 (" § 1985") for deprivation of civil rights, false arrest, malicious prosecution, abuse of process, excessive force, conspiracy, violation of equal protection, and municipal liability against the City Defendants.[2] She also brought pendent state claims for false arrest, assault, battery, malicious prosecution, abuse of process, intentional or negligent infliction, prima facie tort, negligent hiring, training, supervision, and retention against McDonald's Corporation and its employees, as well as claims under the state and city Human Rights Laws against all defendants.

[2]     Sforza's conspiracy claims are brought against McDonald's and its employees as well.

**\*2** On July 19, defendant the City of New York requested and received a sixty-day extension, from July 23 to September 24, 2007, to respond to the complaint. The City, with plaintiff's consent, sought the extension because the plaintiff had named no individual defendants in the action, and the records of the incident, including police records, may have been sealed pursuant to New York Criminal Procedure Law § 160.50.[3] The City needed to review the records of the matter

in order to respond to the complaint in compliance with its obligations under Rule 11, Fed.R.Civ.P., and it could not do so until plaintiff executed a consent and authorization releasing the records (the "release"). The City represented that it had forwarded to plaintiff the consent and authorization.

[3]     § 160.50 provides, in part, that
[u]pon the termination of a criminal action or proceeding against a person in favor of such person ... unless ... such person or his or her attorney demonstrates to the satisfaction of the court that the interests of justice require otherwise ... the record of such action or proceeding shall be sealed ....

It took more than two months, three more letters to the Court from the City, and a Court Order to obtain the necessary release from the plaintiff so that the litigation could begin. The City wrote on September 7, 2007 to request, with plaintiff's and co-defendant McDonald's consent, an additional forty-five days to respond to the allegations of the complaint. The City stated that it had forwarded the release to plaintiff on July 24, 2007 and again on August 14, 2007, and that plaintiff's counsel, Rose Weber ("Weber"), had recently promised to produce the release by September 14. A September 11 endorsement granted the City's request for an extension to respond to the complaint until October 31, and adjourned the initial conference, which had been scheduled for October 5, to October 26.

By September 24, plaintiff had still not produced the release, and the City wrote to request a further adjournment of the initial conference and an Order requiring plaintiff to produce the release and warning plaintiff that she risked dismissal for failure to prosecute. Without the release, the City stated, it was unable to learn the identities of any of the police officers allegedly involved in the incident, as plaintiff had not named any in the complaint.

Plaintiff proceeded to file her first amended complaint two days later, substituting a different McDonald's entity, McDonald's Restaurants of New York, Inc. ("McDonald's"), as defendant. She also hand-delivered the release to the City. That same day, Weber wrote to the Court to apologize for the delay in providing the release. In her letter, Weber explained that she is a solo practitioner and was one of the lead attorneys in litigation arising from arrests during the 2004 Republican National Convention ("RNC"). Noting that "[t]hese cases have required a super-human effort on my part over the past several months," Weber admitted that "[i]t has,

consequently, been difficult for me to pay proper attention to my non-RNC cases." Weber's letter was docketed and filed with an endorsement warning her that "further similar failures to comply diligently with discovery obligations in this case may result in dismissal." The endorsement also adjourned the initial conference to November 30, 2007.

**\*3** The City wrote again on September 28 to complain about plaintiff's September 26 letter, which it deemed "misleading and unfair." The release produced by plaintiff on September 26, the City explained, was not properly completed (it did not include docket or indictment numbers) and might not allow the City to access the necessary records. [4] As a result, the City would not have sufficient time to obtain the documents needed to respond to the amended complaint. In addition to a further 45–day extension of its time to respond to the complaint, the City requested that plaintiff be ordered to produce a properly completed release by a date certain.

[4]    The release form, attached by the City to its September 28 letter, requires little investment of effort on plaintiff's behalf. She needed only to provide the name of the criminal action terminated in her favor, its docket or indictment number, and her signature, and have the form notarized.

A telephone conference was held with the parties on October 5. The plaintiff was reminded of her responsibility to be diligent in the prosecution of the case. Following the conference, an Order of October 9 required plaintiff to provide a compliant release pursuant to New York Criminal Procedure Law § 160.50 by October 19 or submit a letter explaining why her efforts had been unsuccessful. The initial conference was rescheduled for December 7, and defendants were directed to answer the amended complaint by that date. The plaintiff finally produced the required release.

3. Delays in Conducting Discovery

At the initial conference on December 7, a schedule for the balance of the litigation was established, including a December 21, 2007 deadline for plaintiff to provide her medical releases to the defendants. Fact discovery was to close on June 27, 2008. Following expert discovery, a pretrial order or summary judgment motion was due on October 3, 2008.

About a month after the close of fact discovery, plaintiff's counsel wrote the Court on July 24, 2008 to request a 120–day extension (running from the date of the letter) of the fact

discovery deadline. [5] She noted that defendant McDonald's consented to the extension, but that the City wanted the 120 days to run from the end of future settlement discussions, hoping to avoid the costs of discovery. Plaintiff also requested a conference to discuss outstanding discovery disputes and stated that the resolution of one of the disputes, involving the identities of officers at a New York City Police Department precinct, was likely to create the need for amendments to the complaint. Plaintiff explained that she had not yet amended her complaint to name any police officers because "[i]n order to avoid piecemeal, sequential amendments to the complaint, plaintiff has held off on amending the complaint until she can add all of the police officer defendants." The letter revealed that no depositions had been taken and that the plaintiff wanted to depose "several" police officers and some other witnesses, including an unknown number of McDonald's employees.

[5]    Weber had written a substantially similar letter on July 7, 2008 to the Magistrate Judge to whom the parties had been referred for settlement discussions.

A telephone conference with the parties was held on the record on July 31, 2008. At the conference, the delays and lack of diligence, especially on plaintiff's part, were noted. Plaintiff had been warned about the possibility of dismissal for failure to prosecute ten months earlier, and the schedule set at the initial conference in December 2007 had been set to accommodate her needs. The parties had failed to have any settlement discussions before Magistrate Judge Dolinger, had not begun depositions, and did not mention any existing discovery disputes or request any extension of fact discovery until a month after they were supposed to have completed the process.

**\*4** The City noted that plaintiff had given only vague information regarding the visits to the precinct she made to attempt to file a complaint against the McDonald's employee. While the plaintiff had identified six or seven dates of visits to the precinct, she had given no names for the officers with whom she had spoken or even a general physical description of them, such as their gender, race, or height. The City explained that the assigned desk officer might not have been at the desk when plaintiff appeared at the precinct and that the plaintiff could not have a good-faith basis for naming an assigned desk officer as a defendant. Without descriptions from the plaintiff, the City was still not able to identify the officers with whom plaintiff may have interacted. Weber

2009 WL 857496

insisted that she was entitled to the names of the assigned desk officers in discovery and that their names were all she wanted to know.

Following the telephone conference, an Order of July 31, 2008 gave plaintiff five days to file an amended complaint "naming each of the police officers present at McDonald's restaurant on the date of the incident alleged." The Order also required the City to "identify the desk officers assigned at the times and dates specified by plaintiff" by August 29. Plaintiff was directed to amend her complaint further by September 5 to include any additional police officers, but warned that the complaint must be amended "consistent with [Weber's] obligations under Rule 11" and that "[t]here shall be no further amendment or joinder of additional parties after September 5, 2008." Additionally, the Order extended fact discovery to December 19 and set a March 27, 2009 due date for either a summary judgment motion or pretrial order.

### 4. The Second and Third Amended Complaints

Plaintiff amended her complaint for the second time on August 6, 2008, naming Officers Joseph Bonner, Dennis Morgano, Bryan Hanson, Jordan Bistany, and Sergeant Liz Salinas as defendants. She filed a Third Amended Complaint on September 5, adding Sergeants Michael McGovern, Christopher Newsom, Ralph Perfetto, John Adriano and Luigi Pagano. Neither the Second nor the Third Amended Complaints ties any of the ten officers to either the incident at McDonald's or the precinct where plaintiff alleges she was strip-searched and repeatedly denied the opportunity to file a complaint. The Third Amended Complaint lists all of the above individuals together in one paragraph and alleges that they were police officers. The allegations of wrongdoing found elsewhere in the complaint refer only to "defendant police officers," failing to identify any individual officer or even a group of officers, despite the fact that these officers were identified to plaintiff as present at either McDonald's or the precinct.

The filing of the Third Amended Complaint did not put an end to the disputes and delays. On August 18, the City wrote a letter stating that, while plaintiff had filed her Second Amended Complaint on August 6, she had not yet served the five individual defendants it named. The plaintiff was directed to serve the defendants named in the amended complaint by September 19, 2008.

**\*5** The City wrote again on September 23, representing that plaintiff had not properly served the defendants in compliance

with Rule 4, Fed.R.Civ.P., because the delivered papers did not include a summons directed to each defendant. Instead, plaintiff had listed all of the individual City Defendants together on the summons and highlighted the name of the particular individual being served. Plaintiff refused to correct the defects in service and wrote a letter on September 24 contesting whether the Federal Rules require inserting each defendant's name into the "To:" section of a summons.

A telephone conference was held on the record on September 25 to discuss the parties' submissions. The conference opened with the Court noting the numerous delays that had thus far occurred. Both parties were heard on the summons issue. Following the conference, an Order of September 26 directed plaintiff to serve the individual City Defendants by October 3 in accordance with Rule 4(a)(1)(B), Fed.R.Civ.P., which requires that a summons be "directed to" each defendant. Defendants were ordered to answer or otherwise respond by November 3. [6]

> [6]    Orders of October 24 and December 10 addressed the parties' disputes regarding access to the plaintiff's medical providers. *See Sforza v. City of New York,* No. 07 Civ. 6122(DLC), 2008 WL 4701313, at \*3 (S.D.N.Y. Oct.24, 2008).

### 5. City Defendants' Motion to Dismiss or for Summary Judgment

On November 3, the City Defendants moved to dismiss or for summary judgment. A November 5 Order required plaintiff to oppose the motion by November 21 and the City Defendants to reply by December 5. Plaintiff wrote a letter on November 5, stating that she had "not yet had the opportunity to conduct any depositions whatsoever" and noting that "much of the paper discovery is still outstanding." She asked that the City be directed to withdraw its motion without prejudice for refiling at the close of discovery or that plaintiff be permitted to file her opposition papers at the close of discovery. In the alternative, she requested until December 5 to submit her opposition, stating that "[f]our weeks is the norm for opposition papers, and, as a solo practitioner with a very busy practice, I will need every minute of those four weeks." [7] City Defendants submitted a letter opposing plaintiff's requests. An Order of November 13 authorized plaintiff to file her opposition to the motion to dismiss by December 5, with City Defendants' reply due on December 19.

2009 WL 857496

7      In fact, Local Civil Rule 6.1(b) states that parties
       have ten business days to file opposition papers to
       most motions.

The parties next submitted a series of letters concerning various discovery disputes. On November 12, a letter was received from Weber listing ten discovery disputes and requesting a conference to address them. The requests concerned, *inter alia,* the City's refusal to provide information regarding whether the officers involved in the incident were using steroids, its insistence that any information regarding the individuals who had placed 911 calls regarding the incident at McDonald's must be accompanied by an attorneys'-eyes-only stipulation, as well as its refusal to provide various records and training documents relevant to the issue of municipal liability until after motion practice. Besides opposing the plaintiff's positions on these issues, the City requested a stay of depositions until its November 3 motion was resolved. At a December 2 conference held on the record, neither party objected to a stay of depositions pending resolution of City Defendants' motion. The parties were ordered to complete document discovery by December 19.

**\*6**  Plaintiff submitted her opposition to the motion to dismiss or for summary judgment on December 5. That opposition included plaintiff's own declaration, which did not specifically identify any police officers. The motion was fully submitted on December 19.

## DISCUSSION

The City Defendants' arguments that the Third Amended Complaint must be dismissed with respect to the claims brought against individual City Defendants will first be addressed, followed by analysis of claims against the City. A trial court considering a Rule 12(b)(6) motion must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted).

A court considering a Rule 12(b)(6) motion applies a "flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir.2008) (citation omitted). "To survive dismissal, the plaintiff must provide the grounds on which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted).

Under the pleading standard set forth in Rule 8(a)(2), complaints must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "[A] plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests." *Leibowitz v. Cornell Univ.,* 445 F.3d 586, 591 (2d Cir.2006). Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). No heightened or more specific pleading standard applies to claims brought under § 1983. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Iqbal v. Hasty,* 490 F.3d 143, 153 (2d Cir.2007). § 1983 claims need not be plead with particularity, but may be averred generally. *Leatherman,* 507 U.S. at 168.

In *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004), an employment discrimination claim also brought under § 1983, the court noted that "Rule 8 does not necessarily require ... that the complaint separate out claims against individual defendants." *Id .* at 80. Deciding that Wynder's complaint satisfied Rule 8, however, the court also noted that "each of the named defendants-appellees is explicitly tied to one or more of Wynder's allegations." *Id.* "[R]eading the complaint carefully, the individual defendants can discern which claims concern them and which do not." *Id.* The court ultimately found that plaintiff's complaint, which was "a model of neither clarity nor brevity," *id.* at 79, met the standard of Rule 8(a). The *Wynder* court noted, however, that a complaint which passed muster under Rule 8 might nonetheless be dismissed under Rule 12(b)(6) for failure to state a claim. Where "the complaint accuses *all* of the defendants of having violated *all* of the listed constitutional and statutory provisions," defendant may move to dismiss "those causes of action as to which no set of facts has been identified that support a claim against him." *Id.*

1. Claims Against Individual City Defendants

2009 WL 857496

**\*7** 42 U.S.C. § 1983 provides in part that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

It is "well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted).

Sforza's pleading fails to allege personal involvement of any defendant in any of the actions which allegedly violated her rights. It does not attribute any of the actions giving rise to Sforza's allegations to any of the specific officers named, or to any group of the officers. Sforza offers no arguments explaining why she fails to identify any specific police officers or suggesting that the City failed to identify officers as present at either McDonald's or the precinct. Nor is it possible to infer from the list of police officers which ones were personally involved in which deprivations of Sforza's rights, whether it is the excessive use of force, an unlawful arrest, an abusive strip search, or a refusal to take a complaint.[8]

[8]   Plaintiff's response in her opposition papers that the identity of the officers "is obvious" is not sufficient. It is not at all obvious from the statement in the complaint that "police officers" took certain actions against her which officers, and how many officers, should be held responsible for any of the enumerated violations of her rights.

The individual City Defendants have therefore not received fair notice regarding which of their actions gave rise to the claims upon which the complaint is based, because it is impossible to discern from the Third Amended Complaint why Sforza has named any of the police officers she lists as

defendants. As such, the Third Amended Complaint fails to state a claim against any individual City Defendant and will be dismissed pursuant to Rules 8 and 12(b)(6), Fed.R.Civ.P.

Sforza has requested leave to amend her complaint to allege personal involvement in the event that the City Defendants' motion is granted on these grounds. The July 31, 2008 Order stated that Sforza would not be granted further leave to amend following her submission of the Third Amended Complaint.

Rule 16, Fed.R.Civ.P., governs leave to amend after a scheduling order has been entered. Rule 16 provides that a district court may enter a scheduling order that limits the time to amend the pleadings, and that "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge." Fed.R.Civ.P. 16(b). Rule 16 "is designed to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir.2000) (citation omitted). Disregarding the instructions of a scheduling order "would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation." *Id.* (citation omitted).

**\*8** "[A] district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Id.* In determining whether a party has shown good cause, "the primary consideration" is whether the movant has been diligent. *Kassner v. 2nd Avenue Delicatessen Inc.,* 496 F.3d 229, 244 (2d Cir.2007). Another relevant factor is prejudice to the defendants.[9] *Id.* The Second Circuit has upheld the denial of a request seeking leave to amend under Rule 15 when the district court judge had earlier "expressly admonished the plaintiff, before the limitations period had expired, to discover the names of the individual officers and to amend his complaint to add them as defendants." *Soto v. Brooklyn Correctional Facility,* 80 F.3d 34, 37 (2d Cir.1996).

[9]   In addition to the burden placed on them by the plaintiff's neglect of her obligations to prosecute her claims diligently, the individual City Defendants contend that they have been prejudiced by the failure of the Third Amended Complaint to link them to specific unlawful acts. Specifically, they point out that they have been unable to craft the argument that they are entitled to receive qualified

immunity from claims pressed in this lawsuit and to be dismissed as defendants. Given the plaintiff's lack of diligence it is unnecessary to reach this additional factor supporting dismissal.

Sforza has made no showing of diligence, nor has she attempted to do so. The City's correspondence, the conferences with the Court, and the Order of July 31, 2008 fully alerted her to the deficiencies in her pleading. Further, she had over a year from the initial filing of the complaint until the deadline set by the July 31 Order to craft an adequate pleading. *See Parker,* 204 F.3d at 340. The time for amendment having closed, further leave to amend shall not be granted. [10]

[10]   It is noteworthy that the plaintiff did not submit a proposed amended pleading with her opposition to the motion to dismiss demonstrating that she could cure the defects in her pleading while complying with the mandates of Rule 11, Fed.R.Civ.P.

Lest this seem an overly harsh result, it is worth pausing to note several examples of plaintiff's lack of diligence in pursuing amendment of the pleadings and discovery in this case. Plaintiff took over two months to return the release to the City, which required the barest of information and without which individual defendants could not be named, an answer could not be filed, and discovery could not begin. Plaintiff's counsel acknowledged in her September 26, 2007 letter that she had neglected to attend to Sforza's case properly, and her actions following the letter show similar signs of neglect.

The City included the identities of five police officers with its initial disclosures on December 7, 2007. Plaintiff did not attempt to amend her complaint for over eight months, until the Order of July 31, 2008 directed her to do so. Meanwhile, she conducted little, if any, fact discovery to attempt to learn information that would help her to meet her burden of proof, and did not contact Chambers to request an extension until a month after fact discovery should have been completed. Finally, after the extension of fact discovery was granted, plaintiff waited over three months before noticing the depositions of the ten individual City Defendants, attempting to compress those ten depositions into a four-week timeframe (plaintiff was unavailable for one week of the remaining discovery period) that included the Thanksgiving holiday.

It is unfortunate that plaintiff's claims against the individual City Defendants will be dismissed before consideration of their merits. Plaintiff, however, had over a year to amend

her pleading to state a claim against the individual City Defendants, was specifically directed to do so by the July 31 Order, and the issue was discussed with plaintiff's counsel in conferences before the Court on multiple occasions. She had an additional four months between the July 31 Order and the submission of her affidavit accompanying the opposition to the motion to dismiss, and still did not take that opportunity to identify any specific police officers. The pleading deficiencies were not the result of a single oversight, but rather the regrettable manifestation of a pattern of delay and neglect.

## 2. Municipal Liability

 ***9**  Having dismissed Sforza's claims against the individual City Defendants, it is still necessary to consider defendants' arguments that claims against the City should be dismissed. Defendants assert that, because plaintiff cannot show that any individual City Defendant violated a constitutional right, her federal claims against the City must fail. City Defendants also state that Sforza's claims do not meet the municipal liability standards established in *Monell v. Department of Social Services.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), because she does not identify any policy, custom, or practice that violated her rights and impermissibly attempts to establish liability based on a single incident. Finally, the City argues that it is entitled to summary judgment on each of the claims. The City has shown that it is entitled to summary judgment on each of the plaintiff's claims except the claim for excessive force.

A municipality can be held liable pursuant to § 1983 only if its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell,* 436 U.S. at 694; *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 128 (2d Cir.2004). A finding of municipal liability without finding a violation of constitutional rights by an individual is not permitted where 1) the municipal liability arises from the authorization of or a policy leading to the individual's alleged violation and 2) there is a finding that no individual violation occurred. [11]  "[N]either *Monell v. New York City Dept. of Social Services,* nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). In *Heller,* a jury found that a police officer had not used excessive force (and therefore

2009 WL 857496

had not violated § 1983). *Id.* at 798. The Supreme Court held that the city could not be held liable under an alleged unconstitutional municipal policy of using excessive force during arrests. *Id.* at 799. The Court observed that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *Id.* (emphasis removed).

11    Despite the City's argument, "municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange County Human Rights Comm'n,* 194 F.3d 341, 350 (2d Cir.1999). In *Barrett,* the Second Circuit held that the Human Rights Commission could be liable for infringing Barrett's constitutional rights even though the most prominent members of the Commission, who were named as individual defendants, were found not to be liable. *Id.* The court reasoned that the Commission was a multi-member body whose decisions were made by a vote of all the members; therefore, its acts could be independent of two of its members and Barrett's alleged injuries were not solely attributable to the actions of the named defendants. *Id.*

Applying *Heller,* the Second Circuit has recognized that "a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights." *Curley v. Village of Suffern,* 268 F.3d 65, 71 (2d Cir.2001). *Curley,* like *Heller,* involved allegations that the conduct of specific individual police officers injured plaintiff, the complaint named all of those police officers as defendants, and there was "no question with respect to whether another officer violated plaintiff's rights for which the village might be liable." *Id.* The liability of the municipality for failure to train or properly supervise was therefore tied to the liability of the individual defendants. *Id.* As the jury had found no deprivation of plaintiff's rights with respect to the officers' alleged use of excessive force, the municipality could not be held liable, because it was "implicated in plaintiff's amended complaint only by way of the individual defendants' conduct." *Id.*

**\*10** More recently, the Second Circuit, citing *Heller,* declined to hold the City of New York liable under § 1983

because it found at the summary judgment stage that the individual police officer defendants had not violated the constitutional rights of a confidential informant whom they allegedly failed to protect from being assaulted by a drug dealer. *Matican v. City of New York,* 524 F.3d 151, 154 (2d Cir.2008). The police officers named as defendants were the three officers in whose sting operation plaintiff had assisted. *Id.* at 153. As in *Curley,* they were the entire group of officers who could have been responsible for the alleged violation of Matican's rights. Before finding that the individual officers had not violated plaintiff's right to substantive due process, the court framed the issue as follows, citing *Heller:* "[d]id the officers' actions violate Matican's constitutional rights? If they did not, then the City cannot be liable to Matican under § 1983, regardless of whether the officers acted pursuant to a municipal policy or custom." *Id.* (citation omitted).

Where claims against individual municipal defendants are dismissed without a finding on the merits, however, the *Monell* claim survives. For instance, the Second Circuit has held that granting an individual officer qualified immunity 12 does not dispose of the issue of municipal liability. *See Curley,* 268 F.3d at 71; *Prue v. City of Syracuse,* 26 F.3d 14, 19 (2d Cir.1994). The same is true here: where claims against the individual officers have been dismissed without reaching their merits, it is still possible for a jury to find a constitutional violation for which a municipality may, though its policies, practices, or customs, be liable.

12    The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* ——U.S. ——, ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citation omitted).

Alternatively, the City argues that plaintiff has not stated a claim for *Monell* liability because she has not identified any policy, custom, or practice resulting in a violation of her rights, and her factual allegations describe only one incident purportedly involving wrongdoing, which is insufficient to support a *Monell* claim. The City relies on *Dwares v. City of New York,* 985 F.2d 94 (2d Cir.1993), which states that "[a] single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Id.* at 100.

The plaintiff has adequately identified a municipal policy and practice for at least some of her claims. The Third Amended Complaint alleges that the

> customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department included, but were not limited to, *arresting and prosecuting individuals solely because they are transgender,* manufacturing false charges against such individuals, *using excessive force against such individuals, and allowing members of the opposite sex to search such individuals.*

**\*11** (Emphasis supplied).

The City's argument that plaintiff alleges only one incident in support of her *Monell* claim, and that one incident is insufficient evidence of a City policy, is similarly unpersuasive. *Monell* liability may spring from a single violation, as long as the conduct causing the violation was undertaken pursuant to a City-wide custom, practice, or procedure. *See, e.g., DiSorbo v. Hoy,* 343 F.3d 172, 180–81 (2d Cir.2003) (city liable under *Monell* for excessive force in simultaneous arrest of two sisters); *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003) (county held liable under *Monell* following the retaliatory discharge of an employee). *Dwares,* cited by the City, involved a complaint containing insufficient allegations of a custom or practice. *Dwares,* 985 F.2d at 97, 101. Plaintiff's *Monell* claim will therefore not be dismissed in its entirety on grounds that it either fails to allege a policy or is based entirely on single incidents.

A prerequisite to a *Monell* claim, of course, is a violation of plaintiff's constitutional rights. *Hartline v. Gallo,* 546 F.3d 95, 99–100 (2d Cir.2008). To address the City's motion, it is necessary to determine whether each of the § 1983 and § 1985 claims in the Third Amended Complaint 1) pleads a cause of action and 2) survives the summary judgment motion.

Sforza's opposition and November 5, 2008 letter to the court, discussed above, are peppered with assertions that a summary judgment motion is premature because discovery is not yet complete. Sforza has not, however, filed an affidavit pursuant to Rule 56(f) to explain that she cannot present facts in support of her opposition because of inadequate discovery.

"The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." *Hellstrom v. U.S. Dept. of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000) (citation omitted). "[S]ummary judgment is generally disfavored when the party opposing the motion has not obtained discovery." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 152 (2d Cir.1990) (dicta). Rule 56(f), Fed.R.Civ.P., "sets forth a specific procedure by which a party lacking information necessary to oppose a summary judgment motion may seek further discovery." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 573 (2d Cir.2005) (per curiam).

> To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful.

*Gualandi v. Adams,* 385 F.3d 236, 244 (2d Cir.2004). "The failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Di Benedetto v. Pan Am World Service, Inc.,* 359 F.3d 627, 630 (2d Cir.2004) (citation omitted). "A reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994). *See generally National Union Fire Ins. Co. of Pittsburgh, PA. v. Stroh Companies, Inc.,* 265 F.3d 97, 117 (2d Cir.2001) (requiring Rule 56(f) affidavit and denying request for additional discovery when party had several months to pursue discovery).

**\*12** Sforza may not, therefore, defeat the City's summary judgment motion by simply arguing that she requires more discovery. Even if it were appropriate to consider arguments

2009 WL 857496

presented solely in a memorandum, with a single possible exception, her memorandum has not focused her request for more discovery on the specific facts she needs, how she seeks to obtain them, and why they would make a difference.[13] Given that Sforza has had nearly a year for discovery, it would be especially important for her to indicate which arguments she can support with the discovery that has already occurred and which arguments will require depositions or other currently incomplete discovery for their support. To the extent, therefore, that a claim states a cause of action and the City has moved for summary judgment, the summary judgment motion shall be considered.

[13]    The single exception relates to her equal protection claim and her explanation that she needs to depose individual plaintiffs to discover their discriminatory motives.

Summary judgment may not be granted, however, unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings. Fed.R.Civ.P. 56(e); accord *Sista,* 445 F.3d at 169. That is, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over material facts—facts that might affect the outcome of the suit under the governing law—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Sforza asserts that the following claims constitute deprivations of her rights in violation of § 1983: false arrest, malicious prosecution, malicious abuse of process (in connection with her arrest); excessive force; failure to permit her to file charges against the McDonald's employee; violation of equal protection; and conspiracy to deprive Sforza of her constitutional rights (also brought under §

1985).[14] Her first claim, though, is for a general "Deprivation of Federal Civil Rights Under § 1983."

[14]    Sforza makes no explicit allegation of deliberate indifference to her medical needs, although the City's motion papers address this claim. Sforza notes in her opposition that her complaint does not include a cause of action for deprivation of medical care. Given this acknowledgment, the City's arguments on the issue of indifference to medical needs will not be considered.

3. "Deprivation of Federal Civil Rights"
Sforza's claim for "deprivation of federal civil rights" does not state of which rights she was deprived—only that the First, Fourth, Fifth, Eighth, and Fourteenth Amendments were involved—or provide any information on the deprivation she allegedly experienced. Defendants interpret this claim as possibly including claims for violations of procedural or substantive due process. Without any factual illumination of this claim, though, Sforza has failed to meet the Rule 12(b)(6) standard requiring her to "provide the grounds upon which [her] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc.,* 493 F.3d at 98. While plaintiff incorporates all of her factual allegations by reference into her "deprivation of civil rights" claim, the results of combining the myriad factual events described in the entirety of the complaint with the range of constitutional rights contained in this claim is that defendants do not have "fair notice of what the claim is and the grounds upon which it rests." *Leibowitz,* 445 F.3d at 591. Sforza's "deprivation of federal civil rights" claim will therefore be dismissed on Rule 8(a)(2) grounds.

4. False Arrest
 **13**  Sforza alleges that, when the police officers arrived on the scene at McDonald's, they refused to allow her to describe her confrontation with the manager and, relying on false statements given by a McDonald's employee that Sforza had attacked him, they falsely arrested and imprisoned her. The City moves for summary judgment on this claim, arguing that probable cause for Sforza's arrest existed, because the arresting officer was entitled to rely on the statements of the complaining witness, and that, in any event, the manager's statement was corroborated. In support of its argument, the City has submitted the complaint taken at McDonald's, in which the manager of McDonald's stated that Sforza did "strike [him] several times with a closed fist and kicked [him]

2009 WL 857496

in the legs," causing "bruising [and] swelling to [his] legs," as well as the arrest worksheet documenting the same. Plaintiff concedes that the McDonald's manager reported to police that plaintiff had assaulted him.

Allegations of unconstitutional false arrest are analyzed by "look[ing] to the law of the state in which the arrest occurred." *Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006) (citation omitted). The elements of a claim for false arrest under New York law are that

> (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.

*Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir.2003) (citation omitted). A claim for false arrest or false imprisonment fails when the arresting officer had probable cause to make the arrest. *Jenkins v. City of New York,* 478 F.3d 76, 84 (2d Cir.2007).

The requirement of probable cause does not create a high bar for law enforcement. It exists where "the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *United States v. Delossantos,* 536 F.3d 155, 158 (2d Cir.2008) (citation omitted). "When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." *Curley,* 268 F.3d at 70. Probable cause does not inquire into the arresting officers' subjective motivations, but rather asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them ." *Bryant v. City of New York,* 404 F.3d 128, 136 (2d Cir.2005) (citation omitted). "[ S] ummary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins,* 478 F.3d at 88. A court deciding whether an arrest is reasonable "must examine the totality of the circumstances of a given arrest." *Delossantos,* 536 F.3d at 159. An officer is not "required to explore and eliminate every plausible claim of innocence

before making an arrest." *Jaegly,* 439 F.3d at 153. "[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Panetta v. Crowley,* 460 F.3d 388, 395–96 (2d Cir.2006).

**\*14** Plaintiff was arrested on suspicion of misdemeanor (third-degree) assault. A person is "guilty of assault in the third degree when: (1) with intent to cause physical injury to another person, he causes such injury to such person or to a third person ...." N.Y. Penal Law § 120.00. The statements of the McDonald's manager establish probable cause to arrest Sforza for assault, and Sforza has not offered evidence to raise a question of fact regarding that finding.

Sforza argues that the manager's statement was insufficient to establish probable cause for several reasons. Sforza first asserts that the manager's lack of injuries, contrasted with Sforza's condition ("bruised, bloodied, and missing teeth") contradicted the McDonald's employee's account of a fight instigated by Sforza. By not comparing the two parties' injuries, she argues, the police disregarded exculpatory evidence, negating a finding of probable cause. The possibility that both parties were injured may indicate the existence of probable cause to arrest the manager as well, but the manager's lack of severe injury does not indicate that no fight occurred or that the manager was not punched or kicked, and misdemeanor assault does not require serious physical injury. N.Y. Penal Law § 120.00. While Sforza contests whether the manager had any visible injuries at all, the arrest report and complaint show that the officers had the impression that he did. In any event, Sforza's own injuries and her belief that the manager was not injured do not constitute "plainly exculpatory evidence."

The Second Circuit case Sforza cites for the "plainly exculpatory evidence" exception to the establishment of probable cause by a complainant's statement is based on an Eighth Circuit case that listed "DNA evidence and a videotaped account of the crime that conclusively establish the suspect's innocence" as the kind of "plainly exculpatory" evidence negating a finding of probable cause. *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir.1999) (cited in *Panetta,* 460 F.3d at 395). That one participant in a fight is injured less than the other does not approach the "plainly exculpatory" level contemplated by *Kuehl.* Neither is the involvement of a witness in a confrontation enough to cast doubt on that witness's veracity and negate probable cause. *See Curley,* 268 F.3d at 69–70 (probable cause for plaintiff's arrest supported by testimony of witnesses involved in fight with plaintiff);

*Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997) (probable cause supported by statement of witness identifying plaintiff as his assailant and witness's visible injuries, despite plaintiff's claims that he had acted in self-defense).

In addition, Sforza argues that on a motion for summary judgment "the Court must accept plaintiff's statement that she did not assault the manager in any way." The deference that her declaration of innocence receives at the summary judgment stage does not demonstrate a lack of probable cause for her arrest. Probable cause does not speak to the arrestee's ultimate guilt or innocence. While probable cause requires more than a "mere suspicion" of wrongdoing, its focus is on "probabilities," not "hard certainties." *Walcyk v. Rio,* 496 F.3d 139, 156 (2d Cir.2007) (citation omitted). The arresting officer need not be certain that the arrestee will be successfully prosecuted. *Curley,* 268 F.3d at 70; *see also Panetta,* 460 F.3d at 395 ("the fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause"). Adopting Sforza's standard for false arrest, in which the innocence of the arrestee negates probable cause, would allow any person acquitted of a crime to bring charges for false arrest. Summary judgment is granted to the City on the false arrest claim.

5. Excessive Force

 **\*15** Sforza has alleged excessive use of force during her arrest and detention. She claims that she was handcuffed too tightly, creating ongoing numbness in her hands, and that the police deliberately slammed her head twice into the roof of a police vehicle, causing bruises that remained for two months. Defendants assert that they are entitled to summary judgment because the medical records reflect injury only to plaintiff's left arm. They note that Sforza complained of pain to her arm and neck and did not report any head or wrist injuries or pain.

"[E]xcessive force claims must be analyzed under the rubric of the constitutional right that is most directly implicated by the facts giving rise to the claim." *Nimely v. City of New York,* 414 F.3d 381, 390 n. 7 (2d Cir.2005). Claims that law enforcement officers have used excessive force in the course of an arrest are analyzed "under the Fourth Amendment and its 'reasonableness' standard." *Kerman v. City of New York,* 261 F.3d 229, 238–39 (2d Cir.2001) (citation omitted). Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is "objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation." *Jones*

*v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (citation omitted). Determining whether excessive force has occurred requires a court to weigh the "facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Id.* (citation omitted). A plaintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient. *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004); *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe").

The conflicting accounts of the amount of force used preclude entry of summary judgment. Granting summary judgment based on the hospital records would require that inferences be inappropriately drawn in the City's favor.

6. Malicious Prosecution

Defendants also seek summary judgment on the malicious prosecution claim. "To sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003). Put otherwise, a plaintiff must establish the elements of malicious prosecution under state law, and then show that her Fourth Amendment rights were violated after legal proceedings were initiated. *See Fulton v. Robinson,* 289 F.3d 188, 195 (2d Cir.2002) (citation omitted).

 **\*16** In New York, a plaintiff bringing a malicious prosecution claim must show that a prosecution was initiated without probable cause to believe that it could succeed, that the prosecution was brought with malice, and that the prosecution terminated in plaintiff's favor. *Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir.2003). The existence of probable cause at the time of arrest may not be sufficient to provide probable cause for a prosecution, as

> even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. In order for probable cause to dissipate, the groundless nature of the charge must be made

apparent by the discovery of some intervening fact.

*Kinzer,* 316 F.3d at 144.

To show that her legal rights were violated after legal proceedings were initiated, plaintiff must show a seizure or other "perversion of proper legal procedures" implicating her rights under the Fourth Amendment. *Washington v. County of Rockland,* 373 F.3d 310, 316 (2d Cir.2004) (citation omitted). That deprivation must be "pursuant to legal process," as "[t]he essence of malicious prosecution is the perversion of proper legal procedures." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 117 (2d Cir.1995) (citation omitted). Where the arrest was effected without a warrant, any post-arraignment deprivation of liberty constitutes the unlawful seizure. *See id.*

Sforza has offered no evidence that the probable cause that existed at the time of the arrest dissipated between the arrest and her prosecution. Without any evidence supporting the vitiation of probable cause, Sforza has raised no material issue of fact in support of her claim of malicious prosecution. Sforza has also submitted no evidence demonstrating malice or any post-arraignment deprivation of liberty. Summary judgment will be granted in the City's favor on this claim.

### 7. Malicious Abuse of Process

Defendants argue that Sforza has failed to present evidence supporting her claim for abuse of process. As with malicious prosecution, courts look to state law for the elements of a § 1983 claim based on the malicious abuse of process claim. *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). New York recognizes a malicious abuse of process claim against "a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." [15] *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003) (citation omitted). In addition, a plaintiff bringing an abuse of process claim must allege actual or special damages. *Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 405, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975). "[L]egal process means that a court issued the process, and the plaintiff will be penalized if he violates it," such as an arraignment. *Cook,* 41 F.3d at 80 (citation omitted). *See also Shain v. Ellison,* 273 F.3d 56, 68 (2d Cir.2001).

[15] The City states that "it is unsettled in this Circuit whether abuse of process under state law is even the basis for a § 1983 claim," citing a civil commitment case, *Olivier v. Robert L. Yeager Mental Health Ctr.,* 398 F.3d 184, 189 n. 4 (2d Cir.2005). Numerous decisions in this Circuit have addressed § 1983 claims premised on abuse of *criminal* process. *See, e.g., Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003); *Shain v. Ellison,* 273 F.3d 56, 68 (2d Cir.2001).

*17 While a lack of probable cause is not explicitly an element of an abuse of process claim, the presence of probable cause negates a claim for abuse of process, particularly the second element. *See Rosen v. Hanrahan,* 2 A.D.3d 352, 768 N.Y.S.2d 818, 819 (1st Dep't 2003); *Berman v. Silver, Forrester & Schisano,* 156 A.D.2d 624, 549 N.Y.S.2d 125, 127 (2d Dep't 1989). Conversely, the lack of probable cause gives rise to an inference of malice, supporting a finding of "intent to harm." *Id.* at 126.

The "collateral objective" requirement, in turn, means that defendants must have an improper purpose or objective in instigating the action beyond the plaintiff's criminal prosecution; that defendants had an improper motive is not enough. *Savino,* 331 F.3d at 77. "A malicious motive alone does not give rise to a cause of action for abuse of process." *Id.* (citing *Curiano v. Suozzi,* 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984)). "[T]he basis of the tort lies in the use of the process to gain a collateral objective, the accomplishment of which the process in question was not intended to secure." *Pagliarulo v. Pagliarulo,* 30 A.D.2d 840, 293 N.Y.S.2d 13, 15 (2d Dep't 1968).

Sforza's abuse-of-process claim fails on multiple grounds. Her opposition to the City's motion does not attempt to address the point that her claim, based on a warrantless arrest, does not involve legal process. Moreover, Sforza has not demonstrated a collateral objective. [16] Summary judgment is therefore granted for defendants on the abuse of process claim.

[16] Sforza argues that improper motive satisfies the collateral objective requirement. *Savino* clearly states the opposite. *Savino,* 331 F.3d at 77.

### 8. Violation of Equal Protection

The City submits that Sforza has failed to allege facts that would state a claim for a violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution, and moves dismissal of, rather than summary judgment on, the equal protection claim. [17] "The Equal Protection Clause requires that the government treat all similarly situated people alike." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (citation omitted) (overruled on other grounds, *Appel v. Spiridon,* 531 F.3d 138, 140 (2d Cir.2008)). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that she was treated differently "than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation omitted). As the claims against the individual City Defendants shall be dismissed, Sforza's § 1983 claims are being considered here only to the extent that they give rise to *Monell* liability against the City, which requires that the conduct causing Sforza's injury be pursuant to "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694.

[17]   In its reply memorandum, the City shifts its focus to argue as if it has sought summary judgment on Sforza's equal protection claim, stating that Sforza has not demonstrated or proven differential treatment. Summary judgment arguments with regard to the equal protection claim will not be considered.

Sforza alleges that her right to equal protection of the laws was violated because, while individuals who are not transgender are permitted to file criminal complaints after they have been attacked, officers at the precinct did not allow Sforza to file a complaint against the McDonald's manager after her release from custody. [18] Her allegations concerning "policy or custom," meanwhile, identify "arresting and prosecuting individuals solely because they are transgender, manufacturing false charges against such individuals, using excessive force against such individuals, and allowing members of the opposite sex to search such individuals."

[18]   Sforza makes other allegations elsewhere in the complaint that implicate differential treatment based on her transgender status, but limits her equal protection claim to her attempts to file a complaint at the precinct. Her failure to name any of the officers with whom she interacted during her arrest, strip-search, detention, precinct visits, and prosecution makes it impossible to say whether these allegations concern any of the same officers. Sforza's opposition also disingenuously represents additional facts not in the complaint as facts alleged in support of her equal protection claim. These additional allegations will not be considered.

*18   Sforza has not alleged any policy or custom encouraging officers to reject transgender individuals' attempts to file complaints. Because her equal protection claim is premised on the precinct officers' rejection of her complaints, and she does not allege that the rejections occurred pursuant to municipal policy or custom, she has failed to state a claim against the City for violation of her right to equal protection.

9. Conspiracy

Sforza's final basis for § 1983 liability is a claim that all defendants conspired to deprive her of her constitutional rights and participated in overt acts in furtherance of the conspiracy by falsely arresting and maliciously prosecuting her. Among other arguments, defendants urge that plaintiff's conspiracy claims be rejected (ostensibly on summary judgment grounds) because she has not proven any underlying violations of § 1983 that were the object of the conspiracy. Characterizing Sforza's conspiracy allegations as conclusory, they also seek to have them dismissed on this ground. Sforza also brings conspiracy claims against all defendants under § 1985, alleging the same facts.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). A conspiracy claim under § 1985, meanwhile, requires a showing of

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. A § 1985(3)

conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.

*Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 791 (2d Cir.2007) (citation omitted). A municipality may be held liable under § 1985 if it is involved in the conspiracy or if the aim of the conspiracy is to "influence the activity of" the municipality. *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1997).

Sforza alleges malicious prosecution and false arrest as the underlying conspiratorial acts. As explained earlier in this Opinion, she has not raised an issue of fact with regard to either. She consequently fails to raise a genuine issue regarding the existence of any overt acts conducted in furtherance of the alleged conspiracies. Summary judgment is therefore granted in the City's favor on both conspiracy claims.

10. State Law Claims

Sforza's remaining claims thus include one federal claim for municipal liability based on the alleged use of excessive force against Sforza and twelve state-law claims. Two of those claims, alleging violations of New York's Human Rights Law, N.Y. Exec. L. §§ 292 and 296, and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8–107(1)(a) and 8–603(a), are brought against all defendants (the "Human Rights Claims"). Sforza brings her remaining ten state-law claims against McDonald's and its employees only. The City Defendants ask that the Court dismiss the Human Rights Claims brought against the City, or, in the alternative, that it decline to exercise supplemental jurisdiction over these claims.

*19 The Human Rights Claims accuse all defendants of violating provisions forbidding discrimination in public accommodations based on sexual orientation, as well as harassment and violence motivated by a victim's gender or sexual orientation. Sforza incorporates all of her factual allegations into each claim, which otherwise include only a recitation of the legal standard. Assuming that the public accommodation is the McDonald's Restaurant, it is impossible to discern which acts allegedly constituted the illegal discrimination, harassment, or violence, and whether each act in question was committed by McDonald's employees, individual City Defendants, or both. These conclusory allegations do not give the City fair notice of the basis for these two claims, and fail to meet the Rule 8(a) (2) pleading standard. They are therefore dismissed.

CONCLUSION

The City Defendants' November 3, 2008 motion to dismiss and for summary judgment against plaintiff's § 1983 and § 1985 claims is granted, except that it is denied with regard to plaintiff's claim for municipal liability based on the use of excessive force in violation of § 1983. Plaintiff's state law claims for relief under the New York Human Rights Law and New York Administrative Code are dismissed against the City Defendants.

A conference will be held with the parties to disucss the schedule for the remainder of the litigation and the issue of supplemental jurisdiction over the remaining state-law claims.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 857496

---

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 60 of 140

2010 WL 125774
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Thomas DALLIO, Plaintiff,

v.

Scott SANTAMORE; William Comstock; Frank
Buksa; Amos LeClaire; Alicia McGuoirk; Lawrence
Hopkinson; Craig Ramsdell; Andrew Bouchey;
Paul Gilmore; Donald Quinn; Roy Girdich; C.O.
Gettman; Lt. O'Connell; R.N. Kimberly Perrea; R.N.
Lillian Riley; and R.N. Debra Smith, Defendants.

No. 9:06–CV–1154 (GTS/DRH).
|
Jan. 7, 2010.

West KeySummary

1    **Federal Civil Procedure**  🔑 Civil Rights
     Cases in General

     A genuine issue of material fact as to
     whether corrections officers used excessive force
     in restraining a prisoner precluded summary
     judgment in favor of the officers in the prisoner's
     Eighth Amendment excessive force action.
     The prisoner struck an officer, was quickly
     restrained, and was then allegedly assaulted by
     multiple officers, which was unreasonable and
     unnecessary to sustain institutional order and
     safety since the prisoner was compliant and
     defenseless. U.S.C.A. Const.Amend. 8.

**Attorneys and Law Firms**

Thomas Dallio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Dean J. Higgins, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

**DECISION and ORDER**

Hon. GLENN T. SUDDABY, District Judge.

 **\*1**  Currently before the Court in this *pro se* prisoner civil
rights action filed by Thomas Dallio ("Plaintiff") against
sixteen employees of the New York State Department of
Correctional Services ("Defendants") are (1) Defendants'
motion for summary judgment (Dkt. No. 78), (2) United
States Magistrate Judge David R. Homer's Report–
Recommendation recommending that Defendants' motion be
granted in part and denied in part (Dkt. No. 87), and (3)
Plaintiff's Objections to the Report–Recommendation (Dkt.
No. 88). For the following reasons, Plaintiff's Objections
are rejected; the Report–Recommendation is accepted and
adopted in its entirety; Defendants' motion is granted in part
and denied in part; and Plaintiff's Complaint is dismissed in
part.

**I. RELEVANT BACKGROUND**

  **A. Plaintiff's Complaint**
Plaintiff filed his Complaint in this action on September 27,
2006. (Dkt. No. 1.)

Construed with the utmost of liberality, Plaintiff's Complaint
alleges that, between approximately November 10, 2003, and
November 20, 2003, while he was incarcerated at Upstate
Correctional Facility in Malone, New York, the above-
captioned Defendants violated his rights in the following
manner: (1) by subjecting him to excessive force in violation
of the Eighth Amendment; (2) by failing to intervene to
prevent others from subjecting him to excessive force, in
violation of the Eighth Amendment; (3) by being deliberately
indifferent to his serious medical needs, in violation of
the Eighth Amendment; (4) by conspiring to violate his
aforementioned constitutional rights; and (5) by committing
various torts against him (including assault, battery and
negligence) under New York State law. (*See generally* Dkt.
No. 1 [Plf.'s Compl.].)

More specifically, Plaintiff alleges as follows: (1) Defendants
Santamore, Comstock, LaClaire, Buksa, Ramsdell, and
Hopkins assaulted him after he was fully restrained in his cell;
(2) Defendants Gilmore and McGuoirk failed to intervene
during this incident; (3) Defendants Riley and Perrea failed
to properly treat him for his subsequent injuries; and (4)

**WESTLAW**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.    1

Defendants conspired against him by falsifying investigative reports and medical records. (*Id.*)

For a more detailed recitation of Plaintiff's factual allegations, the Court refers the reader to the Complaint in its entirety, and Magistrate Judge Homer's Report–Recommendation. (Dkt.Nos.1, 87.)

### B. Defendants' Motion for Summary Judgment and Plaintiff's Response

On October 1, 2008, Defendants filed a motion for summary judgment. (Dkt. No. 78.) In their motion, Defendants argue that Plaintiff's Complaint should be dismissed for the following reasons: (1) Plaintiff has failed to establish an excessive-force claim and/or a failure-to-intervene claim under the Eighth Amendment because insufficient record evidence exists from which a rational fact finder could conclude either that Plaintiff was subjected to force that was sufficiently serious or that Defendants used that force with a sufficiently culpable mental state; (2) Plaintiff has failed to establish a medical-indifference claim under the Eighth Amendment because insufficient record evidence exists from which a rational fact finder could conclude either that Plaintiff experienced a medical need that was sufficiently serious or that Defendants were deliberately indifferent to such a medical need; (3) Defendants are protected from liability as a matter of law by the doctrine of qualified immunity; (4) Plaintiff has failed to establish a conspiracy claim because insufficient record evidence exists from which a rational fact finder could conclude that Defendants reached an agreement to deprive Plaintiff of his constitutional rights; and (5) Plaintiff's pendant state law claims (of assault, battery and negligence) should be dismissed under the Eleventh Amendment and New York Corrections Law § 24 because (a) Plaintiff sued Defendants for damages arising out of acts that they allegedly performed or failed to perform within the scope of their employment, and (b) New York Civil Law Practice Law and Rules § 215(3) bars Plaintiff's intentional tort claims on the ground of untimeliness. (Dkt. No. 78, Attachment 20, at 7–18.)

**\*2** On October 31, 2008, Plaintiff filed his response in opposition to Defendants' motion. (Dkt. No. 85.) In his response, Plaintiff argues as follows: (1) he has adduced sufficient record evidence to establish an excessive-force claim and a failure-to-intervene claim under the Eighth Amendment; (2) he has adduced sufficient record evidence to establish a medical-indifference claim under the Eighth Amendment; (3) Defendants are not protected from liability

as a matter of law by the doctrine of qualified immunity, based on the current record; and (4) Plaintiff has adduced sufficient record evidence to establish a conspiracy claim. (Dkt. No. 85, Attachment 2, at 1–14.) In addition, Plaintiff concedes that his state law claims are barred by New York Corrections Law § 24. (*Id.* at 13.)

### C. Magistrate Judge Homer's Report–Recommendation

On October 26, 2009, Magistrate Judge Homer issued a Report–Recommendation recommending as follows: (1) that all of Plaintiff's claims against Defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley be dismissed with prejudice pursuant to Fed.R.Civ.P. 56;[1] (2) that Plaintiff's excessive-force claims and failure-to-intervene claims against Defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson and Gilmore *not* be dismissed pursuant to Fed.R.Civ.P. 56 due to the existence of genuine issues of material fact regarding those claims; and (3) that Plaintiff's claims against Defendant Smith be dismissed without prejudice for failure to serve, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b). (Dkt. No. 87.)

[1]     The Court notes that included in these claims are all of Plaintiff's medical-indifference claims under the Eighth Amendment, and Plaintiff's conspiracy claims. (Dkt. No. 87, at 14–20.) The Court notes also that Magistrate Judge Homer recommends the dismissal of all of Plaintiff's claims against Defendants Bouchey and Gettman based on Plaintiff's failure to demonstrate their personal involvement in the constitutional violations alleged. (*Id.* at 20–21.)

### D. Plaintiff's Objections

On November 4, 2009, Plaintiff timely filed his Objections to the Report–Recommendation. (Dkt. No. 88.) In his Objections, Plaintiff asserts, *inter alia,* the following arguments: (1) he did not hit his head against the wall, but rather his injuries were caused by Defendants, a fact that Defendants are collectively trying to "cover up";[2] (2) because Magistrate Judge Homer failed to refer to a number of his exhibits in the Report–Recommendation, he failed to resolve all ambiguities and draw all reasonable inferences in his favor; (3) Plaintiff did not receive adequate due process during his grievance investigation in that he was denied an opportunity to "present witnesses and other evidence in support of his Grievance Complaint"; and (4) Defendants

Perrea, Riley, Girdich, and O'Connell should not be dismissed from the action because the record evidence demonstrates that these Defendants "act[ed] in concert with each other to participate in the violation of Plaintiff's Eighth Amendment rights." (Dkt. No. 88, at 1–5.)

2      More specifically, Plaintiff argues that Defendant McGuoirk and the Department of Correctional Services ("DOCS") Inspector General's investigator tried to "cover up" the fact that he did not hit his head. To the extent that Plaintiff is attempting to assert, for the first time, a claim against the DOCS Inspector General's investigator, such a claim is dismissed because, among other things, the DOCS Inspector General is not a named party Defendant. *Excell v. Burge,* 05–CV–1231, 2008 WL 4426647, at *3 n. 4 (N.D.N.Y. Sept.25, 2008) (Kahn, J. adopting DiBianco, M.J.) (noting that a person "not listed in the caption and ... never served with process ... is not ... a defendant [in the action]").

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report–Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[3] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

3      On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

4      *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

### B. Standard Governing a Motion for Summary Judgment

**\*3** Magistrate Judge Homer correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 87, at 8–9.) As a result, this standard is incorporated by reference in this Decision and Order.

## III. ANALYSIS

After carefully reviewing all of the papers herein, including Magistrate Judge Homer's thorough Report–Recommendation, the Court can find no error (clear or otherwise) in the Report–Recommendation. Magistrate Judge Homer employed the proper standards to Plaintiff's claims, accurately recited the facts surrounding these claims, and reasonably applied the law to those facts. The Court would only add the following three observations.

First, with regard to Plaintiff's argument that he did not receive adequate due process during his grievance investigation, the Court declines to consider the due process claim implicitly asserted in the argument because Plaintiff is asserting that due process claim for the first time in his Objections to the Report–Recommendation. *Williams v. Cooney,* 01–CV–4623, 2004 WL 434600, at *2 n. 1 (S.D.N.Y. Mar.8, 2004) (noting that a district court "has discretion to review arguments which are raised for the first time in objections to the Report"). In any event, even if the Court were to consider this late-blossoming due process claim, the Court would reject that claim on three alternative grounds: (1) Plaintiff has failed to introduce any admissible record evidence that he exhausted his administrative remedies with regard to this claim; (2) Plaintiff has failed to introduce any admissible record evidence that he was in fact not provided with an opportunity to present evidence in support of his grievance; and (3) "the manner in which grievance investigations are conducted do[es] not create a protected liberty interest." *Odom v. Poirier,* 99–CV–4933, 2004 WL 2884409, at *10 (S.D.N.Y. Dec.10, 2004) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 [S.D.N.Y.2003] ), *accord Thomas v. Picio,* 04–CV–3174, 2008 WL 820740, at *5 n. 5 (S.D.N.Y. Mar.26, 2008). For all of these reasons, the Court rejects Plaintiff's newly asserted due process claim.

Second, with regard to Plaintiff's argument that Magistrate Judge Homer's omission of references to Plaintiff's numerous exhibits in the Report–Recommendation is evidence that Magistrate Judge Homer failed to resolve all ambiguities and draw all reasonable inferences in his favor, this argument fails to specifically address any of Magistrate Judge Homer's factual or legal conclusions. Instead, the argument generally attacks the findings and conclusions of the Report–Recommendation. As a result, the portion of the Report–Recommendation challenged by the argument is subject to only clear-error review. In any event, this portion of Magistrate Judge Homer's Report–Recommendation, as well as the other portions of his Report–Recommendation, would survive even a *de novo* review. Contrary to Plaintiff's argument, Magistrate Judge Homer relied on Plaintiff's version of the facts (and thus on Plaintiff's exhibits) in concluding that a question of material fact exists regarding Plaintiff's excessive-force claims and failure-tointervene claims. For these reasons, the Court rejects Plaintiff's argument that Magistrate Judge Homer failed to resolve all ambiguities and draw all reasonable inferences in his favor.

**\*4** Finally, with regard to Plaintiff's argument that he did not hit his head against the wall, but rather his injuries were caused by Defendants, and Defendants are collectively trying to "cover up" this fact, Plaintiff has failed to point to (or introduce in his Objections) any admissible record evidence as to when, where, or how Defendants came together and planned to (1) assault him, and (2) subsequently cover up the assault. As a result, the Court rejects Plaintiff's argument that his conspiracy claim should survive summary judgment.

For all of these reasons, Magistrate Judge Homer's Report–Recommendation is accepted and adopted in its entirety.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Homer's Report–Recommendation (Dkt. No. 87) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 78) is ***GRANTED*** in part and ***DENIED*** in part, in the following regards:

(1) all of Plaintiff's claims against Defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley (including all of Plaintiff's medical-indifference claims under the Eighth Amendment, and Plaintiff's conspiracy claims) are ***DISMISSED*** with prejudice pursuant to Fed.R.Civ.P. 56;

(2) Plaintiff's claims against Defendant Smith are ***DISMISSED*** without prejudice for failure to serve, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b);

(3) remaining in this action, following the issuance of this Decision and Order, are Plaintiff's excessive-force claims and failure-to-intervene claims against Defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson and Gilmore. (Plaintiff's claims against these Defendants are *not* dismissed due to the existence of genuine issues of material fact regarding those claims.)

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[DAVID R. HOMER], United States Magistrate Judge.

Plaintiff pro se Thomas Dallio ("Dallio"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this civil rights action pursuant to [42 U.S.C. §§ 1981], [1983], and [1985] alleging that defendants, sixteen DOCS employees, violated his constitutional rights under the Eighth Amendment. Compl. (Docket No. 1).

Presently pending is the motion of fifteen of the defendants[2] for summary judgment pursuant to [Fed.R.Civ.P. 56]. Docket Nos. 78, 79, 83, 84. Dallio opposes the motion. Docket No. 85. For the following reasons, it is recommended that the motion be granted in part and denied in part.

[2]    Defendant R.N. Debra Smith has never been served with process or other wise appeared in the action. *See* Docket Nos. 11 (summons returned unexecuted as to Smith after service was attempted by the United States Marshals Service), 36 & 38 (answers filed for 11 defendants except Smith), 78–1 (defendants' motion herein filed on behalf of all defendants except Smith). Under [Fed.R.Civ.P. 4(m)], a complaint must be served upon a defendant within 120 days. *See also* N.D.N.Y.L.R. 4.1(b) (same). The complaint herein was filed on September 27, 2006 and the summonses were issued on November 20, 2006. Docket No. 1; Docket entry dated Nov. 20, 2006. Thus, more than 120 days have elapsed without completion of service of process on Smith. Accordingly, it is recommended that the complaint be dismissed without prejudice as to Smith in accordance with [Rule 4(m)] and Local Rule 4.1(b).

## I. Background

The facts are related herein in the light most favorable to Dallio as the non-moving party. *See* subsection II(A) *infra*.

## A. The Incident

On November 10, 2003, defendants Scott Santamore and William Comstock, corrections officers at Upstate Correctional Facility, arrived at Dallio's cell to escort him to a holding area while his cell was searched. Compl. ¶ 19; Comstock Decl. (Docket No. 78–11) ¶ 1; Santamore Decl.

(Docket No. 78–10) ¶ 2. After the search, Santamore and Comstock escorted Dallio back to his cell and instructed him to stand against the wall so that his waist chain could be removed. Comstock Decl. ¶¶ 1–3; Santamore Decl. V 3. The waist chain was removed, Dallio was ordered to turn and proceed into his cell, and when Dallio turned, he punched Comstock in the face. Comstock Decl. ¶¶ 3–5; Santamore Decl. ¶¶ 5–7; Dallio Decl. (Docket No. 85–2) ¶ 6; Dallio Dep. Tr. (Docket No. 78–14) at 26. A struggle ensued as Comstock, Santamore, and Dallio all fell into Dallio's cell. Comstock Decl. ¶ 6–8; Santamore Decl. ¶¶ 8–12.

**\*5**    An alarm was sounded and a response team composed of defendants Alicia McGuoirk, Amos LaClaire,[3] Frank Buksa, Craig Ramsdell, Lawrence Hopkins, and Paul Gilmore quickly arrived at Dallio's cell. Docket No. 78, Ex. D at 28, 32–35; LaClaire Decl. (Docket No. 78–4) ¶ 1; Buksa Decl. (Docket No. 78–5) ¶ 1; Ramsdell Decl. (Docket No. 78–6) ¶ 2; Hopkinson Decl. (Docket No. 78–7) ¶ 2; Gilmore Decl. (Docket No. 78–9) ¶¶ 3–5. Dallio immediately fell to the ground, was restrained, and ceased physical resistance but was then kicked and punched over twenty times in his face, abdomen, back, and legs. Dallio Decl. ¶¶ 2, 6–7, 15; Dallio Dep. at 31–37. Gilmore and McGuoirk stood by while Santamore, Comstock, LaClaire, Buksa, Ramsdell, and Hopkinson assaulted Dallio. Dallio Decl. ¶¶ 16, 18.[4] During the incident, Dallio's arms (Gilmore Decl. ¶ 13; Hopkinson Decl. ¶¶ 3–4; LaClaire Decl. ¶ 2; Docket No. 78, Ex. D at 33, 35) and legs (Gilmore Decl. ¶ 12; Ramsdell Decl. ¶ 4; Buksa Decl. ¶ 1; Docket No. 78, Ex. D at 32, 34) were restrained, immobilized with a bed sheet (Gilmore Decl. ¶¶ 12, 14, 15; Buksa Decl. ¶¶ 1–2), and Dallio was placed under his bunk without further incident. Gilmore Decl. ¶ 16; Buksa Decl. ¶ 3; Docket No. 78, Ex. D at 32.[5] Dallio was then left alone in his cells.[6]

[3]    The complaint spells the name as "LeClaire." Compl. The correct spelling is LaClaire." *See* LaClaire Decl. (Docket No. 78–4). The correct spelling will be used herein.

[4]    Defendants dispute Dallio's account.

[5]    A video tape was made by a surveillance camera fixed on the hallways outside Dallio's cell which shows the events which occurred outside the cell but not those inside. It also contains sound recordings of the raised voices while the parties

were inside the cell. *See* Video (Docket No. 78–20). The video shows Dallio strike Comstock, Comstock, Santamore, and Dallio then tumbling into Dallio's cell, and officers responding to the cell. Dallio can be heard on the tape yell that he was not resisting and that excessive force was occurring. *Id.; see also* Dallio Dep. Tr. at 28 (testifying that he agreed that the video was an accurate depiction of what occurred in the hallway).

6 McGuoirk was then sent back to Dallio's cell to check on him and heard strange noises coming from his cell. McGuoirk Decl. ¶ 4. McGuoirk observed Dallio hitting his head and rubbing his face against the wall multiple times. *Id.* ¶¶ 4–6. McGuoirk reported this behavior to Gilmore and the medical department. *Id.* ¶ 7. McGuoirk then returned to Dallio's cell and observed him engaging in the same activity. *Id.* ¶¶ 8–9. Dallio now denies this conduct, but during an interview with the DOCS Inspector General's investigator, Dallio admitted to hitting his head against the wall of his cell in frustration after the incident. Docket No. 83, Ex. E at 169.

Later that day, Dallio was issued a misbehavior report which charged him with violating a direct order, assault on a staff member, and violent conduct. Docket No. 78, Ex. D at 22. A disciplinary hearing was conducted on the charges and at its conclusion, Dallio was found guilty of all three charges. Docket No. 78, Ex. D at 17; *see also* Docket No. 78, Ex. D at 68–150 (disciplinary hearing transcript). After administrative appeals, Dallio received a total sentence of twenty-four months in the special housing unit (SHU) [7] and twenty-four months loss of packages, commissary, and telephone privileges. Docket No.78, Ex. D at 13–16.

7 SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On November 24, 2003, Dallio filed a grievance against the defendants for the alleged assault. Docket No. 78, Ex. F at 4.

After an investigation, defendant Donald Quinn determined that "[b]ased on the documentation submitted and Inmate Dallio's lack of witnesses or evidence his allegations cannot be substantiated." Docket No. 78, Ex. F at 7; *see also* Docket No. 78, Ex F at 7–60 (attachments of all documents and interviews considered during the investigation). The grievance was denied based on the internal investigation. Docket No. 78, Ex. F at 3. Dallio appealed, but the denial was affirmed, based upon both the findings of the internal investigation and the outcome of Dallio's disciplinary hearing. Docket No. 78, Ex. F at 2–3.

On November 24, 2003, Dallio filed a complaint with the Office of the DOCS Inspector General (IG) concerning the incident. Docket No. 83, Ex. E at 15–19. After another lengthy investigation, the IG concluded that the "[m]edical documentation and photo's [we]re consistent with The Use of Force reported by [the defendants]" and that Dallio's allegations were unsubstantiated. Docket No. 83, Ex. E at 1–2; *see also* Docket No. 83, Ex. E at 20–180 (compilation of all the correspondence, interviews, documentation, photographs, and records utilized by the IG in evaluating Dallio's complaints).

**B. Medical Treatment**

 **\*6** After the incident, Dallio was taken to the medical department where defendant Kimberly Perrea, a registered nurse, and Perrea completed a physical examination. Docket No. 78, Ex. D at 36; Docket No. 78, Ex. F at 19; Docket No. 85, Ex. I. Examination revealed (1) bruising and superficial abrasions to the forehead, (2) bruising on both cheeks, (3) bruising and swelling of the bridge of Dallio's nose, (4) one superficial abrasion on the left elbow, (4) superficial abrasions to the left shoulder and bruising to the left clavicle, (5) swelling and abrasions on the right flank, (6) a bruised right knee, (7) a bruised right hip with superficial abrasions, (8) redness throughout the middle and lower portions of Dallio's spine and back, sternum, and front of the neck, and (9) superficial abrasions and redness on Dallio's right wrist. Docket No. 78, Ex. D at 36; Docket No. 78, Ex. F at 36; Docket No. 85 Ex. I. The medical report indicated that Dallio should cleanse the areas which received abrasions with soap and water when he returned to his cell. Docket No. 78, Ex. D at 49; Docket No. 78, Ex. F at 20. During his deposition, Dallio testified that he suffered from internal bleeding in his eye, injuries to his spinal area, difficulty walking, bruising throughout his face and legs, and lacerations. Dallio Dep.

at 45–48. Defendants Lt. O'Connell and Roy Girdich both subsequently made rounds after the incident and observed Dallio's condition and failed to take any actions. Compl. ¶¶ 35, 44–45.

On November 11, 2003, Dallio was examined by a non-party member of the medical staff who noted Dallio's subjective complaints of bruising on his head, legs, back and stomach, chest pains, and difficulty breathing. Docket No. 83, Ex. E at 144. There was no physician or nurse practitioner on duty due to the holiday and when Dallio was informed of this, he became upset. *Id.* Dallio appeared in no obvious distress and could breathe easily as he had no difficulty yelling at the nurse. *Id.* Later that day, Dallio sought emergency treatment to see a physician but was warned that his current medical condition was not an emergency and that further abuse of the system would result in a misbehavior report. *Id.*

On November 12 and 13, 2003, Dallio complained of a spinal injury from the incident. Docket No. 83, Ex. E at 143; *see also* Riley Decl. (Docket No. 78–8) ¶ 5 (noting Dallio's complaints of discomfort, desire to see a chiropractor, the absence of objective signs of distress, and that he was given Tylenol to relieve pain). Both days, Dallio was observed standing in no distress, waving his extremities without any difficulty with his range of motion, responding easily to questions and yelling at staff to express his displeasure, and was treated with pain relievers. Docket No. 83, Ex. E at 143; *see also* Riley Decl. ¶ 9 ("At times from November 10, 2003 to November 15, 2003 [Dallio] frequently yelled at me...."). Additionally, Dallio complained of an injury to his right eye which was not noted to have occurred at the time of the incident. Docket No. 83, Ex. E at 143; *see also* Riley Decl. ¶ 6 (noting that "medical records for November 14, 2003 reveal that other medical personnel observed no injury to either of his eyes."). When the eye was examined, it was found to be reddened but without symptoms. Docket No. 83, Ex. E at 143. Dallio asked to be referred to a chiropractor for his complaints of spinal pain. Docket No. 83, Ex. E at 143.

**\*7** The following two days, November 14 and 15, 2003, Dallio continued to complain about his eye injury. Docket No. 83, Ex. E at 141–42. Dallio was seen by optometry on July 3, 2003 and by ophthalmology on October 9, 2003, his eye was reddened, but no further treatment was indicated. Docket No. 83, Ex. E at 141–42. Dallio was again noted to be moving all extremities without difficulty, standing in no apparent distress, ambulating without difficulty, speaking clearly, and continually yelling at medical staff. Docket No.

83, Ex. E at 141–42. [8] Again on November 17, 2003, Dallio was noted to have no difficulty with ambulation, movement, or speech. *Id.*

[8]    Dallio's examination was eventually terminated due to his behavior. Docket No. 83, Ex. E at 141–42. It was similarly terminated on November 17 due to his behavior and aggression toward staff. Docket No. 83, Ex. E at 141.

On November 18, 2003, Dallio requested treatment for injuries suffered during the incident. Docket No. 83, Ex. E at 140. Dallio was offered Tylenol and Motrin, and refused both. *Id.* He again demanded to see an eye doctor. *Id.* On November 20, Dallio lodged his last set complaints of back pain. *Id.* He again refused pain medication and was noted to be waving his arms around wildly and yelling at staff. *Id.* After twenty minutes, the examination was terminated due to Dallio's behavior. *Id.*

This action followed.

## II. Discussion [9]

[9]    Initially Dallio alleged pendant state law claims for assault, battery, and negligence. However, he has since conceded that his state law claims are barred. Plaintiff's Memorandum of Law (Docket No. 85–3) at 13. Accordingly, defendants' motion as to those claims should be granted.

In his complaint, Dallio alleges that defendants have violated his Eighth Amendment rights by subjecting him to excessive force, failing to intervene, and being deliberately indifferent to his serious medical needs. Additionally, Dallio alleges that defendants conspired to falsify reports and medical records and to remain silent about his injuries after the incident to make him appear culpable for the incident. The moving defendants seek summary judgment on all claims.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing

the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

**\*8** When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the

Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

**\*9** In this case, the moving defendants have proffered substantial evidence to refute Dallio's claim of excessive force. The defendants themselves have offered affidavits that the force used was only that necessary to restrain Dallio from assaulting officers further. Dallio was found guilty of assault and that finding was affirmed on administrative appeal. The video tape confirms Dallio's assault on Comstock. An independent investigation by the IG found no basis for Dallio's contentions. The physical injuries allegedly suffered by Dallio were consistent with the self-inflicted injuries

observed by McGuoirk. Opposed to this evidence are only Dallio's own testimony and his voice on the video tape asserting that the officers were assaulting him in his cell after he had been restrained.

The question presented by this motion, then, is whether any question of fact exists as to whether any defendant used excessive force against Dallio or failed to intervene to prevent the use of such force. The evidence must be construed in the light most favorable to Dallio as the non-moving party. So construed, Dallio's testimony and statements heard on the vido tape stand in stark contrast to the substantial evidence proffered by defendants. This competing evidence rests on each side on the credibility of Dallio on the one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party leaves no choice but to credit Dallio's version of events for purposes of this motion. *See In re Dana Corp.,* 574 F.3d 128, 152 (2d Cir.2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved for a jury and not a judge) (citing cases).

As described above, Dallio's evidence would concede that he in fact struck Comstock but that he was quickly restrained in his cell and, so restrained and defenseless, was struck repeatedly by Comstock, Santamore, LaClaire, Buksa, Ramsdell, and Hopkinson while Gilmore and McGuirk stood by and took no steps to intervene. Despite the relatively minor injuries Dallio suffered, the defendants' actions in assaulting an inmate who was restrained and compliant could constitute a *per se* constitutional violation. Thus, viewing the facts in the light most favorable to Dallio, he has proffered sufficient evidence to raise an issue of fact as to the objective prong of the Eighth Amendment analysis to require resolution by a jury.

Furthermore, if Dallio's evidence is credited, defendants' actions could be found wanton and malicious. The need for force dramatically subsided once Dallio was restrained and compliant on the ground. Viewing the facts in the light most favorable to Dallio, defendants continued to assault him. This conduct could be found unreasonable and unnecessary to sustain institutional order and safety once Dallio was compliant. Thus, such actions, as alleged by Dallio, are more than sufficient as well to raise a question of material fact as to the subjective prong of the Eighth Amendment analysis.

*10 Accordingly, defendants' motion for summary judgment should be denied as to defendants Comstock, Santamore, LaClaire, Buksa, Ramsdell, and Hopkinson on Dallio's claim of excessive force.

### 2. Failure to Intervene

Daillo further claims that Gilmore and McGuoirk failed to intervene when they saw the other defendants assaulting him. Prison officials are obliged to protect prisoners from known harms. *Farmer,* 511 U.S. at 829. "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). In order to establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.*

Viewing the facts in the light most favorable to Dallio, he has raised a material issue of fact as to the failure to intervene of Gilmore and McGuoirk. While the two defendants may not have had advanced warning that the other defendants' attack against Dallio when they responded to the alarm and arrived at Dallio's cell, it became clear when Dallio was restrained and became compliant that Gilmore and McGuoirk could and should intercede to prevent additional harm when they observed six officers punching and kicking a defenseless inmate. Additionally, as discussed *infra,* a reasonable person in the officer's position would be well aware that such a use of force was contrary to an individual's constitutional rights. Thus, crediting Dallio's evidence, by standing idly by, Gilmore and McGuoirk failed to take no reasonable steps to intervene and terminate the violation of Dallio's constitutional rights. This conclusion is further supported as to Gilmore in light of his position as a supervisor,

Therefore, defendants' motions for summary judgment on Dallio's claim against Gilmore and McGuoirk for failing to intervene should be denied.

### 3. Medical Treatment [10]

10     Liberally construing Dallio's complaint, he alleges deliberate indifference to his cardiac conditions as well. Defendants traditionally filed Dallio's medical record. Docket No. 78, Ex. G. There are no indications of deliberately indifferent to Dallio's treatment. In the four months following the incident, Dallio was examined solely for cardiac issues on twenty different occasions, underwent four diagnostic tests, signed four refusals of treatment, and had one referral to a specialist. Additionally, from June 2005 until June 2007, Dallio's medical records reflect at least sixty related examinations for cardiac care, six diagnostic examinations revealing unremarkable results, four specialist consultations, five trips for emergency medicine, and nine treatment refusals. These 600 pages of records confirm that defendants were actively involved in Dallio's care on a near-daily basis and were neither deliberately indifferent nor delayed any treatments. Any claims based on Dallio's alleged cardiac condition should, therefore, be denied.

The Eighth Amendment prohibition also extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson,* 503 U.S. at 9). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (*citing Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care

should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*11** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

Defendants correctly contend that, even viewing the facts in the light most favorable to Dallio, the bleeding in his right eye, bruises, and superficial abrasions were insufficient to constitute a serious medical condition either separately or in combination. In a recent decision in this district in another case, Dallio's Eighth Amendment claims for similar injuries sustained in another incident were deemed insufficient on a motion for summary judgment. *See Dallio v. Herbert,* No. 06–CV–118 (GTS/GHL), 2009 WL 2258964, at \*5 (N.D.N.Y. July 28, 2009) (granting judgment to defendants for lack of serious injuries where Dallio suffered black eyes, bruising in his abdomen and kidney area, kick marks to his abdomen, open lacerations and bruising on his knees, lacerations on his arms and wrists, a headache, and numbness in his hands and fingers) (citing cases).

Even assuming that Dallio has raised a question of fact on this prong, he has still failed to prove deliberate indifference to that condition. Dallio received medical attention immediately after the incident, complaining of relatively minor injuries that only required cleansing with soap and water. Docket No. 78, Ex. D at 49; Docket No. 78, Ex. F at 20. Dallio disagreed with this course of treatment, but such disagreements are insufficient to sustain a constitutional violation. *Sonds,* 151 F.Supp.2d at 312.

Moreover, in the following ten days, Dallio was seen by the medical staff on eight of those days. Docket No. 84, Ex. E at 140–44. Thus, despite Dallio's conclusory allegations of a failure to provide medical treatment, the

2010 WL 125774

record demonstrates that medical staff treated Dallio on a near-daily basis. Such involvement with an inmate's care is not indifferent. Additionally, examination of Dallio generally revealed that he was standing and waiting at his cell door, he ambulated without any difficulty, he appeared in no physical distress, and he had no problem speaking clearly, yelling, or waving his arms at medical staff to signify his displeasure. [11] *Id.* Such uncontradicted determinations by multiple individuals, both parties and non-parties to this action, belie Dallio's subjective and uncorroborated complaints of disabling pain and indifferent treatment. Additionally, Dallio was consistently offered pain medication to increase his level of comfort. On at least two occasions, Dallio refused this medication. Docket No. 83, Ex. E at 140. Dallio's voluntary actions in refusing the pain medication cannot be attributed to any alleged delay or interference by any defendant.

[11]    Any allegations that Dallio's progressive and frequent fits of rage were exaggerated or contrived are belied by the medical record which indicates at least twenty-seven instances from June 2005 until June 2007 where Dallio showed extreme anger and yelled at staff. Additionally, from prior to the incident until January 2004, there were seventeen similar instances where Dallio became argumentative and uncooperative with medical staff generally resulting in the termination of the examination.

 **\*12**  Furthermore, Dallio's contentions that he had injured his eye are not supported by any objective medical evidence. While it is undisputed that Dallio suffered from a reddened eye, the cause and timing of the irritation is immaterial to this claim, for medical staff noted and evaluated the condition and determined that it was not an emergency. Docket No. 83, Ex. E at 143. These findings were supported by the multiple record entries, by multiple medical staff, which agreed that there was no injury to the eye. Riley Decl. ¶ 6. No medical evidence has been proffered by Dallio to the contrary. Even if there was an injury and the multiple opposing medical conclusions were wrong, the misdiagnosis would, at worst, constitute negligence. *See Estelle,* 429 U.S. at 107. This is still insufficient to sustain a claim for deliberate indifference. *Id.* at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Moreover, to the extent that Dallio contends that he should have been seen by a chiropractor or eye doctor, [12] such

contentions are also insufficient to support a constitutional claim. Docket No. 83, Ex. E at 143. An inmate has no right to a physician of his or her choosing. *See Dean v. Coughlin,* 804 F.3d 207, 215 (2d Cir.1986). Moreover, any decisions relating to the appropriateness or timing of a specialist consultation are within the purview of the medical staff and any disagreement the inmate has with the decision qualifies as a disagreement over treatment, which is not an actionable Eighth Amendment claim. *Sonds v. St. Barnabas Hosp.,* 151 F.Supp.2d 303, 312 (S.D.M.Y.2001).

[12]    Medical records indicate that Dallio had seen eye specialists on July 3 and October 9, 2003. Docket No. 83, Ex. E at 141–42. Additionally, records subsequent to the incident indicate an ophthalmology consult within a month of the incident as well as multiple examinations by medical staff over eye problems and broken glasses, glasses orders, and follow-up appointments and consultations. Therefore, there is no dispute in the record on this motion that Dallio's eyes were being treated in an appropriate manner and defendants' actions neither delayed treatment nor showed deliberate indifference to Dallio's treatment.

Accordingly, defendants' motion as to this claim should be granted as to Perrea and Riley.

### C. Conspiracy

Dallio alleges that all defendants conspired to violate his constitutional rights.

#### 1. § 1983

In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143,177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d

2010 WL 125774

Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

 **\*13** In this case, even construing the facts in the light most favorable to Dallio, he has failed to advance anything more than conclusory allegations of a conspiracy. Dallio fails to show specifically when, where, or how defendants came together and planned to assault him. Moreover, Dallio fails to show when or how multiple departments agreed, either expressly or implicitly, to collaborate with one another and independently perpetrate the alleged web of deceit by filing false incident reports, medical records, and investigations. Without anything more than a conclusory allegation that all defendants conspired with one another, Dallio's claims fall short of raising a material question as to whether defendants' actions constituted a conspiracy. [13]

[13]    Dallio relies on *Juan v. Rafferty,* 577 F.Supp. 774 (D.N.J.1984), to support the proposition that his assertions that all defendants filed false reports is sufficient to withstand the current motion. Dallio's reliance is misplaced. In *Juan,* (1) defendants filed a motion to dismiss as opposed to the present motion for summary judgement and (2) the litigation was in its infancy as discovery had not yet been completed. *Id.* at 778. Therefore, the pleadings were sufficient at that early stage to present a basis for a claim. *Id.* The present case is at a far different point. Discovery is now complete and actual evidence rather than allegations of agreements among multiple parties must be advanced. Like *Juan,* Dallio has survived the pleadings stage of the litigation. However, unlike *Juan,* allegations alone at this stage are insufficient as evidence must now be presented for the claim to withstand the current motion. As no evidence was provided, the claim fails to raise a material question of fact.

### 2. § 1985

"Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). To demonstrate that a conspiracy existed, "the plaintiff must prove a mutual understanding or meeting of the minds to violate [his or] her civil rights." *Salgado v. City of N.Y.,* No. 00–CV–3667 (RWS), 2001 WL 290051, at \*8 (S.D.N.Y. Mar.26, 2001) (citations omitted). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Dallio does not assert any facts giving rise to a conspiracy. First, Dallio vaguely assert conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. *See X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.1999). Second, as discussed *supra,* there has been proffered no evidence relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Dallio of his civil rights. Lastly, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus.

Accordingly, defendants' motion for summary judgment as to Dallio's claims of conspiracy should be granted.

### D. Bouchey and Gettman

Defendant Andrew Bouchey was named in the complaint as a member of the response 20 team. Compl. (Docket No.

1) ¶ 22. However, the undisputed evidence shows that he was not personally involved in the incident. As such, no personal involvement has been shown and Bouchey is entitled to judgment on all claims against him. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ( "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotations and citations omitted).

 **\*14** Similarly, defendant C.O. Gettman was identified in the complaint as the individual responsible for taking the photographs subsequent to the incident. Compl. ¶¶ 36–37. All submissions indicate without contradiction that the individual responsible for these photographs was named Clarke. *See generally* Docket No. 78, Ex. D at 7. As such, no evidence of any personal involvement has been shown with regard to Gettman either. Accordingly, he as well should be granted judgment. *Wright,* 21 F.3d at 501.

### E. Qualified Immunity

Defendants claim that even if Dallio's constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03–CV–1157, 2006 WL 839525 \*16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if a plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

Here, the second prong of the inquiry need not be reached concerning Dallio's claims other than his Eighth Amendment excessive force and failure to intervene claims because, as discussed *supra,* accepting all of Dallio's evidence as true, he has not shown that any of the defendants in those claims violated his constitutional rights.

As to Dallio's excessive force and failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. *See, e.g., Hudson,* 503 U.S. at 9–10. Thus, accepting all of Dallio's allegations about the incident as true, qualified immunity cannot be granted to defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, or Gilmore since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation.

 **\*15** Accordingly, defendants' motion for summary judgment on this ground should be (1) granted in the alternative as to Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley, and (2) denied as to Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, and Gilmore.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No.78) be:

A. **GRANTED** as to defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley as to all claims against them, and these defendants should be terminated from this action; and

B. **DENIED** as to defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, and Gilmore as to Dallio's Eighth Amendment claims of excessive force and failure to intervene; and

2. The complaint be **DISMISSED** without prejudice as to defendant Smith pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

2010 WL 125774

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of*

*HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 125774

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1063875
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,

v.

R. LAMORA, R. Scott, R. MacWilliams, K. Crossett, E. Facteau, C.O. Demers, R. Woods, R. Gill, Defendants.

Civ. Action No. 9:08–CV–431 (GLS/DEP).
|
Feb. 24, 2010.

West KeySummary

1    **Federal Civil Procedure** 🔑 Civil Rights
Cases in General

Genuine issue of material fact existed as to whether corrections officer repeatedly hit the inmate after the inmate was subdued and thus summary judgment was precluded on the inmate's excessive force claim. The inmate alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that the corrections officer punched him unnecessarily in the head several times during the inmate's cell extraction. Although the cell extraction was supposed to be videotaped, the video was never recorded. Despite the fact that the inmate's injuries were slight and were at least indirectly brought about by his own action of refusing handcuffs, there were credibility issues to be determined. U.S.C.A. Const.Amend. 8.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, State of New York, C. Harris Dague, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. In his complaint Cicio, who refused multiple orders from prison officials to exit his cell in order to effectuate a transfer to another location, complains that in the course of the ensuing cell extraction, during which he was removed through the use of force, one of the corrections officers who participated exerted excessive force causing him to suffer injuries, while the others involved failed to intervene, all in violation of the Eighth Amendment's protection against cruel and unusual punishment. As relief for the violation, plaintiff seeks the recovery of compensatory and punitive damages from defendants.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint. In their motion defendants challenge the legal sufficiency of plaintiff's excessive force and failure to intervene claims and additionally assert their entitlement to Eleventh Amendment immunity from suit in their official capacities and good faith qualified immunity from suit as individuals. Because a reasonable factfinder could conclude from the record now before the court that more force than necessary to subdue and remove Cicio from his cell was applied maliciously and sadistically by prison officials, I am constrained to recommend that defendants' motion be denied, except as to plaintiff's claims against defendant Woods and those against defendants in their official capacities, which are subject to dismissal.

I. *BACKGROUND* [1]

[1]    In light of the procedural posture of this case, the following recitation is from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 128, 137 (2d Cir.2003). It should be noted that while most of the pertinent facts are undisputed, defendants sharply contest plaintiff's allegation that he was unnecessarily punched by defendant MacWilliams during the forcible removal from his cell.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1); *see also* Dague Decl. (Dkt. No. 35–16) ¶ 3 and Exh. A (Dkt. No. 35–17). At the times relevant to his claims, plaintiff was designated to the Upstate Correctional Facility ("Upstate"), located in Malone, New York. [2] *Id.*

[2]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at \*4 n. 11 (S.D.N.Y. Sept. 12, 2002).

The events giving rise to the claims in this action were set in motion on December 27, 2007, when plaintiff refused to return a razor given to him by prison officials to permit him to shave. Dague Decl. (Dkt. No. 35–16) Exh. B (Dkt. No. 35–18) (Transcript of Deposition of Terry Cicio, conducted on March 12, 2009, hereinafter cited as "Cicio Dep. Tr.") at pp. 29–30; Gill Aff. (Dkt. No. 35–4) ¶ 5 and Exh. A (Dkt. No. 35–5). According to Cicio, he purposefully withheld the razor in order to prompt a transfer out of the gallery on which his cell was located to another area. Cicio Dep. Tr. at pp. 27–28.

Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or "PIMS", intended to provide incentive and encourage behavioral adjustment for SHU inmates. *See* Dague Decl. (Dkt. No. 35–16) ¶ 8. Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges. *Id.; see also* Cicio Dep. Tr. at p. 27. At the time of plaintiff's refusal to surrender his razor, he was assigned to a PMS level three cell. Cicio Dep. Tr. at p. 27.

**\*2**  On December 27, 2007, following the razor incident, plaintiff was informed that he would be relocated to a PIMS level one cell. Cicio Dep. Tr. at p. 31; Gill Aff. (Dkt. No. 35–4) ¶ 7 and Exh. B (Dkt. No. 35–6). To effectuate the move, prison officials instructed the plaintiff to place his back to the cell door and his hands through the feed up slot in order to permit the application of hand restraints. Gill Aff. (Dkt. No. 35–4) ¶ 8. Plaintiff refused that order as well as several subsequent directives to voluntarily exit his cell. *Id.* at ¶ 9 and Exh. A. Attempts were made to convince plaintiff to reconsider his refusal; those efforts included interventions by clergy and

guidance staff at the facility. *Id.* When those measures proved unsuccessful, orders were given to prepare a cell extraction team. Gill Aff. (Dkt. No. 35–4) ¶ 10.

At 2:30 p.m. on that day Corrections Lieutenant Andrew Lamora issued a final order directing plaintiff to exit his cell, warning that if he persisted in his refusal force would be applied to carry out his removal. Gill Aff. (Dkt. No. 35–4) ¶¶ 11–12; Lamora Aff. (Dkt. No. 35–8) ¶¶ 8–10; *see also* Complaint (Dkt. No. 1) Statement of Facts ¶ 4. Despite that last directive, plaintiff refused to obey defendant Lamora's command. Lamora Aff. (Dkt. No. 35–8) ¶ 9.

Following established facility protocol, prison officials took the first step toward conducting a forcible extraction by administering two one-second bursts of a chemical aerosol into plaintiff's cell, followed by another request for voluntary compliance. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–13 and Exhs. A (Dkt. No. 34–5) and B (Dkt. No. 34–6); Lamora Aff. (Dkt. No. 35–8) ¶ 11. The process was repeated at two minute intervals on four more occasions; each time, corrections officers offered plaintiff the opportunity to comply with their orders before administering another dose. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–14.

When the use of chemicals failed to convince Cicio to exit his cell, the cell extraction team that had been assembled, including Corrections Officers Richard Scott, Richard MacWiliams, Kurt Crossett and Christopher Demers, entered the cell. Gill Aff. (Dkt. No. 35–4) ¶ 17 and Exhs. A (Dkt. No. 35–5) and B (Dkt. No. 35–6); Lamora Aff. (Dkt. No. 35–8) ¶ 15. To accomplish the forced extraction each of those individuals was assigned a specific task. Lamora Aff. (Dkt. No. 35–8) ¶ 16. Corrections Officer Scott was designated to be the first to enter the cell and, through use of a shield, was tasked with attempting to bring Cicio to the ground and assist with the application of handcuffs. *Id.* Corrections Officer MacWilliams' assigned role was to control plaintiff's arms and to assist in the take down and application of handcuffs. *Id.* Corrections Officer Demers was assigned to control Cicio's right leg and assist in the take down and application of ankle restraints, and Corrections Officer Crossett was similarly designated as the person responsible for control of plaintiff's left leg, assisting in the take down, and application of ankle restraints. *Id.* The cell extraction, which proceeded in accordance with this protocol, was successfully completed in approximately two minutes or less. Gill Aff. (Dkt. No. 35–4) ¶ 20; Lamora Aff. (Dkt. No. 35–8) ¶ 18; Scott Aff. (Dkt. No. 35–7) ¶ 13; Demers Aff. (Dkt. No. 35–12) ¶

2010 WL 1063875

13; Crossett Aff. (Dkt. No. 35–10) ¶ 13; Facteau Aff. (Dkt. No. 35–11) ¶ 12.

**\*3** Also in accordance with the established protocol, Corrections Officer Eric Facteau was assigned to record the cell extraction using a hand-held camera. Facteau Aff. (Dkt. No. 35–11) ¶¶ 5–6. Unfortunately, however, while Corrections Officer Facteau attempted to videotape the process he later discovered the tape was defective, and none of the cell extraction was recorded. *Id.* at ¶¶ 9, 14.

Following the cell extraction, plaintiff was taken to a decontamination area where his clothes were removed and traces of the chemical aerosol were eliminated. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5). Plaintiff was thereafter brought to a holding cell to be medically examined and photographed. *Id.*

During the course of the cell extraction both plaintiff and two of the participating corrections officers suffered injuries. Plaintiff described his injuries as including a scratch to the right side of his face less than an inch long, a contusion above his left eye, a bruise on his left shoulder "the size of a quarter or a little bigger[, n]othing major", and a bruise to the back of his shoulder. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; Cicio Dep. Tr. at pp. 48–52. A medical report prepared following the examination notes the following with regard to plaintiff's injuries:

> Inmate has small abraised/red area to rt. upper/lateral aspect of chest. Has small contused area to left lateral aspect of forehead, has small eccymotic area to rt. lateral aspect of shoulder. No life threatening injuries. No blood present. Alert and oriented. No signs of distress. No treatment necessary.

Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6). Following the incident plaintiff stated to medical staff that he was "fine" and did not wish to receive treatment. *Id.; see also* Cicio Dep. Tr. at pp. 75–76. During the cell extraction Corrections Officer MacWilliams suffered injury to his right wrist, and Corrections Officer Scott injured his right hip; no other staff members involved reported any injuries. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5).

For the most part, the foregoing facts are not disputed by the plaintiff. He does, however, contend that during the course of the extraction he was "repeatedly punched" by Corrections Officer MacWiliams, who asked "you want to play?" Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 46–47; Cicio Aff. (Dkt. No. 36) ¶¶ 10, 12. Plaintiff further alleges that while the other members of the cell extraction team, including Sergeant R. Gill and Lieutenant R. Lamora, "had ample time to curb the abuse" he suffered, they stood by without intervening. *Id.* at ¶ 11.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 7, 2008. Dkt. No. 1. Named as defendants in Cicio's complaint are Robert Woods, the superintendent at Upstate; Corrections Lieutenant Randy Lamora; Corrections Sergeant Robert Gill; and Corrections Officers Richard Scott, Richard MacWillams, Kirk Crossett, Eric Facteau, and Christopher Demers. Plaintiff's complaint asserts a single cause of action, alleging violation of his Eighth Amendment right against cruel and unusual punishment.

**\*4** Following joinder of issue and completion of pretrial discovery, defendants moved on August 6, 2009 for summary judgment dismissing plaintiff's complaint. Dkt. No. 35. In their motion, defendants argue that plaintiff's excessive force and failure to intervene claims are lacking in merit, that his claims against the defendants in their official capacities are barred by the Eleventh Amendment, and that in any event they are entitled to qualified immunity from suit against them for damages as individuals. *Id.* Plaintiff has since responded in opposition defendants' motion,[3] Dkt. No. 36, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York 72.3(c). *See* Fed.R.Civ.P. 72(b).

[3]     Plaintiff opposes defendants' motion and, alternatively, requests that he be granted a continuance so that he may pursue additional discovery. In particular, plaintiff seeks discovery regarding the facility's alleged refusal to allow plaintiff to view the DOCS directives regarding use of force, video procedures, chemical agents, and cell extractions. As an initial matter, I note that the deadline for completion of discovery expired on March 13, 2009, Dkt. No. 28, several months

before defendants filed their pending motion, and plaintiff has shown no reason why he did not timely pursue the discovery now requested. In any event, as will be seen, none of the information now sought by plaintiff would impact my recommendation regarding the defendants' motion, especially considering that nearly all of the material facts are undisputed by the plaintiff.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d

Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998).[4] The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

| 4 | With their motion defendants properly filed a statement of materials facts alleged not to be in dispute, as required under Northern District of New York Local Rule 7.1(a)(3). Dkt. No. 35–2. Under that rule when filing papers in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it in matching numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). In light of plaintiff's failure to provide such a statement, the court could deem the assertions set forth in defendants' Local Rule 7.1(a)(3) Statement, including to the effect that defendant MacWilliams did not punch him as alleged, *see* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 35–2) ¶¶ 34–35, to have been admitted by him. *Id.; see, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and contested the claim that defendant MacWilliams did not strike him, though without minimizing the importance of Local Rule 7.1(a) (3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement. |

### B. *Excessive Force*

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)
2010 WL 1063875

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. —— U.S. – – – –, —— S.Ct. ——, —— L.Ed.2d – – – –, 2010 WL 596513, at *3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

*6   [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting Hudson, 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated .... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000).

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 79 of 140
Cicio v. Lamora, Not Reported in F.Supp.2d (2010)
2010 WL 1063875

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

 **\*7** In this case, although the injuries sustained by Cicio as a result of the incident in question were admittedly slight and at least indirectly brought about by his own actions, because the governing law requires that the evidence be viewed in the light most favorable to the non-moving party, I am compelled to conclude that issues of fact preclude the entry of judgment as a matter of law in favor of the defendants. Plaintiff has alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that defendant MacWilliams punched him unnecessarily in the head several times during the cell extraction. Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 52–55; Cicio Aff. (Dkt. No. 36) ¶ 10. According to Cicio, when the defendants entered the cell and hit him with a shield he immediately dropped to the floor. Cicio Dep. Tr. at p. 64. At that point, plaintiff asserts, he could no longer resist because the corrections officers involved had his arms pinned, and could have easily handcuffed him. *Id.* Instead, plaintiff claims, "[MacWilliams] just kept hitting me. He hit me several times.... When I say maliciously and sadistically when he tells me that, when he's asking me if I want to play, he's hitting me. That means he's doing it for his own purpose...." *Id.* at pp. 52, 53–54. One could argue further that from the lack of a videotape recording of the relevant events, despite orders to Corrections Officer Facteau to follow the established protocol and record the cell extraction, a reasonable factfinder could infer that excessive force was applied during the incident and that a videotape of the events would have disclosed the punches thrown by defendant MacWilliams.

Without question, the evidentiary support for plaintiff's claim is far from overwhelming. Plaintiff's assertions are sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio. MacWilliams Aff. (Dkt. No. 35–9) ¶ 13. Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him. Additional evidence tending to contradict plaintiff's allegations includes the fact that it took two minutes or less for the corrections officers to perform the cell extraction and the reports of medical examinations conducted of the plaintiff shortly after the incident as well as the photographs of plaintiff's face, both revealing that he sustained only a slight bruise, *see* Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6), an injury that would also be fully consistent with what would be expected to result when corrections officers must take a resisting inmate to the floor for the purpose of administering arm and leg restraints. [5] Moreover, during his deposition, plaintiff acknowledged that the photographs accurately depict the full extent of the injuries suffered during the cell extraction. Cicio Dep. Tr. at 80–81.

5    Not insignificantly, during his deposition plaintiff acknowledged his realization that his refusal to obey a direct order to leave his cell would result in the use of force to accomplish that end. *See* Cicio Dep. Tr. at p. 37. This evidence could provide some support for a finding that defendants' acted reasonably.

 **\*8** Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact. *Griffin,* 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him."). I view the foregoing, I am obligated to recommend that defendants' motion be denied as to plaintiff's excessive use of force claim.

### C. Failure To Intervene

In addition to asserting that defendant MacWilliams beat him excessively, plaintiff alleges that the various other defendants

observed the incident but stood by without intervening on his behalf .[6] Defendants contend that plaintiff's failure to intervene claim similarly lacks merit.

[6]    Superintendent Wood has submitted an affidavit indicating that he was not present during the course of the incident, and plaintiff has offered no evidence to the contrary. *See* Woods Decl. (Dkt. No. 35–13) ¶ 7. Under these circumstances, defendant Woods is entitled to dismissal of plaintiff's claims against him on the independent basis of his lack of personal involvement in the constitutional violation alleged. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor).

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02–CV–6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).[7] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

[7]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*9** Although defendants deny that MacWilliams struck plaintiff, I have already determined that material questions of fact exist with respect to this issue. As to the co-defendants, plaintiff testified that "they had plenty of time during the whole incident to actually stop [MacWilliams] from assaulting [him]." Cicio Dep. Tr. at p. 52. Once again, though the evidence in plaintiff's favor is weak, I find that questions of fact preclude summary judgment with respect to plaintiff's failure to intervene claim and therefore recommend that this portion defendants' motion also be denied.

### D. *Eleventh Amendment*

To the extent that damages are sought against them in their official capacities, defendants' motion also seeks dismissal of those claims on the basis of the protection afforded under of the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and to state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

It is unclear from plaintiff's complaint whether he has sued defendants in their individual or official capacities, or both. Insofar as plaintiff's damage claims against the defendants are brought against them in their official government-employee capacity they are the equivalent of claims against the State of New York, and they are subject to dismissal under the Eleventh Amendment state-employee exception. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–

99 (N.D.N.Y.1984)) (McCurn, J.). I, therefore, recommend dismissal of plaintiff's damage claims against the defendants in their official capacities.

### E. *Qualified Immunity*
In their motion defendants also rely on the doctrine of qualified immunity, arguing that because their actions were reasonable under the circumstances they are immune from suit and plaintiff's complaint should be dismissed.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

***10** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[8] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[9] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient

disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[10] *Pearson,* 555 U.S. at——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

[8]　In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

[9]　In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

[10]　Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at ——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional

2010 WL 1063875

violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*11** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Undeniably, the right of a prison inmate to be free from excessive use of force has long been established. *Russo v. City of Bridgeport,* 479 F.3d 196, 212 (2d Cir.), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007). Since I have already determined that, if credited, plaintiff's testimony could support a jury finding that defendants acted intentionally to harm him, it follows that a rational trier of fact could also conclude that defendants' conduct was not objectively reasonable under the circumstances. *See id.; see also Dallio v. Santamore,* No. 9:06–CV–1154, 2010 WL 125774, at \*14 (N.D.N.Y. Jan.7, 2010) (Suddaby, J. and Homer, M.J.) ("As to [plaintiff's] excessive force and failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. Thus, accepting all of [plaintiff's] allegations about the incident as true, qualified immunity cannot be granted ... since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation."). As a result, I have determined that material questions of fact exist on the issue of whether defendants are entitled to qualified immunity from suit and therefore recommend that this portion of defendants' motion also be denied.

## IV. *SUMMARY AND RECOMMENDATION*

Given the circumstances leading up to the forcible extraction of Cicio from his cell, it is doubtful that he will be viewed by a jury as a particularly sympathetic plaintiff. Plaintiff placed his own safety as well as that of others in jeopardy by refusing a lawful order to exit his cell, admittedly knowing that his actions would result in the use of force to remove him. Plaintiff's refusal to obey prison officials' commands, however, though plainly indefensible, did not provide corrections officers with a license to exact retribution by needlessly punching him after he was subdued and no longer resisting, as he has alleged. Whether Officer MacWilliams did, in fact, needlessly punch the plaintiff raises a question of credibility given the conflicting accounts now before the court. I am therefore compelled to conclude that the existence material questions of fact preclude the court from granting defendants' motion for summary judgment with respect to plaintiff's excessive use of force and failure to intervene claims and on the issue of qualified immunity. Because defendants are immune from suit in their official capacities, however, and plaintiff has adduced no evidence that defendant Woods was personally involved in the offending conduct, defendants' motion dismissing plaintiff's damage claims against them in their official capacities and all claims against defendant Woods should be granted. Accordingly, it is hereby respectfully

**\*12** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods be DISMISSED but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such

objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063875

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1839299
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Brent JACOBY, Plaintiff,

v.

D. PHELIX, Captain, Franklin Correctional
Facility; R. Gates, Sergeant, Franklin Correctional
Facility; E. Coupal, Correctional Officer,
Franklin Correctional Facility, [1] Defendants.

[1]     Plaintiff's original complaint included L. Sears, D.
Artus, and D. Selsky as defendants. Pursuant to the
order entered by Judge Hurd on August 19, 2008,
(Dkt. No. 23) the complaint was dismissed without
prejudice as to defendants Sears, Artus, and Selsky.

No. 9:07–CV–872 (DNH/ATB).
|
March 31, 2010.

**Attorneys and Law Firms**

Brent Jacoby, pro se.

Adrienne J. Kerwin, for Defendants.

**REPORT AND RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred by United States District Judge
David N. Hurd for Report and Recommendation pursuant to
28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). The
case was transferred to me on January 4, 2010, following the
retirement of U.S. Magistrate Judge Gustave J. Di Bianco.
(Dkt. No. 46).

While an inmate in the custody of the Department of
Correctional Services ("DOCS") at Clinton Correctional
Facility, plaintiff filed his complaint, pursuant to 42 U.S.C. §
1983, regarding events that occurred during his incarceration
at Franklin Correctional Facility ("Franklin"). Plaintiff's

complaint lists three causes of action. He alleges that
defendants Coupal and Phelix retaliated against plaintiff for
filing grievances ("Count 1"). (Compl. at 19). [2] He claims
that defendant Coupal violated plaintiff's Eighth Amendment
right to be free from cruel and unusual punishment ("Count
2"). (*Id.*). Finally, plaintiff alleges that defendants Phelix
and Gates violated his Fourteenth Amendment right to due
process ("Count 3"). (Compl. at 19–20). Plaintiff seeks
monetary damages. (Compl. at 20).

[2]     Plaintiff's complaint is confusingly numbered,
with the first six pages, which appear to be a
form, numbered 3–8 and the next fourteen pages
numbered 1–14. Plaintiff has numbered some of the
paragraphs, but not all of them. Consequently, for
the sake of clarity, the court will cite to information
in the complaint by page number, beginning with
the first page of the complaint as page 1 and
continuing through page 20.

Presently before this court is defendants' motion for summary
judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 37). Plaintiff
has responded in opposition to the motion. (Dkt. No. 45). For
the following reasons, this court recommends that defendants'
motion be granted in part and denied in part.

**DISCUSSION**

**I.** *Facts*

On September 30, 2006, plaintiff was issued a misbehavior
report for "cheeking" pills. (Defs.' Ex. A). A Tier III [3]
hearing was held on October 4, 2006, and plaintiff was found
guilty of creating a disturbance, smuggling, interference with
an employee, and refusing a direct order. (Defs.' Ex. C).
Plaintiff was sentenced to one month in the Special Housing
Unit ("SHU"), which time began on October 4, 2006. (*Id.*).
Plaintiff had his first interaction with defendant Coupal,
a corrections officer in the Alcohol and Substance Abuse
Treatment ("ASAT") dorm, on October 3, 2006—the day
before his Tier III hearing. (Compl. p. 1, Pl.'s Dep. at 22,
27). At his deposition [4] in this case, plaintiff testified that
he had arrived in the ASAT dorm about four days before
his encounter with defendant Coupal. (Pl.'s Dep. at 22). This
statement is consistent with the location indicated on the
misbehavior report dated September 30, 2006. (Defs.' Ex. B).

3    New York prison inmates are subject to three levels of disciplinary hearings for violations of prison rules. *Porter v. Coughlin,* 421 F.3d 141, 142 n. 1 (2d Cir.2005) (citing *inter alia* N.Y. COMP.CODES R. & REGS. tit. 7 §§ 270.2 (Standards of Inmate Behavior), 270.3 (Tiers of Disciplinary Hearings), 252.5 (Tier I dispositions), 253.7 (Tier II dispositions), and 254.7 (Tier III dispositions)). Tier III hearings are reserved for the more serious violations.

4    Plaintiff was deposed on February 9, 2009, and the transcript of the deposition has been filed as Defendants' Ex. A.

Plaintiff alleges that, when he first arrived at the ASAT dorm, he put up a "collage," consisting of girls' pictures. (Pl.'s Dep. at 27; Pl.'s Resp. Ex. 1, at 60 [5]). Some of the other inmates in the ASAT dorm told plaintiff that he would be told to take down the pictures and that defendant Coupal "would flip out as soon as he came in." (Pl.'s Dep. at 28). Plaintiff wrote a grievance about the picture policy on October 2, 2006, the day before defendant Coupal's shift. (Pl.'s Dep. at 28; Pl.'s Resp. Ex. 1, at 60). Plaintiff alleges that, after inmate representatives from the grievance committee came to discuss the grievance with him on October 3, 2006, defendant Coupal confronted plaintiff about the grievance and told plaintiff to take down the pictures. (Compl. ¶ 1; Pl.'s Dep. at 30). Plaintiff alleges that defendant Coupal also asked numerous questions plaintiff considered "personal," which plaintiff refused to answer. (Compl.¶ 4).

5    Plaintiff filed 66 pages of documents as an "exhibit" to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. (Dkt. No. 45–1). For ease of reference, the court will refer material contained in "exhibit" by page number beginning with the first page of the exhibit and cite it as "Pl.'s Resp. Ex."

*2    Plaintiff then alleges that defendant Coupal took him to an area between two sets of doors at the entrance to the ASAT dorm, where defendant Coupal was "in [plaintiff's] face intimidating [him] and acting like [Coupal] was gonna assault [plaintiff] with his fists because he put on some thick gloves." (Compl.¶ 5). Plaintiff alleges that after this intimidation, he and Coupal went back to defendant Coupal's desk, where plaintiff again refused to answer questions. (Compl.¶ 7). He also told defendant Coupal that

plaintiff "wasn't signing off [6] on my grievance about the pictures." (Compl. ¶ 7; Pl.'s Dep. at 36).

6    "Signing off" on a grievance is a procedure by which an inmate acknowledges that the problem complained of in the grievance has been informally resolved.

Plaintiff alleges that defendant Coupal then took him between the two sets of doors again, where defendant Coupal

kicked my feet from up [sic] under me with his boots. I fell to the floor and balled up to protect myself. [Coupal] then started kicking me and slinging me around by my shirt and arms into the wall and he stomped on my feet with his boots causing my big toenail to fall off.

(Compl. ¶ 8; *see also* Pl.'s Dep. at 38–40). Plaintiff alleges that defendant Coupal then told him to go back to his "cube ." (Compl.¶ 9).

Plaintiff wrote a grievance dated October 3, 2006, about the alleged assault. (Compl. ¶ 11; Pl.'s Resp. Ex. at 48–51; *see also* Pl.'s Dep. at 45–46). [7] After plaintiff's Tier III hearing [8] on October 4, 2006—the day after the alleged assault incident with defendant Coupal—he was sentenced to 30 days in the SHU. (Def.'s Ex. C; Pl.'s Dep. at 40). After serving 30 days in the SHU, plaintiff did not return to the ASAT dorm, but was released back into the general prison population. (Pl.'s Dep. at 65–66).

7    This grievance was appealed to the superintendent and found to be without merit, as indicated on the report consisting of the last two pages of Defs.' Ex. R. The report indicates the grievance was filed November 14, 2006, and signed by the superintendent on December 7, 2006.

8    This hearing was for the "pill cheeking" misbehavior report.

Plaintiff was not checked by medical personnel for injuries related to the alleged October 3, 2006, assault until December 1, 2006, at which time, no injuries were noted. (Compl. ¶¶ 15–

Jacoby v. PREFIX, Not Reported in F.Supp.2d (2010)
2010 WL 1839299

16; Pl.'s Dep. at 63–64; Pl.'s Resp. Ex. at 54, 56; Defs.' Ex. V). The examination was the result of plaintiff's grievance, complaining of the assault. Although the grievance is dated October 3, 2006, it is stamped received by the Guidance Unit on November 8, 2006, and was given Grievance No. FKN 7373–06 on November 14, 2006. (Pl.Ex. at 48–51). Superintendent Sears ordered an investigation of the grievance on November 14, 2006. (*Id.* at 52). Sergeant B. Buchanan conducted the investigation, including ordering plaintiff to be "checked by medical," as well as interviewing plaintiff and defendant Coupal. (*Id.* at 54). Sergeant Buchanan issued a report on December 1, 2006.[9] (*Id.*). Sergeant Buchanan's report states that plaintiff wished to " 'drop the whole thing.' " (*Id.*).

[9]    Defendant Coupal wrote a memorandum to Sergeant Buchanan, dated December 2, 2006, reflecting what he told Sergeant Buchanan during the interview. (Pl.'s Resp. Ex. at 53).

The plaintiff's Ambulatory Health Record for December 1, 2006, states "viewed for security ... no injuries claimed or seen." (Defs.' Ex. V). However, the Inmate Injury Report indicates that plaintiff initially stated "nothing happened" and refused to answer the place or time of injury, but then "alleges that he was injured by an officer—recanted this 'nothing happened.' Refused to answer any further questions." (Defs.' Ex. V). Plaintiff also signed a paper dated December 1, 2006, which states, "I wish to withdraw all allegations detailed in [the October 3, 2006 grievance]. I am not being coerced in any way, shape or form."[10] (Pl.'s Resp. Ex. at 55). Plaintiff now alleges he was threatened by corrections officers to drop the allegations "or they would kick [plaintiff's] ass and put him in the Box[11] with his other 2 witnesses that he mentioned in his grievance." (Compl. ¶ 13; *see also* Pl.'s Dep. at 63–64).

[10]    The court notes that, although plaintiff signed the document, the handwriting appears to be Sergeant Buchanan's. *Compare* (Pl.'s Resp. Ex. at 54) *with* (Pl.'s Resp. Ex. at 55).

[11]    "Box" is a slang term for the SHU.

**\*3**  By late December 2006 or early January 2007, plaintiff had been re-admitted to the ASAT program and was housed in an ASAT dorm where defendant Coupal worked. (Compl. ¶ 18; Pl.'s Dep. at 68–69). Around this same time, an investigator from the Inspector General's office met with plaintiff. (Compl. ¶ 20; Pl.Ex. at 57). Soon thereafter, plaintiff

claims that he and defendant Coupal started having conflicts again. (Compl.¶¶ 22, 23).

On February 26, 2007, defendant Coupal prepared a misbehavior report for what appeared to be a fresh tattoo on plaintiff's left forearm. (Defs.' Ex. D). Plaintiff was examined by medical staff, who poured peroxide on the tattoos.[12] (Compl.¶¶ 29–30). Plaintiff's ambulatory health record dated February 26, 2007, states, "Tattoos on arm, chest-All tatoos[sic] are not bubbling, but one on L wrist, Dice, on arm appears recent." (Defs.' Ex. V). The Inmate Injury Report dated February 26, 2007, includes the following: "Inmate's Statement: States about 4 months ago—tattoos." (Defs.' Ex. V). Plaintiff then wrote a grievance dated February 27, 2007, stating that defendant Coupal threatened and harassed him. (Defs.' Ex. R).[13]

[12]    Fresh tattoos would cause the peroxide to "bubble."

[13]    This grievance was filed on March 1, 2007, and signed by the superintendent on March 12, 2007, finding that plaintiff was "unable to substantiate his allegations," and affirmed by the Central Office Review Committee on April 11, 2007. (Defs.' Ex. R).

A Tier II hearing was held on March 1, 2007, and plaintiff pled guilty to "tattooing" and an "unhygienic act." (Defs.' Ex. E, F). Defendant alleges that he pled guilty because the lieutenant "said he was gonna find me guilty so just plead guilty and he would go easy on me and not send me to segregation. So I did because I didn't want to lose my ASAT program and vocational classes." (Compl.¶ 32).

On March 16, 2007, plaintiff alleges he dropped some dishes, and when he went out of his cube to retrieve them, he received a misbehavior report from defendant Coupal for being out of his cubicle and refusing a direct order. (Compl. ¶ 37; Defs.' Ex. G). After a Tier II hearing held on March 19, 2007, and continued on March 24, 2007, plaintiff was found guilty of refusing a direct order, being out of place, and noncompliance with hearing disposition.[14] (Defs.' Ex. H). Plaintiff wrote a grievance dated March 20, 2007, stating that defendant Coupal had threatened and harassed him.[15] (Defs.' Ex. S). During the investigation of the March 20, 2007 grievance, plaintiff mentioned that he had already accused Coupal of assaulting him, referring to the alleged October 3, 2006 incident. *Id.*

**14**    Plaintiff was on "non-program hours," meaning he was restricted to his cubicle when he was not participating in prison programming.

**15**    This grievance was filed on March 22, 2007, and signed by the superintendent on April 13, 2007, with the following findings: "The Grievant has not provided any evidence to support any of his allegations. It appears the Grievant is using the [Inmate Grievance Program] to retaliate against the officer for him writing misbehavior reports." (Defs.' Ex. S). These findings were affirmed by the Central Office Review Committee, which mentioned in its report that the Inspector General's investigation of the October 3, 2006, assault incident found the allegations to be unsubstantiated. *Id.*

On March 23, 2007, plaintiff was issued a misbehavior report by defendant Coupal for possessing a set of headphones and an AC adapter, both without plaintiff's inmate number on them. (Defs.' Ex. J). Plaintiff alleges these items were actually taken from him about three weeks prior to March 23, 2007. (Compl.¶¶ 35, 39–40). At a Tier II hearing held on March 27, 2007, plaintiff was found guilty of possessing an altered item, unauthorized exchange, and contraband. (Defs.' Ex. K). He was then sentenced to 30 days in the SHU. *Id.*

On April 1, 2007, plaintiff was issued a misbehavior report by defendant Gates as a result of a continuing investigation into a fire set in another inmate's cube on March 1, 2007, and the discovery of homemade alcohol ("hooch") in another inmate's cube on March 22, 2007. (Defs.' Ex. M; Compl. ¶¶ 42–47). Defendant Gates conducted the investigation and prepared a report for defendant Phelix, his superior officer. (Defs.' Ex. P; Gates Decl. ¶¶ 3, 8; Phelix Decl. ¶ 13). The material in the report is practically identical to that written in the misbehavior report issued to the plaintiff. (Defs.' Ex. M, P; Phelix Decl. ¶ 14). Defendant Phelix conducted the Tier III hearing on April 5, 10, and 16, 2007, where plaintiff was found guilty of making "alcohol or intoxicant" and not guilty of "arson, flammable materials and property damage or loss." (Defs.' Ex. N).

**\*4**  On appeal, the ruling was reversed and expunged because defendant Phelix should have recused himself due to his receipt of defendant Gates' report in Phelix's capacity as Gates' supervisor. (Phelix Decl. ¶ 13). In April 2007, plaintiff had a Time Allowance Committee (TAC) review at Franklin, which recommended that plaintiff not lose any good time.

(Compl. ¶ 64; Defs.' Ex. U). On June 29, 2007, the TAC at Clinton met and recommended plaintiff lose all his good time credit. (Compl. ¶¶ 65–66; *see also* Defs.' Ex. U).

## II. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "All reasonable inferences and any ambiguities are drawn in favor of the nonmoving party." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Additionally, while a court "is not required to consider what the parties fail to point out," the court "may in its discretion opt to conduct an assiduous review of the record" even where a party fails to respond to the moving party's statement of

material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations and internal quotation marks omitted).

### III. *Retaliation*

**\*5** In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett,* 343 F.3d at 137 (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

### A. Defendant Phelix

Defendant Phelix argues that there is no causal connection between his actions and plaintiff's grievances, because his "only involvement with the plaintiff relevant to the complaint was when I served as the hearing officer in connection with a disciplinary charge against the plaintiff." (Phelix Decl. ¶ 3). Phelix further argues that "there is no evidence that [defendant] Phelix knew of the grievances or complaints

made by the plaintiff." (Defs .' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. at 3). These statements are not supported by the documentation included with defendants' motion for summary judgment.

Defendants submitted an "Interdepartmental Communication," associated with plaintiff's grievance filed on March 1, 2007, indicating that defendant Phelix was involved with the review of that grievance. (Defs.' Ex. R). Defendants also submitted another "Interdepartmental Communication" dated April 5, 2007, indicating that defendant Phelix was also involved with the review of plaintiff's grievance filed on March 22, 2007. (Defs.' Ex. S). Another "Interdepartmental Communication," dated March 23, 2007, was filed by the defendants, but the document only indicates that it is connected with the plaintiff, not a specific grievance. (*Id.*). This document is not initialed by defendant Phelix, although the heading indicates the document is from him. (*Id.*).

**\*6** Plaintiff, while pointing out the temporal proximity between the grievances he filed in March and the Tier III hearing held in April, simply concludes that defendant Phelix "was out to get me out of the facility and to a SHU as retaliatory treatment for all the grievances and letters I wrote .... " (Compl.¶ 56). Even though defendant Phelix incorrectly asserts that he had no involvement with plaintiff, other than presiding over the Tier III hearing held in April, it is clear that any actions taken by defendant Phelix would have been taken regardless of plaintiff's grievances and letters.

Defendant Phelix's role in investigating plaintiff's grievances appears to have been merely supervisory, and not determinative, since many other prison officials were also involved in plaintiff's grievances, and the initial findings were eventually reviewed and upheld by Central Office Review Committee ("CORC"). *See* notes 7 & 9, *supra.* As to the findings made in the Tier III hearing in April, defendant Phelix found plaintiff guilty of only one out of four offenses, that of making alcohol. [16] (Defs.' Ex. N; Phelix Decl. ¶ 9). In making his finding, defendant Phelix relied on the testimony of another inmate, Timothy Parry, who specifically testified that plaintiff made the "hooch." [17] (Defs.' Ex. O). Because defendant Phelix likely would have found plaintiff guilty even in the absence of plaintiff's grievances, this court recommends that plaintiff's cause of action based on retaliation as to defendant Phelix be dismissed.

16    It is also questionable that defendant Phelix subjected plaintiff to any "adverse action." He was assigned to preside over plaintiff's hearing; thus, the only thing he did that was arguably adverse to plaintiff was to find him guilty of one of the charges. As stated above, "adverse action" is that which would deter an individual of ordinary firmness from asserting his rights. Clearly, finding someone guilty of only one of four charges undermines the inference that defendant Phelix was being unfair to plaintiff. There is nothing in defendant Phelix's actions that would deter an inmate from asserting his rights.

17    As defendant Phelix stated at the disciplinary hearing, plaintiff's improper misbehavior was exacerbated by the fact that he was being housed in an ASAT dormitory in a program targeting Alcohol and Substance Abuse. (Defs. Ex. O at 56).

### B. Defendant Coupal

The misbehavior reports prepared by defendant Coupal are also based on plaintiff's actions violating prison rules. Defendant Coupal prepared a misbehavior report dated February 26, 2007, because plaintiff appeared to have a fresh tattoo. (Defs.' Ex. D). Defendant Coupal's suspicion was confirmed, as indicated on the Ambulatory Health Record dated February 26, 2007, which states that medical staff examined the tattoo and concluded it was "recent." (Defs.' Ex. V). Defendant Coupal prepared the misbehavior report dated March 16, 2007, because plaintiff was on cube restriction and did not remain in his cube, which plaintiff admits. (Defs.' Ex. H; Compl. ¶ 37). Defendant Coupal prepared the misbehavior report on March 23, 2007, because plaintiff possessed unauthorized altered headphones, which are considered contraband at Franklin, which plaintiff also admits.[18] (Defs.' Ex. J; *see also* Compl. ¶¶ 35, 40). Thus, plaintiff would have been found guilty of the misbehavior reports filed by defendant Coupal, and any First Amendment retaliation claims against defendant Coupal regarding the misbehavior report may be dismissed. *See, e.g., Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (holding that the defendants met their burden to show they would have filed disciplinary charges absent any retaliatory motive when "it was undisputed that [the plaintiff] had in fact committed the prohibited conduct"); *Chavis v. Kienert,* 9:03–CV–39 (FJS/ RFT), 2005 U.S. Dist. LEXIS 41920, at *53–59, 2005 WL 2452150, at *17–19 (N.D.N.Y. Sept. 30, 2005).

18    The court notes that plaintiff tries to explain these incidents by accusing defendant Coupal of conducting searches to harass plaintiff, but the facts that plaintiff had a recent tattoo, was out of place, and possessed contraband remain the same. Plaintiff's arguments based on the technicalities of when he should or should not be written up are not persuasive. (Compl. ¶¶ 39, 40).

**\*7** Plaintiff does claim that defendant Coupal's alleged assault was "in retaliation" for plaintiff's grievance regarding the pictures hanging in his cube. Plaintiff includes a copy of this grievance, and it is dated October 2, 2006. (Pl.'s Resp. Ex. at 60–63). When inferences are resolved against the movant, given the temporal proximity of the grievance and the alleged assault, there are questions of fact as to whether defendant Coupal was aware of plaintiff's grievance about the picture policy in his cube and whether he retaliated against plaintiff by the alleged assault. Thus, plaintiff's First Amendment claim regarding defendant Coupal may not be dismissed as related to the alleged assault.

## IV. *Excessive Force*

### A. Exhaustion of Administrative Remedies

Defendants first argue that plaintiff has failed to properly exhaust the excessive force claim as against defendant Coupal. The PLRA exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). In *Woodford v. Ngo,* 548 U.S. 81 (2006), the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Id.* at 92–93. "Proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See id.* at 89–94. An inmate must appeal any denial of his grievance to the highest available administrative level. *Martinez v. Williams,* 349 F.Supp.2d 677, 682 (S.D.N.Y.2004).

However, the Second Circuit has held that certain exceptions to exhaustion apply. The proper inquiry is to determine "whether: (1) administrative remedies were in fact available to the prisoner; (2) the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions

inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense; and (3) special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Chavis v. Goord,* 333 Fed. Appx. 641, 643 (2d Cir.2009) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (internal quotation marks omitted).

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. COMP.CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the CORC. *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

**\*8** There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8. Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8(a). The inmate then files a grievance under the normal procedures outlined above; but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id.* § 701.8(b). Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment. If so, the Superintendent shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)-(d)(3). An appeal of the adverse decision of the Superintendent may be taken to the CORC as in the regular grievance procedure. *Id.* § 701.8(h).

Here, defendants argue that plaintiff did not properly exhaust his claim because he did not appeal his grievance related to the alleged assault on October 3, 2006, to the CORC. (*See* Defs.' Ex. T). The superintendent reviewed the alleged assault grievance on December 7, 2006, and there is no question that plaintiff did not appeal the superintendent's decision to the

CORC. (Defs.' Ex. R). This is apparently due to the paper signed by plaintiff and dated December 1, 2006, which stated, "I wish to withdraw all allegations detailed in [the alleged assault grievance]. I am not being coerced in any way, shape or form." (Pl.'s Resp. Ex. at 55).

Plaintiff concedes that he did not appeal the assault grievance to the CORC, but claims that the reason he did not pursue the grievance is because he was threatened by Sgt. Buchanan and others, and because he apparently believed that the Inspector General's investigation would be sufficient. (Compl. ¶ 13; Pl.'s Resp. Mem. at 4). When asked during his deposition why he "signed off" on the grievance, plaintiff responded, "Because ... Albany was already involved in it and [the inspector general] ... the grievance was already wrote [sic] and put in, and I knew they were investigating, so it really didn't matter, and I was scared, honestly .... it's like, the heck with it, you know." (Pl.'s Dep. at 63; *see also* Compl. ¶ 14).

The comment plaintiff made at his deposition suggests that he was frightened into dropping his grievance and that he thought the Inspector General's investigation would take care of the matter. If, in fact, plaintiff was threatened into dropping his grievance, the defendants would be estopped from asserting the defense of non-exhaustion. There are questions of fact remaining regarding these alleged threats.

Plaintiff also claims that he "signed off" on the grievance because the Inspector General was already investigating the incident, and therefore it was unnecessary to continue the grievance procedure. (Pl.'s Dep. at 63). Generally, an inmate's attempt to exhaust by simply writing a letter, either to supervisory officials or directly to the Inspector General, will ***not*** suffice to exhaust administrative remedies. *See Grey v. Sparhawk,* No. 99 CIV. 9871, 2000 U.S. Dist. LEXIS 8656, at, \*5, 2000 WL 815916 (S.D.N .Y. June 23, 2000) (holding that a complaint filed directly with the Inspector General did not excuse the plaintiff "from adhering to the available administrative procedures").

**\*9** It has been held that "a grievance through informal channels will satisfy the exhaustion requirement ***if the prisoner thereby obtained a favorable resolution of his grievance."*** *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (citations omitted). The exhaustion requirement will be satisfied because the inmate would not have any reason to appeal a favorable resolution. *Andrews v. Cruz,* 04 Civ. 566, 2010 U.S. Dist. LEXIS 28124, \*16, 2010 WL 1141182 (S.D.N.Y. March 24, 2010) (citations omitted).

In *Andrews,* the court held that the plaintiff could have believed that he obtained a "favorable resolution" because of the Inspector General's investigation since an investigation by the Inspector General was the only relief available under the regulations governing "harassment" grievances. *Id.; See* N.Y.C .R.R. § 701.8. However, the plaintiff in *Andrews* followed the "harassment grievance" procedure, and the Superintendent sent the grievance to the Inspector General for investigation. This case presents a different situation, in which it appears that plaintiff wrote directly to the Inspector General, but his grievance also prompted a DOCS investigation of the incident.

Plaintiff's claim that he had been threatened by defendants leaves questions of fact regarding whether he exhausted his administrative remedies, and this court will not recommend granting summary judgment on this basis.

### B. Eighth Amendment Standard

The Eighth Amendment prohibits the " 'unnecessary and wanton infliction of pain.' " *Baker v. Willett,* 42 F.Supp.2d 192, 196 (N.D.N.Y.1999) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). When the use of excessive force is alleged, the court must determine whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitely v. Albers,* 475 U.S. 312, 320–21 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973)). In order to meet the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.' " *Whitely,* 475 U.S. at 327.

Minor uses of physical force do not reach the constitutional level as long as the force used is not "repugnant to the conscience of mankind." *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). However, the court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely,* 475 U.S. at 321. Not every push or shove, even if it seems unnecessary, amounts to a violation of the constitution. *Hudson,* 503 U.S. at 9–10 (*de minimis* force); *Johnson v. Glick,* 481 F.2d at 1033.

*\*10 Here, defendant Coupal argues that he never assaulted plaintiff. However, resolving inferences against defendant Coupal leaves an issue of fact both as to the nature of the interaction between defendant Coupal and plaintiff on October 3, 2006, and its severity. While there is no direct proof of violence due to the lack of evidence of physical injury, the alleged inmate witnesses' refusal to testify and length of time between the medical examination and the alleged incident at least raises the possibility of threats and a cover-up. If the incident occurred as plaintiff alleges, there appears to be little to no provocation for the alleged physical force used by defendant Coupal. Resolving inferences against the movants results in an issue of fact to be determined by a jury.

Because issues of fact exist as to plaintiff's retaliation claims as well as plaintiff's excessive force claims against defendant Coupal, defendants' motion for summary judgment as to defendant Coupal fails. Accordingly, their motion for summary judgment as to plaintiff's cause of action for retaliation as to defendant Coupal should be denied. In addition, defendants' motion for summary judgment as to plaintiff's cause of action for excessive force as to defendant Coupal should be denied.

### V. *Due Process*

To establish a claim based on a violation of due process, a plaintiff must first establish a constitutionally protected liberty or property interest that a plaintiff was denied without due process. *See Perry v. McDonald,* 380 F.3d 159, 173 (2d Cir.2001) (citations omitted). Prison discipline implicates a liberty interest when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). The Second Circuit has interpreted the Supreme Court's decision in *Sandin* to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose [ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sealey v. Giltner,* 197 F.3d 578, 583 (2d Cir.1999) (quoting *Sandin,* 515 U.S. at 484). Atypicality in a *Sandin* inquiry is normally a question of law. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir.2000); *Sealey,* 197 F.3d at 585. [19] When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d

at 586; *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997). *See also Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y.2000) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within the normal range of prison custody).

19     In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon,* 215 F.3d at 230–31; *Sealey,* 197 F.3d at 585.

**\*11** The duration of a disciplinary confinement, while not the only factor to be considered, remains significant under *Sandin. Colon,* 215 F.3d at 23 1. [20] While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n. 5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231–32. [21]

20     Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. 515 U.S. at 485–86. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.* at 485.

21     In *Colon,* a Second Circuit panel split markedly on whether or not adoption of a 180–day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. 215 F.3d at 232–34 (Newman, C.J.), 235–37 (Walker, C.J. and Sack, C.J., concurring in part).

In this case, plaintiff alleges that his due process rights were violated by defendants Gates and Phelix based on their involvement in the investigations of the homemade alcohol and dorm fire incidents. Defendant Gates' involvement was limited to his April 1, 2007, misbehavior report. Even if the misbehavior report was false, it would not rise to a violation of substantive due process. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) (a prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result

in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process). Additionally, the penalty imposed by defendant Phelix as a result of the Tier III hearing in April included three months in the SHU, with one month suspended and six months deferred. (Phelix Decl. ¶ 10; Defs.' Ex. N). This penalty does not implicate a liberty interest protected by the due process clause. *See Alvarado v. Kerrigan,* 152 F.Supp.2d 350, 355 (S.D.N.Y.2001) (101 days or less in the SHU without more, does not trigger a liberty interest).

Because plaintiff has failed to establish a liberty interest, no due process violation occurred. Therefore, plaintiff's due process claims as to defendants Gates and Phelix must fail. Accordingly, this court recommends that defendants' motion for summary judgment be granted as to plaintiff's cause of action based on a deprivation of due process as to defendants Gates and Phelix. Plaintiff also appears to allege a violation of due process for the revocation of good time credit. (Comp. Count 3). However, plaintiff's claim for damages relating to the loss of good time credits was dismissed on October 4, 2007. (Dkt. No. 6).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 37) be **GRANTED IN PART,** and the complaint **DISMISSED IN ITS ENTIRETY AS TO DEFENDANTS PHELIX and GATES,** and it is further

**RECOMMENDED,** that defendants' summary judgment motion be **DENIED IN PART,** as to plaintiff's claims based on retaliation and excessive force as to defendant Coupal, as discussed above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1839299

**Jacoby v. Phelix, Not Reported in F.Supp.2d (2010)**

2010 WL 1839299

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

Scarbrough v. Thompson, Not Reported in F.Supp.2d (2012)

2012 WL 7761439

2012 WL 7761439
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lester Lee SCARBROUGH, Jr., Plaintiff,

v.

Steven D. THOMPSON, Sergeant, Upstate Correctional
Facility; Timothy Arquitt, Correctional Officer,
Upstate Correctional Facility; Thomas Smith,
Correctional Officer, Upstate Correctional Facility;
Brian Gary, Correctional Officer, Upstate Correctional
Facility; Bruce Truax, Correctional Officer, Upstate
Correctional Facility; Bryan Clark, Correctional
Officer, Upstate Correctional Facility; Paul Burgess;
Robert H. Reynolds; John Matejaik; Steven Salls;
Thomas Quinn; Donald Quinn; Gary Gettmann;
Marla Travers; and David Rock, Defendants. [1]

[1]    The following defendants have been identified
with their job positions: Paul Burgess, corrections
officer; Robert H. Reynolds, corrections officer;
John Matejaik, corrections officer; Steven Salls,
lieutenant; Thomas Quinn, superintendent; Donald
Quinn, captain; Gary Gettmann, sergeant; Marla
Travers, nurse; and David Rock, superintendent.
Am. Compl. (Dkt. No. 37) ¶ 31; Reynolds Decl.
(Dkt. No. 76–20) ¶ 2; Matejaik Decl. (Dkt. No. 76–
16) ¶ 2; Scarbrough Dep. (Dkt. No. 76–3) at 57; T.
Quinn Decl. (Dkt. No. 76–24) ¶ 2; D. Quinn (Dkt.
No. 76–11) ¶ 2; Gettmann Decl. (Dkt. No. 76–12) ¶
2; Travers Decl. (Dkt. No. 76–18) ¶ 2; Rock Decl.
(Dkt. No. 76–10) at ¶ 2.

No. 10–CV–901 (TJM/CFH).
|
Dec. 12, 2012.

**Attorneys and Law Firms**

Lester Lee Scarbrough, Jr., Niagra Falls, NY, pro se.

Hon. Eric T. Schneiderman, Michael G. Mccartin, Esq., of
Counsel, Assistant Attorney General, Attorney General for
the State of New York, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [2]

[2]    This matter was referred to the undersigned for
report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

**\*1** Plaintiff pro se Lester Lee Scarbrough, Jr.
("Scarbrough"), a former inmate in the custody of the New
York State Department of Correctional and Community
Supervision ("DOCCS"), brings this action pursuant to 42
U.S.C. § 1983 alleging that fifteen officials and employees of
DOCCS violated his constitutional rights under the First and
Eighth Amendments. Am. Compl. (Dkt. No. 37). Presently
pending is defendants' motion for summary judgment
pursuant to Fed.R.Civ.P. 56. Dkt. No. 76. Scarbrough opposes
this motion. Dkt. No. 82. For the following reasons, it is
recommended that defendants' motion for summary judgment
be granted in part and denied in part.

**I. Background**

The facts are related in the light most favorable to Scarbrough
as the non-moving party. *See* subsection II(A) *infra*. At all
relevant time periods, Scarbrough was an inmate at Upstate
Correctional Facility ("Upstate"). Am. Compl. ¶ 3.

**A. Cell Flooding**

On the morning of December 31, 2009, Scarbrough was
flushing the toilet in his cell when it began to overflow.
Am. Compl. ¶ 25. Upon Scarbrough's call out for assistance,
defendant Burgess, a corrections officer, arrived at the cell.
*Id.* ¶¶ 28, 31. Despite Scarbrough's explanation that the
flooding was accidental, Burgess informed Scarbrough that
he was lodging a misbehavior report against Scarbrough
for intentionally flooding the prison gallery, resulting in
the reduction of Scarbrough's Progressive Inmate Movement
System ("PIMS") Level from a 3 to a 1. *Id.* ¶ 32. This
required Scarbrough to move to another cell. [3] *Id.* ¶ 32;
Scarbrough Dep. at 21–22. Scarbrough refused to move
before a disciplinary hearing was conducted. Am. Compl. ¶¶
36, 38, 88. Thereafter, Burgess left Scarbrough's cell. *Id.* ¶ 39.

3       According to Scarbrough, Upstate employs a Progressive Inmate Movement System ("PIMS"), which categorizes inmates on a three-level merit system. Am. Compl. ¶¶ 33–34. Level–3 being the highest, it offers inmates various amenities that are unavailable to lower levels. *Id.* ¶ 35. For example, a Level–3 inmate has recreation twice a day, four showers a week, and can keep thirty books in his cell. Scarbrough Dep. at 23.

During his deposition, Scarbrough testified to the following on the issuance of a misbehavior report before a cell transfer:

> Q: Isn't it true that the officers do not have to wait to have a misbehavior report written, and then have that misbehavior report acted upon before an inmate is moved from one cell to another?
>
> A: They do that. But I also seen people cash tickets and stay in the same cell until they are given their hearing. And then they go downstairs because they were found guilty.
>
> Q: That's the decision of the officers to make, not the inmates to make, though[,] correct?
>
> A: I'm not saying that I made any decision. I didn't do nothing wrong. You know what I'm saying? ... The people that came to my cell wasn't trying to hear me.... Scarbrough Dep. at 28–29. As to whether he refused to move out of the cell, Scarbrough testified to the following:
>
> Q: What I'm talking about is what happened. And an officer came and told you [that] you had to move out of your cell—
>
> A: Yes.
>
> Q: —and you refused that?
>
> A: Yeah. I wasn't really thinking, ... I ain't do nothing wrong.
>
> ...
>
> Q: You realize that as you sit here today that the officers have the right to put you in whatever cell they choose[,] correct?
>
> **\*2**  A: They shouldn't ....
>
> ...

> Q: So ... if you were up at Upstate and an officer told you, you got to move out of your cell today, pack up, you're moving out of your cell, is it your position as you sit here today that you have the authority as an inmate to refuse that order? ...
>
> A: That's when they got to have a sergeant come to your cell. And you explain to the sergeant what's going on.

*Id.* at 30–32.

**B. Cell Extraction**

Shortly after Burgess left Scarbrough's cell, three other officers came to Scarbrough's cell and ordered him to voluntarily move to another cell. Defendant Thompson, a sergeant, entered Scarbrough's cell and told him to move to another cell because of his PIMS-level reduction. Am. Compl. ¶¶ 40, 42. Regardless of Thompson's order, Scarbrough refused to move and Thompson left the cell. *Id.* ¶ 43. The same exchange occurred between Scarbrough and defendant Salls, a lieutenant. *Id.* ¶ 45. Salls said to Scarbrough, "[m]ake sure you have your boots on tight because we're coming in there, mother fu\* \* er...." *Id.* ¶ 46. Finally, defendant Donald Quinn, a captain, ordered Scarbrough to exit his cell. *Id.* ¶ 47. Scarbrough remained adamant that he did nothing wrong and refused to leave his cell. *Id.*

Certain DOCCS officials and employees granted authorization for the use of a chemical agent, the medical clearance for such use, and a potential cell extraction. Defendant Rock, a superintendent, authorized Thompson to use a chemical agent on Scarbrough and to conduct a cell extraction if necessary. Rock Decl. ¶ 5. Donald Quinn gave Thompson the final order to use a chemical agent and conduct a cell extraction if necessary. D. Quinn Decl. ¶ 5. Based on Scarbrough's medical records, defendant Travers, a nurse, determined that nothing in the records showed that a chemical agent could not be used against Scarbrough. Travers Decl. ¶ 6. Thereafter, Travers gave medical clearance for the use of a chemical agent against Scarbrough. *Id.*

Thompson returned to administer five applications of a chemical agent. Am. Compl. ¶ 49. Between each application of the chemical agent, Thompson repeatedly ordered Scarbrough to come to the door. Ex. B—Handheld video (submitted with Defs.' Mot. for Summ. J.) (Dkt. No. 76–14). [4] Before the last application, an officer remarked, "appears

Case 9:21-cv-00715-DNH-TWD Document 36 Filed 11/23/22 Page 96 of 140
Scarbrough v. Thompson, Not Reported in F.Supp.2d (2012)
2012 WL 7761439

hiding something in his hand" and "appears to be sock with something in it." *Id.*

4      Despite Scarbrough's complaints with regard to certain liberties he had while watching the videos as well as issues with identifying people in the videos, defendants satisfied the Court's text order by ensuring that Scarbrough reviewed the video recordings of his cell extraction. Dkt. report entry dated 3/22/2012; Dkt. Nos. 84, 85.

After the last application of the chemical agent, Thompson ordered corrections officers and defendants Arquitt, Smith, Gary, Truax, and Clark to enter the cell. Am. Compl. ¶¶ 50–51. Defendant Matejaik manually opened the hatch cover to the cell door and defendant Reynolds manually opened the cell door for the correction officers to enter. *Id.* ¶¶ 52–53. Before entering the cell, something had to be pushed away from the door to the cell in order for the officers to enter the cell.[5] Ex. B—Handheld Video.

5      Defendants identified the barrier as a mattress and a pillow. Use of Force Report (Dkt. No. 76–23) at 12.

**\*3** When the extraction team entered the cell, one of them held what resembled a broom handle. Ex. B—Handheld Video. Scarbrough alleged that he was already down, subdued, and not resisting, when the officers entered and beat him with batons, kicked him in the face, head, and back, and told him to stop litigating against the staff. Am. Compl. ¶¶ 54, 89. While he was unable to identify precisely what each officer did because he was blinded by the chemical agent, Scarbrough contends that the officer who was on the ground told him to stop filing lawsuits. Am. Compl. ¶ 60; Scarbrough Dep. at 40–41. Gary was the officer on the ground with Scarbrough. Gary Decl. ¶ 5.

The named defendants involved in the extraction identified the conduct that they carried out. As an initial matter, defendants contend that when the extraction team entered the cell, Scarbrough used a tube sock loaded with four bars of soap to strike the team.[6] Arquitt entered first, using a shield. Arquitt Decl. ¶ 2. Gary was the second officer to enter the cell and saw Scarbrough swing a weapon that struck Arquitt's shield. Gary Decl. ¶ 5; Arquitt Decl. ¶ 2. Gary struck Scarbrough with a baton in the upper right forearm and Scarbrough released the weapon.[7] Gary Decl. ¶ 5; Dkt. No. 76–23, at 2. Arquitt grabbed Scarbrough by the shoulder area with both hands and forced him to the floor. Dkt. No. 76–23 at

2. Gary dropped to the floor with Scarbrough and grabbed his right shoulder. Gary Decl. ¶ 5. Truax grabbed Scarbrough's left shoulder with his left hand and the right shoulder with his right hand. Truax Decl. ¶ 5. Smith grabbed Scarbrough's left arm. Smith Decl. ¶ 5. Clark, the last officer to enter the cell, placed his hands on Scarbrough's left shoulder area while Scarbrough was on the ground. Clark Decl. ¶ 5. Gary grabbed Scarbrough's right arm with both hands and applied the handcuffs. Gary Decl. ¶ 5. The video does not clearly capture the events of the cell extraction, including the officers' entry and restraining of Scarbrough, all of which took approximately fifty seconds. Ex. B—Handheld video. However, the viewer's first sighting of Scarbrough is him already down on the ground. *Id.*

6      Defendants submitted a photo of the sock of soaps on the ground. Dkt. No. 76–15 at 8, 9. Defendants maintain that the sock of soaps was found on the floor near the shower in Scarbrough's cell. Dkt. No. 76–23 at 24.

7      Scarbrough maintains that he was never hit with a baton in the right arm; instead, he was hit in the back. Scarbrough Dep. at 43.

Gary and Arquitt removed Scarbrough's clothes with scissors. Gary Mem. at 1; Dkt. No. 76–23 at 12. Clark escorted Scarbrough to the decontamination shower, then to the lower holding area for a medical examination and photos to be taken, and finally, returned Scarbrough to his cell where a retention strap was applied. Clark Mem. at 1.

Scarbrough denies that he swung a sock of soaps against the extraction team or placed a mattress in front of the door to prevent the cell extraction. Scarbrough Dep. at 82, 110, 162; Am. Compl. ¶ 86. A DOCCS videotape showed that something was kicked out of the cell before the extraction team entered and something was then handed out of the cell shortly after the team entered the cell and encountered Scarbrough. Ex. A—Corridor Camera at 20:58, 21:35.

**\*4** Scarbrough sustained a cut above his left eye-brow and bruising over his right eye as a result of the assault. Scarbrough Dep. at 45; Dkt. No. 76–19 at 2. Video evidence showed that when Scarbrough emerged from his cell, his entire face was covered with blood. Ex. B—Handheld Video. Scarbrough was bleeding and spitting up blood while undergoing decontamination in the shower. *Id.*

Scarbrough contends that his head was pushed against a wall with "blunt force" while the officers who cut off his clothing had also purposely cut him. Am. Compl. ¶¶ 61–62; Scarbrough Dep. at 92. Video evidence only showed that Scarbrough was held up in a stationary position against a wall while his clothing was removed. Ex. B—Handheld Video. Scarbrough felt that he was going to fall but the officers told him that they were holding him up. *Id.* Scarbrough complained about his foot because it was held against the wall and his fingers because they were being bent. *Id.* At one point, Scarbrough said that his face was bleeding because he was kicked in the face but someone responded, "nobody kicked you in the face," to which Scarbrough replied, "I know." *Id.*

Scarbrough was taken to a holding pen for photos to be taken by defendant Gettmann, a sergeant, as well as a medical examination administered by Travers.[8] Am. Compl. ¶¶ 63, 66. Despite his complaints regarding pains in his head and back, Scarbrough refused Travers's medical care, claiming that he had pre-existing conflicts with Travers and requested medical attention provided by another nurse. *Id.* ¶¶ 64, 67. Scarbrough testified that Travers should have sent him to another medical staff member for treatment and ensured that he received medical care before returning to his cell. Scarbrough Dep. at 36–37.

[8]    Scarbrough suspects that there is some sort of connection between Gettmann and Travers because Gettmann whispered something to Travers. Scarbrough Dep. at 47.

Scarbrough received two misbehavior reports, one for flooding his cell and one for the cell extraction. Scarbrough Dep. at 99. DOCCS records noted that the incident was triggered by a denial of a sick call by a nurse because Scarbrough did not follow proper procedures and was told to sign up for sick call the following day. Dkt. No. 76–23 at 35. Scarbrough contends that had non-party Lieutenant Durgan properly reviewed the report, the report would have showed that he called out for assistance, there were problems with the pipes at Upstate prior to the alleged over flowing, and he did not swing a weapon at the officers. Pl.'s Response at 7.

### C. Post–Cell Extraction

At 12:10 am the next day, Scarbrough agreed to a medical evaluation, was escorted to the outside facility Alice Hyde Medical Center ("Alice Hyde"), and was seen by non-party Nurse Atkinson. Am. Compl. ¶ 70. Scarbrough received approximately twenty-five stitches for a cut above his upper left eye-brow. *Id.* ¶ 80. Since the cell extraction, Scarbrough continued to experience problems with his breathing and vision as well as pains in the head, back, spine, and collar bone. Am. Compl. ¶ 81.

**\*5** Upon Scarbrough's return to Upstate, he was assigned a cell mate. Am. Compl. ¶ 74. Shortly after his return, Scarbrough was attacked by that cell mate after he "exhibited complications with mental disorders." *Id.* ¶ 75. Scarbrough received a misbehavior report for engaging in a fight.[9] Pl.'s Response at 6.

[9]    Scarbrough contends that had non-party Lieutenant Anctil properly reviewed the misbehavior report, DOCCS would not have assigned him a cell mate, which presented an opportunity for the fight that ensued. Pl.'s Response at 7. Scarbrough was attempting to allege a failure to intervene claim under the Eighth Amendment. However, Scarbrough does not allege any facts indicating which defendant assigned him a cell mate or placed him in the cell with a cell mate. Further, even if Scarbrough had alleged the claim against Anctil, Anctil is not a defendant in this action. Moreover, to establish liability under a failure to intervene claim, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). Because the record is devoid of any evidence supporting these three elements, such a speculative conclusion cannot survive a motion for summary judgment. *See McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("speculation alone is insufficient to defeat a motion for summary judgment). Accordingly, Scarbrough's potential failure to intervene claim against Anctil or any defendant with respect to the cell mate assignment must fail as a matter of law.

As a result of the cell extraction, Scarbrough was sentenced to twelve months of confinement in the Special Housing Unit ("SHU")[10] and loss of good time credits. Scarbrough

Dep. at 48–49. Scarbrough appealed this disciplinary hearing disposition; however, it was denied. *Id.* at 49–50. Scarbrough also filed grievances with regard to the cell extraction incident; however, all such grievances were denied and affirmed on appeal. Am. Compl. ¶¶ 83–84.

10      SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On January 12, 2010, between two and five o'clock in the afternoon, an unnamed sergeant came to Scarbrough's cell and told Scarbrough that the reason for the assault was partly due to his ongoing litigation and partly due to talking back at officers. Am. Compl. ¶ 85. [11]

11      Here, Scarbrough attempts to allege a retaliation claim against an unnamed sergeant. However, Scarbrough does not name such a sergeant as a defendant in his amended complaint. Moreover, even if Scarbrough named this sergeant as a "John Doe," more than 120 days has passed since the filing of Scarbrough's amended complaint, the statutory limit for service of process on a defendant. FED. R. CIV. P. 4(m). Accordingly, all claims, if any, alleged against the said sergeant should be dismissed.

On July 23, 2010, Scarbrough commenced this instant action. Compl. (Dkt. No. 1). On July 19, 2011, the Court granted Scarbrough's motion to amend his complaint, adding the following parties as defendants: Paul Burgess; Robert H. Reynolds; John Matejaik; Steven Salls; Thomas Quinn; Donald Quinn; Gary Gettmann; Marla Travers; and David Rock. Decision and Order (Dkt. No. 34) at 3; Am. Compl. Scarbrough seeks a declaratory judgment against defendants for violating his constitutional rights, injunctive relief in the form of both a physical and mental health medical examination, nominal damages, compensatory damages, and punitive damages. Am. Compl. ¶¶ 97–102.

## II. Discussion

Liberally construing Scarbrough's complaint, Scarbrough has alleged that: (1) defendants Thompson, Arquitt, Smith, Gary, Truax, and Clark violated his Eighth Amendment rights by using excessive force during the cell extraction on December 31, 2009; (2) defendants Salls, Reynolds, Matejaik, Thomas Quinn, Donald Quinn, Rock, and Gettmann violated his Eighth Amendment rights by failing to intervene to protect him from the use of excessive force; (3) defendant Travers violated his Eighth Amendment rights by acting with deliberate indifference when she failed to provide him with medical care; (4) defendant Burgess violated his constitutional rights solely by lodging a false misbehavior report against him; and (5) defendant Gary violated his First Amendment rights by using excessive force against him in retaliation for filing lawsuits.

Defendants contend that Scarbrough's: (1) excessive force claims must fail because the video evidence of the cell extraction proves that no rational finder of fact would find in Scarbrough's favor; (2) failure to intervene claims must fail based on the lack of personal involvement of the named defendants; (3) medical indifference claim against Travers must fail because Scarbrough refused medical care that Travers had offered; and (4) claim that is based upon an alleged false misbehavior report is without merit. Alternatively, defendants claim that they are entitled to qualified immunity. Defendants do not address Scarbrough's retaliation claim against Gary.

### A. Legal Standard

**\*6** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 99 of 140
Scarbrough v. Thompson, Not Reported in F.Supp.2d (2012)
2012 WL 7761439

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Eighth Amendment

**\*7** The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Eighth Amendment obligations include the duty to protect prisoners from other known harms. *Farmer v. Brennan,* 511 U.S. 825, 829 (1970); *Matthews v. Armitage,* 36 F.Supp.2d 121, 124 (N.D.N.Y.1999) (citations omitted). It also includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d

63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore

2012 WL 7761439

discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

**\*8** Here, Scarbrough has satisfied the objective prong of the analysis. Considering it is undisputed that as a result of the cell extraction, Scarbrough sustained a cut above his left eyebrow requiring twenty-five stitches, such an injury can be fairly classified as a serious medical need. Moreover, when viewing the facts in the light most favorable to the plaintiff, and considering how Scarbrough acquired the injuries, an issue of material fact arises with respect to the subjective prong of the analysis.

Scarbrough and the defendants posit contrary recitations of fact with regard to the cell extraction. Defendants contend that upon the extraction team's entry into the cell, Scarbrough swung a sock of soaps at them, to which Arquitt blocked with a shield. Gary then struck Scarbrough's upper right forearm in order to compel Scarbrough to release the weapon. Conversely, Scarbrough maintains that he was already down on the ground, subdued, and not resisting, when the team entered. Further, Scarbrough adamantly maintains that he did not swing any weapon at the extraction team. What is undisputed is the fact that Scarbrough emerged from the cell with a gash above one eyebrow and a bruise above the other. The video evidence does not resolve these issues of fact to the point that no rational finder of fact could find in favor of Scarbrough because the video does not show: (1) Scarbrough and what he was holding before defendants entered his cell; (2) how Scarbrough ended up on the ground; and (3) how defendants applied the restraints. This competing evidence rests on the credibility of Scarbrough on one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party leaves no choice but to credit Scarbrough's version of the events for purposes of this motion. *See In re Dana Corp.,* 574 F.3d 128, 152 (2d Cir.2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility

determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

Moreover, Scarbrough's evidence would also establish that he was weaponless and incapacitated by the chemical agents when the extraction team entered and that the use of force was unnecessary to extract Scarbrough from the flooded cell. Despite Scarbrough's repeated refusals to voluntarily exit his cell, defendants' actions in assaulting this inmate could constitute a *per se* constitutional violation that could not be resolved by a motion for summary judgment. Thus, viewing the facts in the light most favorable to Scarbrough, he has proffered sufficient evidence to raise an issue of material fact as to the subjective prong of the Eighth Amendment analysis to require resolution by a jury. Accordingly, defendants' motion on this ground should be denied.

## 2. Personal Involvement

**\*9** Defendants contend that Scarbrough failed to establish the personal involvement of Reynolds, Matejaik, Salls, Gettmann, Rock, Thomas Quinn, and Donald Quinn. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [12]

[12]    Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *See McCarroll v. Fed. Bureau of Prisons,* No. 08–CV–1343 (DNH/GHL), 2010 WL 4609379, *4 (N.D.N.Y. Sept. 30, 2010)* (noting that although the Second Circuit has not yet addressed *Iqbal'* s impact on the five *Colon* factors, several district courts have done so); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N .Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard). The unpublished *Colon's* opinion cited *supra, McCarroll v. Fed. Bureau of Prisons,* is attached to this Recommendation.

### a. Reynolds and Matejaik

Scarbrough contends that Reynolds opened the door, and Matejaik opened the hatch cover, to his cell; therefore, their actions allowed for the alleged use of excessive force that ensued. However, these claims did not involve either defendants' direct participation in the alleged constitutional violation as Scarbrough does not claim that the defendants were present during the assault such that they either directly participated in, or could have directly prevented its occurrence. Even assuming defendants remained at their positions when the extraction team entered, the record is devoid of evidence supporting the defendants' availability to intervene. Accordingly, defendants' motion on this ground should be granted.

### b. Salls

Scarbrough contends that Lieutenant Salls verbally harassed him before the extraction team entered his cell; thereby, failing to intervene to protect him from the assault that ensued. This allegation neither demonstrates that Salls directly participated in the failure to intervene to protect Scarbrough from the use of excessive force nor that Salls had knowledge

of the alleged constitutional violation prior to its occurrence and failed to prevent its occurrence. While Scarbrough alleged that Salls warned him to tighten his boots in preparation for the extraction, no facts were alleged to support that Salls knew excessive force was to be used on Scarbrough during the extraction. Further Scarbrough does not allege that Salls created or allowed the continuance of any policy or custom under which unconstitutional practices occurred, was grossly negligent in his supervision of other subordinates, or exhibited deliberate indifference to his rights by failing to act on information indicating that unconstitutional acts had occurred. Moreover, a claim of threats and harassment alone, without allegations of accompanied injury or use of force, is insufficient to state an Eighth Amendment claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983."). Thus, Scarbrough has failed to allege the personal involvement of Salls. Accordingly, defendants' motion on this ground should be granted.

### c. Gettmann

**\*10** Scarbrough contends that Gettmann failed to protect him from the use of excessive force by videotaping the cell extraction. Assuming excessive force was used on Scarbrough, because Scarbrough's claim concerned Gettmann's presence during the assault and direct failure to intervene, Scarbrough has sufficiently alleged Gettmann's personal involvement. Accordingly, defendants' motion on this ground should be denied.

### d. Rock and Donald Quinn

Scarbrough contends that both Rock and Donald Quinn failed to intervene to protect him from the use of excessive force because they were supervisors who authorized the use of chemical agents against him and a cell extraction if necessary. Such claims do not allege that Rock or Donald Quinn had directly failed to intervene to protect Scarbrough from excessive force or they knew that excessive force was to be used on Scarbrough. Further, "mere linkage in the prison

chain of command is insufficient to implicate" a defendant's personal involvement. *Richard v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal citations omitted). While Scarbrough alleged that Donald Quinn ordered him to leave his cell, there is nothing in the record indicating that Donald Quinn was present for the extraction and available to intervene in the alleged excessive use of force. Accordingly, defendants' motion on this ground should be granted.

### e. Thomas Quinn

Scarbrough names Thomas Quinn as a defendant. However, because Scarbrough does not allege any facts concerning any wrongdoing against Thomas Quinn, and the record does not show otherwise, Scarbrough has failed to allege that Thomas Quinn was either directly or indirectly involved in any of the alleged constitutional violations. Even drawing all inferences in Scarbrough's favor, without having any indication of what Thomas Quinn allegedly did, or did not do, there is no way to conclude that he was personally involved in any of the complained of events. Accordingly, defendants' motion should be granted on this ground and Thomas Quinn should be dismissed as a defendant.

### 3. Failure to Intervene

Assuming none of the defendants' personal involvement defenses are granted, Scarbrough's contention that defendants Salls, Reynolds, Matejaik, Thomas Quinn, Donald Quinn, Rock, and Gettmann failed to intervene to protect him from excessive force must be addressed. Prison officials are obliged to protect prisoners from known harms. *Farmer,* 511 U.S. at 829. "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). To establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.*

 **\*11** Here, construing the complaint liberally, Scarbrough first contends that Salls knew or should have known that Scarbrough was to face excessive force when the extraction team was later called to remove Scarbrough from his cell

because Salls warned him to tighten up his boots. However, such a conclusory and speculative statement does not show that a reasonable person has been warned that a constitutional violation was about to occur. In addition, there is nothing in the record demonstrating that Salls was aware that an assault was planned or had a realistic opportunity to intervene and prevent the harm when the video evidence showed that the alleged use of excessive force took place within fifty seconds. Thus, Scarbrough's claim against Salls must fail.

Second, Scarbrough contends that because Reynolds and Matejaik opened the cell door and hatch cover to his cell, they could have intervened in the alleged excessive use of force that ensued. However, a reasonable person carrying out the same actions would not be alerted that a constitutional violation would follow. Moreover, assuming both defendants stayed at their positions—outside of the cell while the extraction team entered—the record does not support an inference that there was a reasonable opportunity to intervene in light of the brief extraction time of fifty seconds. Thus, Scarbrough's claim against Reynolds and Matejaik must fail.

Third, Scarbrough contends that because Gettmann videotaped the entire cell extraction, Gettmann saw the use of excessive force and could have intervened to prevent the constitutional violation from occurring. However, in light of the number of people in the cell and the relatively short period of time of fifty seconds when the alleged excessive force was used, it is unreasonable to conclude that Gettmann was confronted with a reasonable opportunity to identify a constitutional violation in which he could have intervened. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (holding that an Eighth Amendment violation does not occur for failing to intervene when the assault occurs so quickly that the defendant "had no realistic opportunity to attempt to prevent them [because the event was not] of sufficient duration to support a conclusion that an officer who stood by without trying to assist ... became a tacit collaborator."). Therefore, Scarbrough's claim against Gettmann must also fail.

Lastly, Scarbrough contends that because Rock and Donald Quinn authorized the cell extraction, both Rock and Donald Quinn had a reasonable opportunity to intervene on his behalf. Similar to the reasoning above, such actions would not warn a reasonable person that a constitutional violation was about to occur.

Scarbrough v. Thompson, Not Reported in F.Supp.2d (2012)

2012 WL 7761439

Accordingly, defendants' motion on this ground should be granted.

### 4. Medical Indifference

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson,* 503 U.S. at 9). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (*citing Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*12** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

In this case, it is undisputed that Scarbrough's injuries constituted a serious medical condition since Travers offered Scarbrough medical care. However, Scarbrough's contention that upon his refusal of Travers's care, Travers should have sought medical care on his behalf from another nurse is without merit. First, since Scarbrough is not entitled to the treatment of his choice, it follows that he is not entitled to receive treatment from a person of his choice. Thus, any alleged delay or interference in treatment was due to Scarbrough's own actions. This cannot now be

transformed into an Eighth Amendment claim. Moreover, Scarbrough ultimately received medical treatment. *Perez v. Hawk,* 302 F.Supp.2d 9, 21 (E.D.N.Y.2004) (citation omitted) ("treatment of a [plaintiff's] medical condition 'generally defeats a claim of deliberate indifference.' "). Such treatment was provided the following day and resolved the condition, despite Scarbrough's prior refusals. In addition, any complaints regarding such treatment were not against Travers because she did not provide it. Therefore, the record shows that Scarbrough has failed to establish deliberate indifference on the part of Travers. Accordingly, defendants' motion on this ground should be granted and Travers should be dismissed from this action.

### C. False Misbehavior Report

Construing the plaintiff's complaint liberally, Scarbrough alleged that Burgess violated his constitutional rights solely by lodging a false misbehavior report against him. The Second Circuit has repeatedly held that the issuing of false charges by a corrections officer against an inmate does not constitute a *per se* constitutional violation under § 1983. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1007) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). A false misbehavior report may constitute a constitutional violation when there is more such as "retaliation against the prisoner for exercising a constitutional right." *Id.* (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Further, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in [any] constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). Here, because Scarbrough's claim is based solely on an allegedly false misbehavior report without alleging more wrongdoing on Burgess's part, Scarbrough's assertion against Burgess must fail as a matter of law. Accordingly, defendants' motion on this ground should be granted.

### D. Retaliation

**\*13** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal

Case 9:21-cv-00715-DNH-TWD   Document 36   Filed 11/23/22   Page 104 of 140
Scarbrough v. Thompson, Not Reported in F.Supp.2d (2012)
2012 WL 7761439

quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008).

"Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

*Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009) (internal quotation marks and citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson,* 549 F.Supp.2d at 214–15. Therefore, conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action

against the plaintiff absent his exercising of the protected conduct. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

Here, Scarbrough successfully meets the first element for the filing of lawsuits is a constitutionally protected activity. *Graham,* 89 F.3d at 80. Scarbrough also meets the third element because he filed a lawsuit against Upstate employees on July 28, 2009, which satisfies the temporal proximity for a causal connection. Am. Compl. ¶ 21 (*Scarbrough v. Evans,* No. 09–CV–0850 (NAM) (DEP) (appeal dismissed on September 26, 2011)). However, a genuine issue of material fact arises with the second element. Even though Scarbrough alleged that Gary told him to stop filing lawsuits while Gary was assisting in the cell extraction, the record evidence is in dispute as to whether the excessive use of force flowed from Scarbrough's lawsuit or Scarbrough's refusal to exit his cell. A determination of the second element cannot be clearly established, which results in an issue of credibility that is inappropriate to be decided for purposes of this motion. Noteworthy is the fact that defendants do not address this retaliation claim in their motion. Accordingly, Scarbrough's retaliation claim against Gary should remain.

## E. Qualified Immunity

**\*14** Defendants claim that even if Scarbrough's constitutional claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at

Case 9:21-cv-00715-DNH-TWD Document 36 Filed 11/23/22 Page 105 of 140
Scarbrough v. Thompson, Not Reported in F.Supp.2d (2012)
2012 WL 7761439

the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry must be discussed with regard to Scarbrough's Eighth Amendment excessive force and First Amendment retaliation claim. All other claims advanced in the complaint need not be reached because, as discussed *supra,* it has not been shown that defendants violated Scarbrough's constitutional rights.

There is no question that it was well-settled on December 31, 2009 that the Eighth Amendment prohibited a corrections officer from assaulting or intentionally inflicting harm on an inmate. *See Hudson,* 503 U.S. at 9–10. It was also well-settled on the same day that the First Amendment protected an inmate's right to file lawsuits. *Graham,* 89 F.3d at 80. Thus, accepting all of Scarbrough's allegations as true, qualified immunity cannot be granted to Thompson, Arquitt, Smith, Gary, Truax, and Clark for their alleged use of excessive force and Gary's alleged retaliatory conduct during the extraction. However, defendants' motion should be granted in the alternative on this ground as to all other defendants, for all other claims.

## III. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 76) be:

A. **DENIED** as to Scarbrough's excessive force claims against defendants Thompson, Arquitt, Smith, Gary, Truax, and Clark; AND

B. **GRANTED** as to all other claims and all other moving defendants and that the complaint be **DISMISSED** with prejudice as to those defendants; AND

2. Further **RECOMMENDED** that Scarbrough's retaliation claim against defendant Gary remain in this action.

**\*15** Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b) (1); Fed R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 7761439

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

KeyCite Red Flag - Severe Negative Treatment

Affirmed in Part, Vacated in Part, Remanded by  Brandon v. Kinter,  2nd
Cir.(N.Y.),  September 10, 2019

2016 WL 1638242
Only the Westlaw citation
is currently available.
United States District Court, N.D. New York.

Chamma K. BRANDON, Plaintiff,

v.

Dr. Glen SCHROYER, et al., Defendants.

Civil Action No. 9:13-CV-0939 (TJM/DEP)

|

Signed February 26, 2016

**Attorneys and Law Firms**

Chamma K. Brandon, Ossining, NY, pro se.

Kelly M. Monroe, Andrew L. McNamara,
Molly C. Casey, Thuillez, Ford Law Firm,
Albany, NY, Bradley J. Stevens, Lemire,
Johnson Law Firm, Malta, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE
JUDGE

**\*1** This is an action brought by *pro se* plaintiff
Chamma K. Brandon, a prison inmate formerly
confined in the Clinton County Jail ("CCJ"),
pursuant to 42 U.S.C. §§ 1983, 1985, and
1986, against several individuals working at the
facility alleging that they deprived him of his
civil rights during his period of incarceration
there. Plaintiff's claims fall into three groups,
complaining of (1) a one-month hiatus in a

low-fat, low-cholesterol ("heart-healthy") diet;
(2) the failure to honor his religious diet by
serving him pork products; and (3) the failure
to otherwise accommodate his religious beliefs
as a Muslim. Plaintiff contends that, by their
actions, defendants violated his rights under
the First, Eighth, and Fourteenth Amendments
to the United States Constitution, as well as
the Religious Land Use and Institutionalized
Persons Act of 2000 ("RLUIPA"), 42 U.S.C.
§ 2000cc.

Now that discovery in the action is complete,
all of the defendants, including Dr. Glen
Schroyer, who is separately represented, have
moved for the entry of summary judgment
dismissing plaintiff's claims. For the reasons set
forth below, I recommend that the motions be
granted in part but otherwise denied.

I. *BACKGROUND*

Plaintiff was confined in the CCJ beginning
on January 14, 2012, and again following his
re-arrest on March 2, 2012, until December
28, 2012, when he was transferred into the
custody of the New York State Department
of Corrections and Community Supervision
("DOCCS"). *Dkt. No. 17 at 3,* 12–, 3. Upon
his entry into the CCJ for the first time in
January 2012, Brandon was five-feet, eleven-
inches in height, weighed 250 pounds, and was
considered clinically obese. [1] *Dkt. No. 77–6
at 2; Dkt. No. 77–10 at 4.* Plaintiff alleges
that, while he was incarcerated at the CCJ, the
defendants (1) deprived him of constitutionally
adequate medical care by removing him from a
heart-healthy diet for one month; (2) deprived
him of his rights under the First Amendment
and RLUIPA to freely exercise his Muslim

religion by (a) repeatedly providing him with meals that contained pork products, (b) denying him the opportunity to participate in Ramadan, and (c) denying him access to worship space and congregate religious services; and (3) retaliated against him by denying him adequate medical care and depriving him of his right to freely exercise his religion in response to grievances and complaints he filed against them during his incarceration at the CCJ.[2] *See generally Dkt. No. 17.* Additionally, plaintiff's amended complaint asserts a failure-to-protect claim against defendants Clancy and Blaise, a corrections sergeant and a corrections officer, respectively, at the CCJ. *Id.*

### A. *Plaintiff's Diet*

**\*2** When he first arrived at the CCJ, Brandon reported that he was allergic to shellfish. *Dkt. No. 17 at 4; Dkt. No. 75–6 at 2.* A special diet notification form reflecting that food allergy was forwarded to the facility's kitchen.[3] *See Dkt. No. 17 at 47; Dkt. No. 75–1 at 37.* In March 2012, plaintiff reported that tomatoes and tomato by-products cause him to experience severe acid reflux. *Dkt. No. 17 at 4; Dkt. No. 75–6 at 2.* As a result, a notification was sent by medical personnel to the CCJ kitchen indicating "no tomato or tomato products per MD." *Dkt. No. 17 at 48; Dkt. No. 75–1 at 38.*

In May 2012, defendant Dr. Glen Schroyer, the jail physician at the CCJ, placed plaintiff on a heart-healthy diet due to his high cholesterol levels. *Dkt. No. 17 at 4–5,* 49; *Dkt. No. 75–1 at 39; Dkt. No. 75–6 at 2.* Plaintiff's heart-healthy diet restriction was later lifted on October 16, 2012, after a review of plaintiff's commissary purchases, which were being monitored by

medical staff, revealed the purchase of many items that were inconsistent with plaintiff's dietary restrictions, including products that were high in fat and cholesterol.[4] *Dkt. No. 17 at 8–9,* 52; *Dkt. No. 75–1 at 41; Dkt. No. 75–6 at 3.* For example, the record reveals that, during the relevant period, plaintiff's commissary purchases included a wide array of candy, cookies, snacks, and sugared drinks. *Dkt. No. 75–1 at 60–62.* Plaintiff also purchased Ramen chili, which contains tomato powder, and is therefore inconsistent with his previously alleged sensitivity to tomatoes and tomato by-products. *Id.*

Plaintiff's heart-healthy diet was restored on or about November 21, 2012, after plaintiff promised not to purchase certain designated items from the commissary. *Dkt. No. 17 at 10,* 53, 188; *Dkt. No. 75–1 at 42.* Following that restoration, plaintiff's restrictive diet remained in place until his transfer out of the CCJ. *Dkt. No. 17 at 10.*

**\*3** In addition to raising concerns about health-related dietary restrictions implemented at the CCJ, as part of his religious accommodation claim, plaintiff alleges that defendants served him food that was inconsistent with his religion, as a Muslim. Plaintiff alleges that he informed prison officials at the CCJ upon his arrival on January 14, 2012, and again when he was rearrested on March 2, 2012, that, because of his Muslim religion, he cannot eat pork. *Dkt. No. 17 at 12–13; Dkt. No. 83 at 6.* According to plaintiff, despite prison officials' awareness of this restriction, he was served food containing pork on numerous occasions. *Dkt. No. 17 at 17–18,* 20–22. Plaintiff alleges that between the

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

time of his entry into the CCJ through May 28, 2012, he was routinely served pork against his religious beliefs. *Dkt. No. 17 at 13,* 17. He further claims that on May 28, 2012, he filed a complaint with medical staff concerning the failure to receive a religious diet, and that in response, defendant Nurse Kinter stated that the kitchen was aware of his dietary restrictions.[5] *Id.* at 13.

On June 21, 2012, plaintiff submitted a sick-call request inquiring about a knee brace and complaining of being served pork. *Dkt. No. 17 at 13,* 66. The only response to that sick-call request was recorded as "given knee brace." *Id.* at 66. Plaintiff submitted an additional sick-call request raising concerns about his diet on July 4, 2012. *Id.* at 13, 67. In response, a nurse[6] wrote, "Done – for no fish/shell fish. Need to ask security staff to submit diet slip for *pork* medical does not do religious diets." *Id.* at 67 (emphasis in original).

Plaintiff cites eight additional instances when he was served pork and raised complaints. The first and second occurred on September 24, 2012, during lunch and dinner. *Dkt. No. 93– 4 at 82–82.* The next two instances occurred on October 9 and 10, 2012. *Id.* at 94–99. On October 17, 2012, plaintiff contends he was served pork, after which he filed a grievance and was provided a new meal. *Dkt. No. 17 at 18; Dkt. No. 93–4 at 116–17.* Plaintiff was again allegedly served pork on October 29, 2012, although a grievance filed regarding that incident purportedly "disappeared." *Dkt. No. 17 at 20.* Plaintiff was also allegedly served a meal containing pork on November 5, 2012, and although he claims to have lodged a grievance concerning that matter it is not

included within his submissions. *Dkt. No. 17 at 21.* The last occurrence of allegedly being served pork was on December 25, 2012, and plaintiff again filed a grievance concerning the matter. *Dkt. No. 17 at 22; Dkt. No. 93–4 at 16465.*

The record evidence raises a number of questions regarding when the CCJ kitchen staff learned of plaintiff's religious dietary restrictions. According to defendant Laurin, when plaintiff first arrived at the CCJ on January 14, 2012, he did not declare any religious affiliation. *Dkt. No. 7714 at 2.* Although plaintiff disputes this, *Dkt. No. 17 at 12; Dkt. No. 83 at 6,* his initial booking intake record does not reflect any religious designation.[7] *Dkt. No. 77–6 at 2.* There is no dispute, however, that when plaintiff was rebooked on March 2, 2012, he stated that he was a Muslim, and this was reflected on his booking sheet.[8] *Dkt. No. 17 at 210; Dkt. No. 83–3 at 36.*

**\*4** Defendant Laurin explained that "it is the practice of the CCJ that any religious diets to be issued to inmates are initiated by the Booking Officer after an inmate requests such accommodation and demonstrates that he has a sincerely held belief. Notifications of any religious diets have been forwarded to the kitchen." *Dkt. No. 77–14 at 2.* Defendant Laurin contends that, in light of plaintiff's declaration of his religion in March 2012, a notification was placed in his file indicating that he should be provided with a diet consistent with his religious beliefs. *Dkt. No. 77–14 at 3.* In support of that contention, defendant Laurin cites to a document in the record entitled "SPECIAL DIET NOTIFICATION,"

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

reflecting that plaintiff, as a Muslim, was not to receive pork or pork products. *Dkt. No. 77–3 at 7.* Notably, the copy of that notice that is included by defendant Laurin in support of his motion is not dated. *Id.* As an attachment to his amended complaint and in response to defendants' motion, however, plaintiff has submitted copies of the same notice, except his copies both include a date of "10/5/12," which is written in what appears to be defendant Laurin's handwriting. *Dkt. No. 17 at 51; Dkt. No. 83–3 at 42.* Plaintiff contends, and the court finds it plausible, that the version of this notice produced by defendants in support of their motion has been "falsified ... by removing the date written on the notification[.]" [9] *Dkt. No. 93–3 at 11.*

In any event, a careful review of the chronology, including plaintiff's grievances and responses to those grievances by CCJ staff, buttresses the conclusion that it was not until at least late-September 2012 that the CCJ kitchen staff was notified of plaintiff's religious dietary restrictions. *See, e.g., Dkt. No. 77–5 at 21* (entry dated 9/27/12 authored by defendant Laurin stating, "[A]s of 9/27/12 the kitchen was reviewed [sic] of your diet ... and that you are Muslim"); *Dkt. No. 93–4 at 81* (entry dated 9/27/12 and authored by defendant Laurin stating that the "kitchen ... did not have that you were Muslim. You will get no pork or pork products"); *id.* at 94 (entry dated 10/10/12 and authored by Corrections Officer Couture stating, "I talked to Michelle in the kitchen and she told me that until recently they had nothing stating that Inmate Brandon was a no pork diet."); *id.* at 104 (entry dated 10/15/12 and authored by defendant Laurin stating, "Inmate

Brandon was not marked in the kitchen as Muslim diet. That was corrected 10/5/12").

From the evidence in the record, two things are clear. First, until September 27, 2012, the CCJ kitchen staff was unaware of plaintiff's religious dietary restrictions, giving rise to the inference that, until that date, plaintiff was being served pork and pork products on occasion. Secondly, even after the kitchen learned of plaintiff's religious dietary restriction, plaintiff believes that he was served pork or pork products on six occasions, including (1) October 9, 2012; (2) October 10, 2012; (3) October 17, 2012; (4) October 29, 2012; (5) November 5, 2012; and (6) December 25, 2012. [10] *Dkt. No. 17 at 18,* 20, 21, 22; *Dkt. No. 93–4 at 9499,* 116–17, 164–65.

### B. *Other Religious Accommodation*

Plaintiff's complaint also alleges that he was denied a location to practice his religion and the opportunity to celebrate Ramadan between July 20, 2012 and August 19, 2012. *Dkt. No. 17 at 14–15,* 17. According to plaintiff, his requests to accommodate his observation of the holiday were denied by CCJ security because he was one of the only detainees requesting to honor the holiday and there were only a few Muslim detainees at the CCJ. *Id.* at 14. Plaintiff was further advised that, due to staffing and funding shortages, the CCJ was unable to cater to a specific religious group consisting of only a few participants. *Id.* Plaintiff further claims that his request for the opportunity to engage in congregational prayer, referred to as "Jummah," which is allegedly obligatory to all male Muslims, was denied by prison officials. *Id.* at 15. Plaintiff alleges that he filed

grievances concerning these issues within the CCJ and additionally sought redress through outside sources. *Id.* at 15–16.

### C. *Assault by a Fellow Inmate*

**\*5** On or about November 17, 2012, plaintiff alleges that defendants Blaise and Clancy housed a mentally ill inmate, referred to by plaintiff as "Tiny," in the cell next door to him. *Dkt. No. 17 at 31.* Defendant Clancy apparently could be heard by plaintiff to say, " '[L]ets [sic] see if he tries that shit on Brandon!' " *Id.* According to plaintiff, two days later, defendant Blaise directed him to "exit [his] cell and collect all of the trays[.]" *Id.* Plaintiff, however, informed defendant Blaise that, the night before, Tiny had verbally assaulted plaintiff and that he "would rather not pick-up [Tiny]'s tray." *Id.* Defendant Blaise responded by saying to plaintiff, " '[D]on't worry about him, he's a punk. Besides, from what I heard, I'm sure if I let him out, you'd kick his ass.' " *Id.* Tiny thereafter became hostile towards plaintiff and spat on him while defendant Blaise observed. *Id.* Defendant Blaise responded by laughing at plaintiff. *Id.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about August 8, 2013, and later filed an amended complaint, the currently operative pleading, on August 15, 2014. Dkt. Nos. 1, 17. In his amended complaint, plaintiff names the following defendants:

| *Defendant* | *Position* |
| --- | --- |
| Dr. Glen Schroyer | CCJ Jail Doctor |
| Suzanne Kinter | CCJ Nurse |
| Lawrence Bedard | CCJ Food Service Manager |
| Jim Alger | CCJ Corrections Officer |
| Joshua Wingler | CCJ Corrections Officer |
| Thomas Perry | CCJ Corrections Officer |
| Robert Web | CCJ Corrections Officer |
| Eric Blaise | CCJ Corrections Officer |
| Margaret Clansy | CCJ Corrections Sergeant |
| Kevin Laurin | CCJ Corrections Lieutenant |
| County of Clinton.[11] | |

In his amended complaint, which spans forty-four pages comprised of 336 paragraphs, and is accompanied by approximately 177 pages of exhibits, plaintiff chronicles in detail the occurrences at the CCJ giving rise to his claims. The causes of action set forth in that pleading include deliberate medical indifference, failure to permit plaintiff to freely exercise his chosen

religion, retaliation, conspiracy, and failure to protect plaintiff from harm. For the sake of clarity, I have included below a table that reflects the court's understanding of the claims asserted against each of the specific defendants.

| Defendant | Claims Asserted |
| --- | --- |
| Bedard | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Blaise | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Clancy | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Kinter | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Laurin | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Perry | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Schroyer | (1) First Amendment regarding diet (direct theory of liability only); (2) Eighth Amendment (direct and conspiracy theories of liability); and (3) First Amendment retaliation (direct theory of liability only) |

Case 9:21-cv-00715-DNH-TWD   Document 36   Filed 11/23/22   Page 112 of 140

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

| Web | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Wingler | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |

**\*6** On August 3, 2015, defendant Schroyer filed a motion for summary judgment dismissing plaintiff's complaint. *Dkt. No. 75.* On the same date, the county defendants submitted a separate summary judgment motion, also seeking dismissal of plaintiff's claims. *Dkt. No. 77.* The defendants' motions are now fully briefed, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is

"material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright*

2016 WL 1638242

*v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Defendant Schroyer's Motion*

In his amended complaint, plaintiff claims that defendant Schroyer was deliberately indifferent to his serious medical needs by discontinuing his heart-healthy diet for a period of approximately one month, and that the discontinuation was in retaliation for plaintiff's many grievances concerning his diet at the facility. Plaintiff also alleges that defendant Schroyer conspired with others at the facility to violate his rights under the First and Eighth Amendments.

1. *Deliberate Medical Indifference*

Plaintiff's deliberate indifference claim is properly analyzed under the Eighth Amendment, which prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society or which involve the unnecessary and wanton infliction of pain[.]" (*Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, ... neither does it permit

inhumane ones[.]" *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment through deliberate indifference to the inmate's serious medical needs must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer,* 511 U.S. at 844; *see also Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to

2016 WL 1638242

examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003).

**\*8** To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Based upon the record now before the court, I conclude that plaintiff cannot meet either element of the governing deliberate indifference test. The only tangible effect of the month-long hiatus in plaintiff's heart-healthy diet was a modest increase in his cholesterol level from 249 to 264. *Dkt. No. 17 at 25–26,* 62, 63; *Dkt. No. 83 at 5.* According to defendant Schroyer, however, such a fluctuation is within normal limits "and does not place a patient at an increased risk for coronary artery disease, ischemia or stroke." *Dkt. No. 75–6 at 4.* The only "evidence" offered to counter defendant Schroyer's medical opinion is plaintiff's unsupported contention that he was placed at an indiscernible amount of risk for coronary heart disease, ischemia, and stroke as a result of the changed diet. *Dkt. No. 17 at 36; Dkt. No. 83 at 5.* While plaintiff's high cholesterol may constitute a serious medical need – an assertion not disputed by defendants – there is no evidence aside from plaintiff's sheer speculation that defendant Schroyer's decision to remove plaintiff from the heart-healthy diet for one month was objectively sufficiently serious for purposes of a deliberate medical indifference claim.

Moreover, plaintiff has also failed to adduce any evidence to give rise to a genuine dispute of material fact with respect to whether defendant Schroyer removed plaintiff from the heart-healthy diet with the requisite deliberate indifference. In his affidavit, defendant Schroyer states that plaintiff's heart-healthy diet was discontinued on October 16, 2012, because he repeatedly made commissary purchases that were inconsistent with his diet restrictions. *Dkt. No. 75–6 at 4.* Although the parties dispute whether plaintiff was warned ahead of time that

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 115 of 140

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)
2016 WL 1638242

his commissary purchases could result in his removal from the diet, *compare Dkt. No. 17 at 27 with Dkt. No. 75–6 at 3,* there is no record evidence that suggests defendant Schroyer's decision on October 16, 2012 was reckless or executed with a disregard to plaintiff's health.

Plaintiff surmises that defendant Schroyer was complicit in a conspiracy to punish him for filing grievances. Specifically, plaintiff contends that, in retaliation for his filing of grievances up through October 15, 2012, regarding his meal trays, defendant Laurin rendered a medical assessment based on plaintiff's commissary purchases and thereafter instructed defendant Schroyer to remove plaintiff from his heart-healthy diet. *Dkt. No. 17 at 25–27.* Aside from plaintiff's sheer conjecture in this regard, however, he has submitted no evidence from which a reasonable factfinder could conclude that defendant Schroyer was aware of the existence of plaintiff's grievances and took action to discontinue plaintiff's heart-healthy diet for punitive reasons.

Because the record before the court, even when construed most favorably toward the plaintiff, fails to contain evidence from which a reasonable factfinder could conclude that plaintiff has met both the objective and subjective requirements for establishing a claim of deliberate medical indifference, I recommend that it be dismissed.

### 2. *Free Exercise*

**\*9** In addition to claiming deliberate medical indifference, plaintiff contends that defendant Schroyer is responsible for denying him an appropriate religious diet, and specifically, one that conformed to his Muslim faith and did not include pork or pork products. [12] Undeniably, plaintiff was entitled to receive a diet that was consistent with his sincerely held religious beliefs. *See, e.g.,* ⚠️*Johnson v. Guiffere,* No. 04–CV–0057, 2007 WL 3046703, at \*4 (N.D.N.Y. Oct. 17, 2007) (Hurd, J., *adopting report and recommendation by* Peebles, M.J.). [13] The record, however, demonstrates that at the CCJ, accommodating diet restrictions in accordance with an inmate's religious beliefs is the responsibility of security staff, rather than medical personnel. *See, e.g., Dkt. No. 75–6 at 2; see also Dkt. No. 75–1 at 44,* 50. To counter this, and in an attempt to implicate defendant Schroyer, plaintiff offers only his speculation based upon the fact that, at one point, in response to a sick-call complaint by plaintiff that he was being served pork, defendant Kinter, a nurse at the facility, informed him that his religious diet was still in effect and that she had checked with the kitchen regarding the matter. *Dkt. No. 83 at 3; Dkt. No. 83–3 at 11.* Because this assertion does not contradict defendant Schroyer's contention that medical staff is not responsible for accommodating prisoners' religious dietary needs, it does not suffice to raise a genuine issue of material fact that precludes the entry of summary judgment. In short, I find that no reasonable factfinder could conclude that defendant Schroyer was involved in any violation of plaintiff's religious rights through the failure to provide him a diet consistent with his religious beliefs. I therefore recommend that plaintiff's First Amendment free exercise claim asserted against defendant Schroyer be dismissed.

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 116 of 140

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

### 3. *Retaliation*

In his motion, defendant Schroyer does not address the retaliation cause of action asserted against him. Accordingly, while I have not addressed that claim in this report, and therefore recommend it survive defendant's motion, I also recommend that defendant Schroyer be permitted to file a second motion for summary judgment addressing it.

### 4. *Conspiracy*

Plaintiff's amended complaint includes a conspiracy claim against defendant Schroyer in connection with his deliberate medical indifference cause of action. In light of my recommended finding that the underlying constitutional claim lacks merit and should be dismissed, however, I also recommend that the accompanying conspiracy claim be dismissed. *See Droz v. McFadden,* 580 F.3d 106, 109 (2d Cir. 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.").

### C. *County Defendants' Motion*

### 1. *RLUIPA* [14]

To the extent plaintiff intended to assert RLUIPA claims against any of the county defendants in both their official and individual capacities, they are subject to dismissal. As relief, plaintiff's complaint seeks both money damages and declaratory relief. *Dkt. No. 17 at 42–44.* It is now firmly established, however, that the "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord,* 758 F.3d 215, 224 (2d Cir. 2014). While plaintiff ordinarily could pursue a claim for injunctive and declaratory relief under the RLUIPA against defendants in their official capacities, *Williams v. Fisher,* No. 11–CV–0379, 2015 WL 1137644, at *17 (N.D.N.Y. Mar. 11, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.), such claims are now moot based upon plaintiff's transfer out of the CCJ. *See Shepherd v. Goord,* 662 F.3d 603, 610 (2d Cir. 2011) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."). Accordingly, I recommend that plaintiff's RLUIPA claim asserted against the county defendants be dismissed.

### 2. *Conspiracy*

 **\*10** Plaintiff alleges that there was a "meeting of the minds" among some of the defendants to deprive him of his civil rights. *See, e.g., Dkt. No. 17 at 25,* 27–29. Specifically, he contends that defendant Laurin evaluated plaintiff's commissary purchases on or about October 15, 2012, and decided that plaintiff's purchases were inconsistent with his heart-healthy diet. *See Dkt. No. 17 at 24* ("Said conspiracy was initiated on October 15, 2012, as Laurin made a medical assessment stating my commissary buys is a form of non-compliance to my special

2016 WL 1638242

diet."). Defendant Laurin thereafter allegedly communicated his "assessment" to defendants Schroyer and Kinter and the three arrived at an agreement to remove plaintiff from the heart-healthy diet. *See id.* at 25 ("Kinter concurred [with] said assessment [and] Schroyer rubber-stamped it into effect.... Thus, on October 16th, 2012, said conspiracy went into effect; Kinter informed me of the removal of all previously issued diets, stating I'm not complying to said diets based on my commissary purchases."). Plaintiff also specifically implicates defendant Bedard in his conspiracy claim, accusing him of "enforc[ing]" the decision by defendants Schroyer and Kinter to remove him from his special diets and intentionally accelerating the conspiracy by mislabeling his food thereafter to reflect that his meals did not contain pork. *Id.* at 25, 27. To further defendant Bedard's alleged "viciousness," he "established a meeting of the minds with Clansy and Web." *Id.* at 27. According to plaintiff, defendant Clancy furthered the conspiracy by admitting to plaintiff that the CCJ kitchen made a mistake on October 17, 2012, by serving plaintiff a meal containing pork products. *Id.* at 28. On November 5, 2012, defendant Web allegedly fielded a concern by plaintiff that his food contained pork by reaching out to the CCJ kitchen, who told Web that the meat was actually turkey. *Id.* at 29. Plaintiff contends that defendant Web's refusal to disclose who he spoke to in the kitchen perpetuated the conspiracy initiated by defendants Laurin, Kinter, and Schroyer.[15] *Id.*

"To prove a [ section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights are not sufficient to support a cognizable claim under section 1983. *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir. 1983); *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1156 (2d Cir. 1995).

In this case, although plaintiff's allegations regarding the extent of the conspiracy are detailed, there is no evidence in the record to support them. While defendant Kinter confirms that she discussed the decision to remove plaintiff from his heart-healthy diet with defendants Laurin and Schroyer prior to October 16, 2012, there is no record evidence to suggest that the decision was motivated by plaintiff's previously filed grievances or any other reason aside from plaintiff's commissary purchases. *Dkt. No. 7710 at 3–4.* According to defendant Kinter, plaintiff's commissary purchases were monitored by medical staff from July 25, 2012 until September 30, 2012, because "[p]laintiff showed little medical improvement after [his] dietary restrictions had been implemented." *Id.* at 3. A review of plaintiff's commissary purchases, submitted by way of commissary receipts in support of the county defendants' motion, supports defendants' assertion that plaintiff was purchasing foods that were inconsistent with a low-fat, low-cholesterol diet during the relevant time period. *Dkt. No. 77–4 at 2–5.* Plaintiff's bare allegation with respect to the alleged "meeting of the minds" in this respect is not sufficient to defeat the county defendants' motion.

Similarly, plaintiff's allegations in his amended complaint are insufficient to give rise to a genuine dispute of material fact regarding whether defendant Bedard furthered any conspiracy by mislabeling his food. Aside from plaintiff's own allegation, there is no evidence that defendant Bedard did, in fact, mislabel any of plaintiff's meals. In addition, there is no evidence in the record to suggest that defendant Bedard acted maliciously in preparing plaintiff's meals, and he states that the CCJ kitchen staff prepared plaintiff's food "in accordance with the records and notifications [they] had on file for him." *Dkt. No. 77–11 at 4.* Defendant Bedard also explained that, "[t]o the extent the Plaintiff grieved of being served pork he would either be provided a replacement meal, or as was most often the case, be instructed that the food being served was not pork at all, but rather a different type of food such as turkey." *Id.*

**\*11** With respect to plaintiff's allegations that defendant Clancy conspired with defendant Bedard to maliciously mislabel plaintiff's food, again, aside from plaintiff's own contentions in his amended complaint, there is no evidence in the record to support this claim. While plaintiff contends that "a meeting of the minds was established when [defendant Clancy] admitted to speaking to the Kitchen staff" on October 18, 2012, regarding plaintiff having received a meal containing pork in it the day prior, there is no evidence regarding the identity of the person with whom she spoke. *Dkt. No. 17 at 28.* Any contention by plaintiff that defendant Clancy spoke to defendant Bedard or that the two agreed to violate plaintiff's rights at that time is pure conjecture. In any event, plaintiff alleges

that defendant Clancy explained to him that he received the meal from the day prior by mistake due to a new CCJ staff employee's error. *Id.* at 19. Contrary to plaintiff's allegations of a large-scale conspiracy to violate plaintiff's rights, defendant Clancy immediately provided him with a new meal. *Dkt. No. 775 at 26.*

There is also no evidence that defendants Bedard and Web conspired. While plaintiff speculates in his amended complaint that "[a] meeting of the minds was established by Web and Bedard" regarding a meal plaintiff was provided on November 5, 2012, there is no other evidence to suggest that those two individuals ever spoke. *Dkt. No. 17 at 29.* According to plaintiff's own allegations, in response to his complaint that his meal on that date contained pork, defendant Web contacted the CCJ kitchen and then informed plaintiff the meat product was turkey, not pork. *Id.* at 21–22. There is no record of the identity of the person with whom defendant Web spoke, rendering plaintiff's allegation that it was defendant Bedard (and the allegation that the two agreed to violate plaintiff's rights) mere speculation.

For all of the reasons discussed above, I find no evidence from which a reasonable factfinder could conclude that defendants Laurin, Kinter, Bedard, Web, and Clancy conspired to violate plaintiff's constitutional rights.

In addition, plaintiff's conspiracy claim appears to be precluded by the intra-agency, or intra-corporate, conspiracy doctrine, which provides "the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable

Case 9:21-cv-00715-DNH-TWD   Document 36   Filed 11/23/22   Page 119 of 140

**Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)**

2016 WL 1638242

of conspiring together." [16] *Little v. City of N.Y.,* 487 F.Supp.2d 426, 441–42 (S.D.N.Y. 2007).* Because defendants Laurin, Kinter, Bedard, Clancy, and Web are all employees of the County of Clinton, and plaintiff's own allegations suggest that each of them was acting within the scope of his or her employment at the relevant times, plaintiff's conspiracy claims are precluded by virtue of the intra-corporate conspiracy doctrine.

Although plaintiff's amended complaint mentions, in passing, ⚑42 U.S.C. § 1985, there is no record evidence to support a conspiracy claim against the defendants under ⚑section 1985(3). To sustain a cause of action for conspiracy to violate civil rights under that provision, a plaintiff must demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunity secured by law. ⚑*United Bhd. of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 835 (1983);* ⚑*Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994).* "To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." ⚑*Gagliardi,* 18 F.3d at 193.* A plaintiff asserting a claim under ⚑section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can be demonstrated through circumstantial evidence that "shows the parties have a tacit understanding to carry out the prohibited conduct." ⚑*LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir. 1995)* (quotation marks omitted).

**\*12** In this case, there is no record evidence, including any allegations in plaintiff's amended complaint, regarding race-based animus or that plaintiff's membership in a suspect class provided motivation for the defendants' conduct. Indeed, the plaintiff's theory appears to be that it was his filing of grievances, and not his race, that motivated the defendants to take adverse action against him. Accordingly, I recommend plaintiff's ⚑section 1985(3) cause of action be dismissed on the merits.

### 3. *Free Exercise (Regarding Plaintiff's Ramadan and Congregational Prayer Allegations) and Retaliation*

Citing plaintiff's alleged failure to exhaust the available administrative remedies prior to filing this lawsuit, defendants seek dismissal of plaintiff's (1) free exercise claims to the extent they are based on allegations that plaintiff was deprived of the opportunity to participate in (a) Ramadan during July and August 2012, and (b) congregational Jummah services; and (2) retaliation claims.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under ⚑section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." ⚑42 U.S.C. §

Case 9:21-cv-00715-DNH-TWD   Document 36   Filed 11/23/22   Page 120 of 140

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

1997e(a); *see also* 🔖 *Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); 🔖 *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under 🔖 Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." 🔖 *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV– 0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also* 🔖 *Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." 🔖 *Woodford,* 548 U.S. at 95; *accord,* 🔖 *Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir. 2007). [17]

As an inmate at the CCJ, plaintiff had available to him a grievance process for use in complaining of prison conditions. *Dkt. No. 77–14 at 3.* In accordance with the prescribed grievance procedure, an inmate complaining of prison conditions must first request a grievance form from one of the corrections officers on duty. *Id.* At that point the corrections officer

must make an attempt to resolve the grievance informally. *Id.* If those efforts are unsuccessful, a formal grievance must be filed, and the matter is then investigated by defendant Laurin, as the inmate grievance coordinator, who, following his investigation, makes a decision concerning the matter. *Id.* In the event the inmate is dissatisfied with defendant Laurin's decision, he may appeal it to the Citizens Policy and Complaint Review Council ("CPCRC"). *Id.* If a plaintiff fails to follow each of the required steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See* 🔖 *Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

**\*13** The record reflects that plaintiff availed himself of the grievance process on several occasions during the course of his incarceration at the CCJ. [18] *Dkt. No. 17 at 78–161; Dkt. No. 77–5 at 2–47; Dkt. No. 93–4 at 76170.* None of those grievances, however, appear to relate to the alleged failure of prison officials to permit him to observe Ramadan, to engage in congregate prayer, or retaliation by any defendants. *Id.* In his response to the county defendants' motion, plaintiff argues that, with "respect to Ramadhan and Congregational Prayer, not only did Plaintiff grieve these deprivaties [sic], but for exhaustion purposes, he went to the extent of appealing to the direct attention of CPCRC – just as he did all of his other claims." *Dkt. No. 93–2 at 40.* The grievances to which plaintiff cites in support of this contention, however, do not relate to

being deprived access to religious services, the right to participate in Ramadan, or retaliation. *Dkt. No. 93–4 at 167–171.* Thus, it appears that plaintiff has failed to exhaust the available administrative remedies with respect to these causes of action.

Plaintiff's failure to exhaust, however, does not warrant dismissal of the amended complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g.,* 🚩 *Hemphill v. N.Y.,* 380 F.3d 680, 686 (2d Cir. 2004); *see also* 🚩 *Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. 🚩 *Macias,* 495 F.3d at 41; 🚩 *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

Plaintiff contends that he should be excused from the exhaustion requirement because, on the morning that Ramadan began in July 2012, the "Shift Officer" threatened plaintiff with physical violence. *Dkt. No. 93–2 at 40.* There is no evidence in the record, aside from plaintiff's allegations, however, that this threat actually occurred or that the assault of another Muslim inmate from the previous day, to which the Shift Officer referred in threatening plaintiff, actually occurred. In any event, according to plaintiff's own amended complaint, on a different occasion, when he was allegedly threatened by defendant Clancy on or about October 18, 2012 about filing a grievance concerning a meal, he, in fact, complained to defendant Laurin "about Clansy's [sic] threat." *Dkt. No. 17 at 19.* This demonstrates that plaintiff had a history of ignoring threats by some corrections officers and suggests he did not find the threats of CCJ security staff necessarily compelling. Most persuasive to me in recommending that the court find that there are no circumstances that exist to excuse plaintiff's failure to exhaust, however, is that courts in this circuit have concluded that the type of vague threat, allegedly directed toward plaintiff by an unidentified individual, cannot serve as a basis for finding an inmate excused from the PLRA exhaustion requirement. *See* *Singh v. Lynch,* 460 Fed.Appx. 45, 47–48 (2d Cir. 2012) ("The test for determining the availability of grievance procedures to a prisoner is objective.... Singh's subjective fear of retaliatory physical harm derives from two facts: the unreported June 6, 2005 assault and other inmates' warnings that Lynch was out to get him. The former fact cannot, by itself, support an objective finding that grievance procedures were unavailable.... As

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

for the alleged inmate warnings, in the absence of any particulars indicating that Lynch was looking to do more than harass Singh ..., this fact cannot support a finding that grievance procedures for an assault claim were effectively unavailable."); *Harrison v. Stallone,* No. 06–CV–0902, 2007 WL 2789473, at *6 (N.D.N.Y. Sept. 24, 2007) (Kahn, J., *adopting report and recommendation by* DiBianco, M.J.) (concluding that the plaintiff was not excused from exhausting available administrative remedies even where the plaintiff alleged in his complaint that he did not file a grievance because he was " 'afraid of retaliation' " and he stated in opposition to the defendants' motion for summary judgment that "he had a 'legitimate fear' of retaliation because his substantive claim is one for retaliation"). To hold otherwise would permit an exception that would be easily and often incanted by inmates, and would potentially eviscerate the PLRA's exhaustion rule. *Harrison,* 2007 WL 2789473, at *6.

### 4. *Personal Involvement*

 **\*14** Defendants seek dismissal of the claims asserted against defendants Bedard, Blaise, Clancy, Perry, Web, and Wingler, arguing that there is no evidence in the record from which a reasonable factfinder could conclude that any of those individuals were personally involved in the alleged unconstitutional conduct.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [ section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950

F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal,* 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.,* No. 91–CV–8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

In the event the recommendations above are adopted, the remaining claims for consideration against the county defendants in this regard are plaintiff's deliberate medical indifference claim and his free exercise claim regarding his dietary restrictions. At the outset of my analysis, it is worth noting that the thrust of defendants' arguments with respect to whether the defendants considered below were personally involved is aimed at whether they are in fact *responsible* for the conduct alleged by plaintiff. *See, e.g., Dkt. No. 77–19 at 24* ("Although these Defendants had interactions with the Plaintiff, they did not have any authority to alter Plaintiff's medical/dietary restrictions. They simply attempted to ensure that Plaintiff was provided a proper meal and provided him with a replacement meal if need be."). Because a personal involvement

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

inquiry on summary judgment examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct, I have limited my analysis to that particular question in this part of the report.

### a. *Defendant Bedard*

Plaintiff contends that defendant Bedard violated his rights by (1) enforcing the decision by defendants Schroyer and Kinter to remove him from his heart-healthy diet in October 2012, and (2) serving him meals that contained pork. Defendant Bedard's own affidavit discloses that he was personally involved by admitting that he discussed the status of plaintiff's meal restrictions with some of the other named defendants. *Dkt. No. 77–11 at 4.* In addition, defendant Bedard stated that, "[w]hen asked, [he] would discuss the components or ingredients of meals with the [corrections officers], and how this related to any restrictions the kitchen had on file for various inmates, in attempts to resolve any issues regarding an inmate being served a non-compliant meal." *Id.* In light of these statements, and considered in conjunction with plaintiff's allegations that CCJ corrections officers phoned the CCJ kitchen following his complaints about his food containing pork (and some of the grievances reflecting the same), I find that reasonable factfinder could conclude that defendant Bedard was personally involved in the alleged conduct giving rise to plaintiff's deliberate medical indifference cause of action and free exercise claim regarding his religious dietary restrictions.

### b. *Defendant Blaise*

 **\*15**  There is no record evidence that defendant Blaise was involved in either plaintiff's medical indifference or free exercise claim. Indeed, there are no allegations in the amended complaint, nor has plaintiff subsequently alleged, that defendant Blaise was involved in providing or denying him meals at any time. [19] Plaintiff has acknowledged this in his response to the county defendants' motion. *See Dkt. No. 93–2 at 54* ("For the purpose of clarity, nowhere within the Amended Complaint is it alleged that Blaise deprived Plaintiff of meals or any of his various diets."). Accordingly, I recommend that plaintiff's medical indifference claim and free exercise claim regarding his religious diet be dismissed.

### c. *Defendant Clancy*

Turning first to plaintiff's deliberate medical indifference cause of action, there is no record evidence from which a reasonable factfinder could conclude that defendant Clancy was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Clancy.

Plaintiff alleges, however, and there is evidence in the record confirming that defendant Clancy responded to at least one of plaintiff's complaints regarding whether his meal contained pork. *Dkt. No. 17 at 1819; Dkt. No. 93–4 at 116–17.* As a CCJ Corrections Sergeant, defendant Clancy is considered a

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

supervisory official, and, in that capacity, she may be found personally liable for a constitutional violation in the event she learned of a constitutional violation through a report or appeal and failed to remedy the wrong. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 554 (2009); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright,* 21 F.3d at 501. Because there is evidence in the record that reflects defendant Clancy learned that plaintiff received a meal that did not comport with his religious dietary restrictions, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Clancy on the basis of personal involvement.

### d. *Defendant Perry*

Turning first to plaintiff's deliberate medical indifference cause of action against this defendant, there is no record evidence from which a reasonable factfinder could conclude that defendant Perry was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Perry.

As to plaintiff's free exercise claim, plaintiff contends that, on December 25, 2012, defendant Perry responded to his complaint that his meal consisted of "pork rib-eye." *Dkt. No. 17 at 22–23.* Plaintiff requested a grievance form from defendant Perry, and the copy of the completed form that is in the record confirms that defendant Perry responded to plaintiff's request for a new meal. *Dkt. No. 93–4 at 164.* Thus, the record establishes that defendant Perry was involved in the alleged violation of plaintiff's free exercise rights on at least one occasion. For this reason, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Perry on the basis of personal involvement.

### e. *Defendant Web*

**\*16** Like defendants Blaise, Clancy, and Perry, there is no record evidence from which a reasonable factfinder could conclude that defendant Web was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Web.

Turning to plaintiff's free exercise claim, the amended complaint alleges that, on November 5, 2012, plaintiff complained to defendant Web that his meal contained pepperoni. *Dkt. No. 17 at 21.* In response, defendant Web allegedly told plaintiff that the meat was turkey ham, not pork, and thereafter called the CCJ kitchen to confirm that the meat was not pork. *Id.* at 21–22. Although plaintiff alleges that he field a grievance regarding this incident, there is no copy of the grievance in the record before the court. *Id.* at 22; *Dkt. No. 93–4 at 76–171.* In his affidavit submitted in support of the county defendants' motion, defendant Web admits to "recall[ing] an occurrence of which the Plaintiff was complaining that he was served pork in contradiction to his religious diet. However the food he claimed was pork was actually turkey."

*Dkt. No. 77–16 at 2.* In light of this additional record evidence supporting plaintiff's version of the events on November 5, 2012 as alleged in his amended complaint, I find there is a dispute of material fact as to whether defendant Web was personally involved in depriving plaintiff of a meal consistent with his religious diet on that date.

### f. *Defendant Wingler*

Plaintiff's claims against defendant Wingler stem from allegations that, on two occasions, defendant Wingler ignored plaintiff's complaints that his meals contained tomatoes in violation of his medical dietary restrictions. *Dkt. No. 17 at 7; Dkt. No. 93– 2 at 58.* The record evidence includes two grievances, one dated October 3, 2012 and the second October 28, 2012, that confirm, at least, that (1) plaintiff complained of being served tomato products on those dates and (2) defendant Wingler addressed those complaints. *Dkt. No. 93–4 at 92,* 139. Therefore, I find there is sufficient evidence from which a reasonable factfinder could conclude that defendant Wingler was personally involved plaintiff's allegations that he was deprived of medically compliant meals.

With respect to plaintiff's free exercise claim asserted against defendant Wingler, however, there are no allegations in the amended complaint, and plaintiff has failed to subsequently submit any proof, reflecting that defendant Wingler was ever involved in providing or depriving plaintiff of any meals that were not in accordance with his religion. For that reason, I recommend plaintiff's free exercise claim in this regard against defendant Wingler be dismissed.

### 5. *Remaining Claims/Defendants*

### a. *Plaintiff's Deliberate Medical Indifference Claim Asserted Against Defendants Laurin, Kinter, Bedard, and Wingler*

As discussed above in Part III.B. of this report with respect to defendant Schroyer, I find that there is no record evidence from which a reasonable factfinder could conclude that the alleged conduct of defendants Laurin, Kinter, Bedard, and Wingler was sufficiently serious to satisfy the objective element of a deliberate medical indifference cause of action. In particular, there is no record evidence, aside from plaintiff's allegation that he suffered an indiscernible amount of risk for a heart attack and stroke, that removing him from his heart-healthy diet for one month is constitutionally significant. *See, e.g., Cleveland v. Eagleton, No. 14–CV–2444, 2015 WL 8919463, at \*5 (D.S.C. Nov. 12, 2015)* (finding that removing the plaintiff from his cholesterol medicine and his heart-healthy diet does not satisfy the objective element of a medical indifference claim). Because plaintiff cannot establish one of the required elements of the claim, I recommend that his deliberate medical indifference cause of action be dismissed as to defendants Laurin, Kinter, Bedard, and Wingler.

### b. *Plaintiff's Free Exercise Claim (Regarding his Religious Dietary Restrictions)*

*Asserted Against Defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web*

**\*17** While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to "a diet consistent with [their] religious scruples." *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir. 1992); *see also Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). That right, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348–49 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990).

As a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs."[20] *Salahuddin,* 467 F.3d at 274–75. In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin,* 467 at 275. "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were irrational.' " *Ford,* 352 F.3d at 595 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

In this case, there is evidence in the record to support a factfinder's conclusion that plaintiff was initially served a meal that contained pork, which is inconsistent with his religious beliefs, on only ten occasions between March 28, 2012 and December 25, 2012. Specifically, a review of the record evidence, including the allegations in plaintiff's amended complaint, reveal that plaintiff was initially served meals containing pork on (1) June 21, 2012; (2) July 4, 2012; (3) September 24, 2012 at lunch; (4) September 24, 2012 at dinner; (5) October 9, 2012; (6) October 10, 2012; (7) October 17, 2012; (8) October 29, 2012; (9) November 5, 2012; and (10) December 25, 2012. *Dkt. No. 17 at 13,* 18, 20, 21, 22, 66, 67; *Dkt. No. 93–4 at 82–85,* 94–99, 116–17, 164–65. On September 24, 2012, plaintiff learned that the meat in his meals was vegetarian bacon. *Id.* at 83, 85. Similarly on October 10, 2012, plaintiff was told that the meat was turkey ham, not pork. *Id.* at 99. Nevertheless, there

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 127 of 140
Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)
2016 WL 1638242

is evidence suggesting that on October 10, 2012 and December 25, 2012, his meal was replaced. *Id.* at 96, 164. While there is a dispute in the record regarding precisely when the CCJ learned of plaintiff's religious dietary restrictions, it is clear from the record that plaintiff may have been served pork only on ten dates during his one-year incarceration at the CCJ. This is not constitutionally significant and does not give rise to a dispute of fact regarding whether his First Amendment rights were substantially burdened. *See* Norwood v. Strada*, 249 Fed.Appx. 269, 272 (3d Cir. 2007) (finding that the denial of seven consecutive religious meals did not substantially burden the plaintiff's free exercise rights);* Washington v. Afify*, 968 F.Supp.2d 532, 538 (W.D.N.Y. 2013) ("Courts have generally held that incidents that are isolated, or few in number, involving religiously-mandated food, do not give rise to a First Amendment claim." (citing cases));* Evans v. Albany Cnty. Corr. Facility*, No. 05–CV–1400, 2009 WL 1401645, at *8 (N.Y.N.D. May 14, 2009) (Suddaby, J.) (finding the plaintiff's allegations that he was served eighteen "wrong meals" out of an approximate 354 meals was constitutionally de minimis);* Odom v. Dixion*, No. 04–CV–0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (finding the plaintiff's allegation that the defendants failed to provide him with kosher meals on five of the fifteen days he was in keeplock confinement did not give rise to a cognizable constitutional violation). Accordingly, I recommend this claim be dismissed as to defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web.

### c. *Plaintiff's Failure–to–Protect Claim Asserted Against Defendants Blaise and Clancy*

**\*18** The county defendants do not seek dismissal of this claim in their summary judgment papers. For that reason, I recommend that the claim survive this motion but that defendants Blaise and Clancy be permitted an opportunity to file a second motion for summary judgment specific to this remaining claim.

## IV. *SUMMARY AND RECOMMENDATION*

A careful review of the evidence currently before the court demonstrates that no reasonable factfinder could conclude that any of the defendants were deliberately indifferent to plaintiff's medical needs, based upon a decision to remove him from his heart-healthy diet for a period of one month. Addressing plaintiff's religious claims, his assertion that his religious rights were violated when prison officials failed to permit him to celebrate Ramadan and to engage in congregational prayer are precluded based upon his failure to exhaust available administrative remedies before filing this action. Similarly, his retaliation claims are also not properly exhausted. Plaintiff's free exercise claim regarding his religious diet is also subject to dismissal in light of the absence of any evidence from which a reasonable factfinder could conclude that his rights were substantially burdened. Because defendant Schroyer did not seek dismissal of the plaintiff's retaliation claim, I recommend that cause of action survive defendant Schroyer's

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 128 of 140

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

motion but he be permitted to file a second motion for summary judgment addressing it. Similarly, the county defendants did not address plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and, accordingly, I recommend that claim survive but that those individuals be permitted to file a motion for summary judgment regarding that single claim.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant Schroyer's motion for summary judgment (*Dkt. No. 75*) be GRANTED to the extent it seeks dismissal of plaintiff's claims against him, with the exception of plaintiff's retaliation claim and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that the motion for summary judgment submitted by defendants Bedard, Blaise, Clancy, Laurin, Kinter, Perry, Web, and Wingler (*Dkt. No. 77*) be GRANTED to the extent it seeks dismissal of plaintiff's claims asserted against all defendants, with the exception of plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that defendant Schroyer be permitted to file a second motion for summary judgment addressing the retaliation claim not addressed in his first motion, and that defendants Blaise and Clancy be permitted to file a second motion for summary judgment addressing the failure-to-protect claim not addressed in their first motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in Fed. Supp., 2016 WL 1638242

## Footnotes

1    In his amended complaint, plaintiff alleges that he weighed 275 pounds upon his initial entry into the CCJ, and 225 pounds upon his transfer into the custody of the DOCCS. *Dkt. No. 17 at 11.* In a memorandum submitted in opposition to defendants'

Case 9:21-cv-00715-DNH-TWD   Document 36   Filed 11/23/22   Page 129 of 140

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

motions, however, plaintiff claims to have lost "about 175 lbs to 130 lbs" while confined in the CCJ due to the deprivation of meals. *Dkt. No. 93–2 at 62.*

2     A more precise description of the claims asserted against the defendants is included below in Part II. of this report.

3     The order was later reiterated on July 5, 2012. *Dkt. No. 17 at 50; Dkt. No. 75–1* at 40.

4     In his affidavit, defendant Schroyer states that plaintiff was repeatedly counseled by medical staff concerning his non-compliance with his restrictive diets, and was warned, prior to October 16, 2012, that continued non-compliance would result in removal of the dietary restrictions. *Dkt. No. 75–6 at 3.* This assertion is sharply contested by plaintiff, who contends that the restrictions were lifted without warning. *Dkt. No. 83 at 3–4.* Plaintiff notes, moreover, that defendant Schroyer responded as follows to one of his interrogatories:

> *Interrogatory No. 15:*
>
> Did Dr. Schroyer or anyone else within the Medical–Staff notify Plaintiff that purchasing or consuming certain items from commissary would result in the removal (cancellation) of his dietary restriction at anytime [sic] on or before October 16, 2012?
>
> *Answer to Interrogatory No. 15:*
>
> The applicable medical records indicate that a discussion was held between the defendant and plaintiff on October 16, 2012 regarding plaintiff's non-compliance with his low fat/low cholesterol diet. The records further indicate that the proposed plan discussed in response to such noncompliance and plaintiff's assertion that he would, 'not be compliant with any diet' was the removal of such diet.

*Dkt. No. 83–3 at 25.* While this presents a disputed question of fact, as will be discussed below in Part III.B.1. of this report, it is not material to plaintiff's deliberate medical indifference claims against defendant Schroyer.

5     Plaintiff's amended complaint makes reference, in this regard, to Exhibit E. *Dkt. No. 17 at 13.* Relevant portions of the referenced document, however, are illegible. *Id.* at 65. The document is reproduced at *Dkt. No. 83–3 at 2* and *Dkt. No. 93–4 at 68*, and again, half of the document cannot be deciphered.

6     Plaintiff alleges that defendant Kinter authored the response to this sick-call request. *Dkt. No. 17 at 14.* It is not clear, however, that this is accurate because in response to other sick-call requests, defendant Kinter would sign "SK." *See, e.g. id.* at 65. The sick-call response dated July 5, 2012 was signed, "S.F. RN." *Id.* at 67.

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 130 of 140
Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)
2016 WL 1638242

7    The record is unclear as to how long plaintiff was confined in the CCJ after his initial intake on January 14, 2012. Plaintiff's amended complaint does not state whether he received any meals containing pork between that initial intake and his re-arrest in March and, if so, how many.

8    Plaintiff's booking sheet from his rearrest in March 2012 also includes a note that reads, "Cautionary: Muslim Diet." *Dkt. No. 17 at 210.*

9    Defendants characterize plaintiff's accusation as "eccentric" and "evidence of his paranoia." *Dkt. No. 95–3 at 6.* While the court takes no position on these characterizations, it is worth noting that defendants do not dispute plaintiff's contention that the notice was altered. *Id.*

10   Defendants contest whether some of those meals included pork or pork products. *See, e.g., Dkt. No. 77–19 at 9.*

11   Defendants County of Clinton and Alger were dismissed from the action by District Judge Gary L. Sharpe in a decision and order dated August 15, 2015. *Dkt. No. 16.*

For purposes of this report, the following defendants will be collectively referred to as the "county defendants": (1) Suzanne Kinter, (2) Lawrence Bedard, (3) Joshua Wingler, (4) Thomas Perry, (5) Robert Web, (6) Eric Blaise, (7) Margaret Clancy, and (8) Kevin Laurin.

12   Even liberally construed, plaintiff's amended complaint does not assert a First Amendment free exercise cause of action against defendant Schroyer with respect to plaintiff's allegations that he was denied the opportunity to participate in Ramadan and/or congregational services. For that reason, I have not analyzed that claim in the context of defendant Schroyer's motion.

13   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

14   While plaintiff's amended complaint mentions in passing the RLUIPA, it does not expressly state a claim under that provision. *See, e.g., Dkt. No. 17 at 16,* 36–42. Nonetheless, mindful that the court is required to construe a *pro se* litigant's pleadings to raise the strongest arguments suggested, *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013), I have considered plaintiff's amended complaint to assert a cause of action under that provision, as well.

15   To be clear, then, in light of all of the allegations described above, I have construed plaintiff's amended complaint as asserting (1) a deliberate medical indifference claim against defendants Schroyer, Laurin, Kinter, and Bedard based on a conspiracy

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

theory of liability; and (2) free exercise and RLUIPA claims regarding plaintiff's religious dietary restrictions against defendants Bedard, Clancy, and Web based on a conspiracy theory of liability. In addition, although plaintiff contends that defendants Clancy and Blaise conspired to violate his rights with respect to the incident involving another inmate on or about November 17, 2012, *see, e.g, Dkt. No. 17 at 31,* I have construed and analyzed those allegations as giving rise to an Eighth Amendment failure-to-protect cause of action, which I will address more completely below in Part III.C.5.c. of this report.

16    The doctrine is rooted in the Sherman Antitrust Act, ⚑15 U.S.C. § 1, and, although it was developed in the context of business entities, since its inception has been expanded to apply to business corporations and public entities, as well. *Everson v. N.Y. City Transit Auth.,* 216 F.Supp.2d 71, 75–76 (E.D.N.Y. 2002)

17    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. ⚑*Macias,* 495 F.3d at 43 (quoting ⚑*Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir. 2004) (emphasis omitted)).

18    Plaintiff contends that some of his grievances were intentionally lost or destroyed by CCJ staff. *See, e.g., Dkt. No. 17 at 20.*

19    Instead, plaintiff has maintained that defendant Blaise is responsible for housing a mentally ill inmate next door to plaintiff's cell and asking plaintiff to retrieve the inmate's meal tray knowing that plaintiff may be assaulted by the inmate. *Dkt. No. 17 at 31–32; see also Dkt. No. 93–2 at 54–56.* Those allegations will be addressed in Part III.C.5.c. of this report.

20    The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in ⚑*Emp't Div. v. Smith,* 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " ⚑*Ford v. McGinnis,* 352 F.3d 582, 592 (2d Cir. 2003) (quoting ⚑*Emp't Div.,* 494 U.S. at 887); *see also* ⚑*Holland v. Goord,* 758 F.3d 215, 220–21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

**Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)**

2016 WL 1638242

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1103045
Only the Westlaw citation
is currently available.
United States District Court,
N.D. New York.

Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton
Correctional Facility; Dean E. Laclair,
C.O., Clinton Correctional Facility;
Jeffrey R. Ludwig, C.O ., Clinton
Correctional Facility; Michael B. King,
Sgt., Clinton Correctional Facility; D.
Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional
Facility; John Reyell, C.O., Clinton
Correctional Facility; Bob Fitzgerald,
R.N., Clinton Correctional Facility;
John Doe, C.O. (C.O. Gallery Officer
Company Upper F–6); John Doe, C.O.
(Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).
|
March 23, 2011.

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for
the State of New York, Krista A. Rock,
Esq., Assistant Attorney General, of Counsel,
Albany, NY, for Defendants.

**MEMORANDUM–
DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C.
§ 1983, plaintiff, an inmate in the custody of
the New York State Department of Correctional
Services ("DOCS"), claims that defendants
violated his Eighth Amendment rights as a
result of a physical altercation. Defendants
moved for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure (Dkt.
No. 46) and plaintiff opposed the motion. (Dkt.
No. 53). The motions were referred to United
States Magistrate Judge Randolph F. Treece
for a Report and Recommendation pursuant to
28 U.S.C. § 636(b)(1)(B) and Local Rule
72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending
that defendants' motion be granted in part and
denied in part. Specifically, Magistrate Judge
Treece recommended awarding summary
judgment dismissing the following: (1)
plaintiff's claims for monetary relief against
all defendants in their official capacity;
(2) plaintiff's claims of medical indifference
against defendant Fitzgerald; and (3) plaintiff's
allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also
recommended denying defendants' motion for
summary judgment on plaintiff's excessive
force claims against defendants Tompkins,
LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against
defendants Ludwig and King.

Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 134 of 140
Latouche v. Tompkins, Not Reported in F.Supp.2d (2011)
2011 WL 1103045

Defendants filed specific objections to portions of the Report and Recommendation arguing: (1) that the Magistrate Judge erred in "overlooking" plaintiff's failure to comply with Local Rule 7.1(a) (3); (2) that the Magistrate Judge erred when he failed to apply the *Jeffreys* exception as plaintiff's testimony was incredible as a matter of law; and (3) plaintiff's excessive force claims against defendant Reyell are subject to dismissal for lack of personal involvement. (Dkt. No. 61). Plaintiff does not object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C. § 636(b) (1)(c), this Court conducts a *de novo* review of these issues. The Court reviews the remaining portions of the Report–Recommendation for clear error or manifest injustice. *See Brown v. Peters,* 1997 WL 599355, *2–3 (N.D.N.Y.), *af'd without op.,* 175 F.3d 1007 (2d Cir.1999); *see also Batista v. Walker,* 1995 WL 453299, at *1 (S.D.N.Y.1995) (when a party makes no objection to a portion of the report-recommendation, the Court reviews that portion for clear error or manifest injustice). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

### DISCUSSION

#### I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [1]

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

Latouche v. Tompkins, Not Reported in F.Supp.2d (2011)
Case 9:21-cv-00715-DNH-TWD   Document 36   Filed 11/23/22   Page 135 of 140
2011 WL 1103045

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule

7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties. [2]

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception

to this general rule was created by the Second
Circuit in *Jeffreys:*

> While it is undoubtedly the duty of
> district courts not to weigh the credibility
> of the parties at the summary judgment
> stage, in the rare circumstance where the
> plaintiff relies almost exclusively on his own
> testimony, much of which is contradictory
> and incomplete, it will be impossible for
> a district court to determine whether "the
> jury could reasonably find for the plaintiff,"
> and thus whether there are any "genuine"
> issues of material fact, without making
> some assessment of the plaintiff's account.
> Under these circumstances, the moving party
> still must meet the difficult burden of
> demonstrating that there is no evidence in the
> record upon which a reasonable factfinder
> could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations
omitted).

Here, while plaintiff relies exclusively on
his own testimony, for *Jeffreys* to apply, the
testimony must also be "contradictory and
incomplete". In this regard, defendants argue
that plaintiff's allegations are contradicted by
his prior accounts of the incident. Defendants
cite to the record and argue that plaintiff told
Fitzgerald that, "I hit the officer first" and that
"I was hurt when I was subdued". Moreover,
defendants point out that these statements
were documented in an Inmate Injury Report
executed by plaintiff.

Plaintiff does not deny making the
aforementioned statements. However, in
his deposition, plaintiff explained those
discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any
questions while he was examining you?

A. I think he asked me how am I feeling, how
did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic]
whatever officer D. Mason told me to tell
him.

Q. What did you say?

A. I told him I was nervous and whatever
officer D. Mason told me to tell him,
which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you
hit the officer first and you were hurt when
you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891105, at *5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the

defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" .[3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to

Latouche v. Tompkins, Not Reported in F.Supp.2d (2011)
Case 9:21-cv-00715-DNH-TWD    Document 36    Filed 11/23/22    Page 138 of 140
2011 WL 1103045

cover up the incident by removing the shirt he was wearing.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and

> with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

> Q. What about Defendant Reyell, why are you suing Reyell?

> A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

> Q. How so?

> A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

> * * *

> Q. Reyell and another officer took your shirt off?

> A. Yes, ma'am.

> Q. Do you remember the other officer's name?

> A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any

discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

> **\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2011 WL 1103045

## **Footnotes**

1    Local Rule 7.1(a)(3) provides:

> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
>
> The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

2    While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

3    Officer Rock is not a defendant herein.

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.